# EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

PLATINUM-MONTAUR LIFE SCIENCES LLC,

        Plaintiff,

    v.

NAVIDEA BIOPHARMACEUTICALS, INC.,

        Defendant.

---

Index No.: _____

**VERIFIED COMPLAINT**

    Plaintiff Platinum-Montaur Life Sciences LLC ("Platinum-Montaur"), by its attorneys

Holland & Knight LLP, files its Verified Complaint against Defendant Navidea

Biopharmaceuticals, Inc. ("Navidea"), alleging, upon information and belief, as follows:

<u>**PARTIES, JURISDICTION, AND VENUE**</u>

    1.    Platinum-Montaur is a limited liability company formed and existing under the

laws of the State of Delaware.

    2.    At all relevant times, Platinum Partners Value Arbitrage Fund, L.P. ("PPVA") is

and was the holder of 99% of the membership interests in Platinum-Montaur.  By orders dated

October 27, 2016 and December 16, 2016, the Financial Services Division of the Grand Court of

the Cayman Islands ("Cayman Court") directed the winding up of PPVA, and appointed

Matthew Wright and Christopher Barnett Kennedy of RHSW (Cayman) Ltd. as PPVA's joint

official liquidators.  By order dated September 29, 2017, the Cayman Court replaced Matthew

Wright with Martin Trott as a joint official liquidator of PPVA along with Christopher Barnett

Kennedy.

    3.    Platinum-Montaur is currently operated by PPVA's joint official liquidators,

pursuant to Platinum-Montaur's Operating Agreement, dated as of May 10, 2007, and pursuant

to the written consents of the members of Platinum-Montaur to reconstitute and continue

Platinum-Montaur in operation (true and correct copies of which are annexed as <u>Exhibit 1</u>).

      4.     Upon information and belief, Navidea is a corporation formed and existing under

the laws of the State of Delaware, with a principal place of business in the State of Ohio.

      5.     This Court has personal jurisdiction over Navidea pursuant to a contractual choice

of law and forum clause contained in Section 8.6 of a Loan Agreement, dated July 25, 2012 (the

"Loan Agreement"), signed by Navidea, as borrower, and Platinum-Montaur, as lender, and

discussed in detail below.  Pursuant to this contractual provision, Navidea agreed that any

disputes (such as the instant dispute) arising out of or relating to the Loan Agreement would be

heard before the state or federal courts of New York, and irrevocably submitted to the

jurisdiction of this Court for this proceeding.

      6.     Venue in this Court is proper pursuant to the written agreement of the parties in

Section 8.6 of the Loan Agreement, and pursuant to CPLR §§ 501 and 503(a).

<u>**GENERAL ALLEGATIONS**</u>

      7.     This is an action for breach of contract arising from Navidea's failure to pay

amounts due and owing to Platinum-Montaur pursuant to the Loan Agreement, and pursuant to a

promissory note issued pursuant to the Loan Agreement.  Specifically, Navidea has failed to pay

the amount due and owing to Platinum-Montaur—currently in excess of $2 million—plus

additional interest at the Default Rate (as defined in the Loan Agreement), compounded monthly,

as agreed in the Loan Agreement, and plus Platinum-Montaur's costs of collection on Navidea's

debt, including, but not limited to, reasonable attorneys' fees, as agreed in the Loan

Agreement—pursuant to a Third Amended and Restated Promissory Note, dated May 15, 2015,

issued pursuant to the parties' Loan Agreement.

2

#54200507_v1

FILED: NEW YORK COUNTY CLERK 11/02/2017 06:57 PM
NYSCEF DOC. NO.     Case 1:17-cv-09591-VEC   Document 1-1   Filed 12/06/17   Page 4 of 135   INDEX NO. 656710/2017

RECEIVED NYSCEF: 11/02/2017

## A.      The Loan Agreement

8.      On July 25, 2012, Navidea and Platinum-Montaur entered into the Loan Agreement, pursuant to which Platinum-Montaur agreed to extend loans to Navidea on certain terms and conditions as stated therein.

9.      Navidea, in its United States Securities and Exchange Commission ("SEC") filings and elsewhere, has acknowledged, and has not disputed, the existence and terms of the Loan Agreement.  A true and correct copy of the Loan Agreement—as formally disclosed in Navidea's July 31, 2012 Form 8-K filed with the SEC—is annexed hereto as Exhibit 2.

10.      Pursuant to the Loan Agreement, Platinum-Montaur made available to Navidea a non-revolving draw credit facility.  Ex. 2, Section 2.1.  Navidea could take draws against the Loan Agreement's credit facility, up to certain stated aggregate principal credit limits and subject to interest accrual, compounded monthly, and other terms as stated in the Loan Agreement.  *Id.* Sections 2.2, 2.3.  Pursuant to the Loan Agreement, all such credit facility draws by Navidea were to be evidenced by Navidea's issuance of promissory notes to Platinum-Montaur in an agreed form.  *Id.* Section 2.2.

11.      In the Loan Agreement, Navidea "unconditionally promise[d] to pay when due the principal amount of each Draw, all unpaid interest accrued thereon and all other Obligations incurred by it, in accordance with the terms of [the Loan Agreement] and the other Loan Documents."  *Id.* Section 2.1(b).

12.      Further, pursuant to the Loan Agreement, Navidea agreed to be responsible for all "reasonable and documented costs" incurred by Platinum-Montaur in connection with enforcement of Platinum-Montaur's rights under the Loan Agreement, including, but not limited

3

to, "reasonable and documented fees" of Platinum-Montaur's counsel in connection with such enforcement efforts. *Id.* Section 8.2.

### B.     The Navidea Note

13.     Pursuant to the Loan Agreement, a promissory note was issued by Navidea to Platinum-Montaur on July 25, 2012.  That promissory note was amended several times, culminating in the Third Amended and Restated Promissory Note, dated May 15, 2015 (the "Navidea Note").

14.     Navidea, in its SEC filings and elsewhere, has acknowledged, and has not disputed, the existence and terms of the Navidea Note.  A true and correct copy of the Navidea Note—as formally disclosed in Navidea's SEC filings—is annexed hereto as <u>Exhibit 3</u>.

15.     Under the Navidea Note, Navidea agreed to pay to Platinum-Montaur the lesser of $35,000,000 or the collective amount of all Draws (including accrued interest and all other charges thereon) advanced to Navidea by Platinum-Montaur under the Loan Agreement.  *See* Ex. 3, at p. 1.

16.     The Navidea Note provided that it could freely be assigned by Platinum-Montaur and its successors or assigns "in whole or in part."  *See id.*, at p. 3.

17.     As stated by Navidea in its SEC filings, the outstanding balance on the Navidea Note as of December 31, 2015 was approximately $8.5 million.  *See* Navidea's 2015 Form 10-K, filed with the SEC, at pp. 43-44, relevant excerpts of which are annexed hereto as <u>Exhibit 4</u>.

18.     As stated by Navidea in its SEC filings, the outstanding balance on the Navidea Note as of December 31, 2016 was approximately $9.5 million.  *See* Navidea's 2016 Form 10-K filed with the SEC, at p. 76, relevant excerpts of which are annexed hereto as <u>Exhibit 5</u>.

4

#54200507_v1

## C.    Partial Assignment of the Navidea Note to PPCO

19.    By way of an Assignment Agreement, dated as of March 22, 2016 (the "Assignment Agreement"), Platinum-Montaur purported to assign certain assets of Platinum-Montaur to its affiliate Platinum Partners Credit Opportunities Master Fund, LP ("PPCO").  A true and correct copy of the Assignment Agreement is annexed hereto as <u>Exhibit 6</u>.

20.    Notably, in the Assignment Agreement, Platinum-Montaur purported to assign to PPCO only $7,022,715.21 of the amounts then due and owing to Platinum-Montaur under the Navidea Note, Ex. 6, Ex. A, which was in excess of $8.5 million at the time of the purported assignment.

21.    Accordingly, the Assignment Agreement constituted, at most, only a partial assignment by Platinum-Montaur of its payment rights under the Navidea Note.  After this purported partial assignment, Platinum-Montaur retained, at a minimum, the right to receive payment for that portion of the Navidea Note that had not been purportedly assigned to PPCO under the Assignment Agreement.

## D.    Lymphoseek Sale, Demands For Payment, and Payment to PPCO

22.     By way of a Definitive Proxy Statement filed by Navidea with the SEC and dated February 8, 2017, Navidea disclosed that it had entered into an Asset Purchase Agreement pursuant to which Navidea's North American "Lymphoseek" business was to be sold to Cardinal Health 414, LLC, for approximately $80 million in cash at closing, plus future periodic "earnout" payments of up to $230 million.  A true and correct copy of relevant portions of Navidea's February 8, 2017 Proxy Statement is annexed hereto as <u>Exhibit 7</u>.

5

FILED: NEW YORK COUNTY CLERK 11/02/2017 06:57 PM
NYSCEF DOC. NO. Case 1:17-cv-09591-VEC Document 1-1 Filed 12/06/17 Page 7 of 135

INDEX NO. 656710/2017

RECEIVED NYSCEF: 11/02/2017

23.     On information and belief, Navidea's sale of its North American Lymphoseek business was approved by Navidea's shareholders, and the transaction closed on or about March 3, 2017.  *See* Ex. 5, at p. 80.

24.     Navidea acknowledged in its SEC filings that the Lymphoseek transaction triggered Navidea's obligation to pay off, in full, Navidea's outstanding debt owing under the Loan Agreement and the Navidea Note.  *See, e.g.*, Ex. 7, at p. 12 (Navidea acknowledging that, under the terms of both the Loan Agreement and of the Lymphoseek Asset Purchase Agreement, it was obligated to use the proceeds of the Lymphoseek sale to immediately pay off, in full, the Navidea Note, with the approximately $9.6 million outstanding at that time).

25.     In February 2017, in anticipation of the Lymphoseek transaction, PPCO formally demanded payment by Navidea of PPCO's portion of the Navidea Note.  A true and correct copy of PPCO's February 28, 2017 demand letter to Navidea is annexed hereto as Exhibit 8.

26.     PPCO's February 28, 2017 demand letter to Navidea makes clear that Platinum-Montaur retained, at a minimum, the right to receive payment for the portion of the Navidea Note that had not been purportedly assigned to PPCO under the Assignment Agreement:

> The remaining portion of the Platinum Debt, consisting of $1,742,684.20 of principal and accrued interest as of March 22, 2016 plus all related accrued and outstanding interest, continues to be held by Platinum Montaur, which will provide you with separate instructions as to the payment of its portion of the Platinum Debt.

Ex. 8, at p. 2.

27.     Also in February 2017, in anticipation of the Lymphoseek transaction, Platinum-Montaur formally demanded payment by Navidea of Platinum-Montaur's portion of the Navidea Note (estimated at approximately $1,913,963.48, inclusive of accrued interest, as of March 1, 2017, plus standard (non-default) interest at the rate of at least $431.87 per day thereafter).  A

6

true and correct copy of Platinum-Montaur's February 27, 2017 demand letter to Navidea is

annexed hereto as <u>Exhibit 9</u>.

    28.    By letter dated March 2, 2017, PPCO provided a payoff letter to Navidea

purporting to satisfy and release only the indebtedness owed by Navidea to PPCO.  A true and

correct copy of PPCO's March 2, 2017 payoff letter to Navidea is annexed hereto as <u>Exhibit 10</u>.

    29.    On or about the date of the closing of the Lymphoseek transaction, Navidea paid

off PPCO's portion of the Navidea Note by paying "PPCO an aggregate of approximately $7.7

million in partial satisfaction of [Navidea's] liabilities, obligations and indebtedness under the

[Loan Agreement]."  Ex. 5, at p. 72.

### E.    Default

    30.    Navidea, however, did not pay Platinum-Montaur's portion of the Navidea Note

at or around the time of closing of the Lymphoseek transaction.  This is so despite Navidea's

admissions, in its SEC filings: (a) that Navidea was obligated to pay off the Navidea Note, in its

entirety, at the time of the closing of the Lymphoseek transaction on March 3, 2017; (b) that,

notwithstanding Navidea's payment of PPCO's portion of the Navidea Note, Navidea continues

to owe approximately $2 million on the Navidea Note; and (c) that Platinum-Montaur has timely

demanded payment for Platinum-Montaur's portion of the Navidea Note, representing the

balance admittedly owing by Navidea thereon.

    31.    By way of example, Navidea's most recent quarterly SEC filing states, in relevant

part, as follows:

> In connection with the closing of the Asset Sale to Cardinal Health 414, the
> Company repaid to PPCO an aggregate of approximately $7.7 million in partial
> satisfaction of the Company's liabilities, obligations and indebtedness under the
> Platinum Loan Agreement, which, to the extent of such payment, were transferred
> by Platinum-Montaur to PPCO.  The Company was informed by PPVA that it was
> the owner of the balance of the Platinum Note.  **Such balance of approximately**

7

> **$1.9 million was due upon closing of the Asset Sale but withheld by the Company . . . . As of June 30, 2017, the remaining outstanding principal balance of the Platinum Note was approximately $2.0 million**.

Navidea's June 30, 2017 Form 10-Q filed with the SEC, at p. 16 (emphasis added), relevant excerpts of which are annexed hereto as <u>Exhibit 11.</u>

32.     By way of a letter from Platinum-Montaur's counsel to Navidea's counsel dated March 10, 2017, Platinum-Montaur formally advised Navidea that its refusal to pay the Platinum-Montaur portion of the Navidea Note when admittedly due and owing constituted a breach of the Loan Agreement and an Event of Default thereunder.  A true and correct copy of this letter is annexed hereto as <u>Exhibit 12</u>.

33.     To date, Navidea has failed to pay Platinum-Montaur the amounts owing under the Platinum-Montaur portion of the Navidea Note.

34.     The only purported justification **ever** provided by Navidea in an attempt to justify its non-payment of the money it owes to Platinum-Montaur is an alleged "competing claim" to such money by Navidea's own President, CEO, and Board member, Michael Goldberg.

35.     Navidea claims that Mr. Goldberg has informed Navidea that another entity—not Platinum-Montaur, and not Platinum-Montaur's operating owner PPVA—purported to transfer Platinum-Montaur's entitlement to payment under the Navidea Note to Mr. Goldberg.

36.     However, neither the Loan Agreement nor any part of the Navidea Note was ever transferred or assigned, directly or indirectly, by Platinum-Montaur to Mr. Goldberg.

37.     Indeed, Navidea—through its counsel—has admitted that it has seen no documents indicating that the Loan Agreement or any part of the Navidea Note was ever transferred or assigned, directly or indirectly, by Platinum-Montaur to Mr. Goldberg.

38.     Navidea appears to rely on the undocumented and unjustified "competing claim" of Navidea's own President, CEO, and Board member as sufficient ground to refuse to pay

8

Platinum-Montaur the amount plainly—and admittedly—owing to Platinum-Montaur under the Navidea Note. The competing claim is both specious and not a defense to payment: Navidea is in default, Platinum Montaur is entitled to additional interest at the Default Rate, compounded monthly, and its enforcement costs, including, but not limited to, attorneys' fees.

## COUNT I – BREACH OF CONTRACT

39. Platinum-Montaur repeats and re-alleges the allegations contained in paragraphs 1 through 38 as though fully set forth herein.

40. The Loan Agreement, and the Navidea Note, are valid, binding, and enforceable contracts between Platinum-Montaur and Navidea.

41. Platinum-Montaur fully performed its obligations under the Loan Agreement and the Navidea Note.

42. Navidea has no legal basis to refuse payment of the amount owed to Platinum-Montaur under the Loan Agreement and the Navidea Note.

43. Navidea breached its contractual obligations under the Loan Agreement and the Navidea Note by refusing to pay the amount due and owing to Platinum-Montaur at the time of closing of the Lymphoseek transaction.

44. Navidea's refusal to pay the amount due and owing to Platinum-Montaur at the time of closing of the Lymphoseek transaction constituted an Event of Default under the Loan Agreement as of that time.

45. Navidea's breaches of the Loan Agreement and the Navidea Note, and the Event of Default under the Loan Agreement, are continuing as of the date of commencement of this action as a result of Navidea's continuing refusal to pay the amount due and owing to Platinum-Montaur.

9

#54200507_v1

46.     Platinum-Montaur has been damaged as a proximate result of said breaches.

## COUNT II – UNJUST ENRICHMENT

47.     Platinum-Montaur repeats and re-alleges the allegations contained in paragraphs 1 through 46 as though fully set forth herein.

48.     Navidea has been enriched by its continuing refusal to pay to Platinum-Montaur the amount due and owing to Platinum-Montaur.

49.     Navidea has no legal or equitable basis to refuse payment of the amount owed to Platinum-Montaur.

50.     Platinum-Montaur has been damaged as a proximate result of Navidea's continued non-payment of the amount owed to Platinum-Montaur.

51.     Equity and good conscience militate against permitting Navidea to continue to retain the amount owed to Platinum-Montaur.

**WHEREFORE**, based upon the foregoing, Plaintiff Platinum-Montaur respectfully requests judgment in its favor against Defendant Navidea as follows:

A.      Actual damages of $1,914,827.22, representing the amount owed to Platinum-Montaur under the Loan Agreement and the Navidea Note on March 3, 2017, the date on which the Lymphoseek transaction closed;

B.      As agreed in the Loan Agreement, interest at the agreed Default Rate, compounded monthly, since March 4, 2017;

C.      As agreed in the Loan Agreement, Platinum-Montaur's costs and expenses incidental to Navidea's breaches of the Loan Agreement and the Navidea Note, and Platinum-Montaur's efforts to collect thereupon, including, but not limited to, Platinum-Montaur's reasonable attorneys' fees; and

10

#54200507_v1

D.      Such other, further, and different relief as this Court may deem just, equitable,

and proper.

Dated: November 2, 2017
       New York, New York

                     HOLLAND & KNIGHT LLP


                 By:  */s/ Robert J. Burns*
                     Robert J. Burns
                     Warren E. Gluck
                     Sean P. Barry
                     31 West 52nd Street
                     New York, New York 10019
                     Telephone:  (212) 513-3200
                     Fax:  (212) 385-9010

                     *Attorneys for Plaintiff*
                     *Platinum-Montaur Life Sciences LLC*

#54200507_v1

## **VERIFICATION**

STATE OF NEW YORK  )
           ) ss:
COUNTY OF NEW YORK )

  Robert J. Burns, being duly sworn, deposes and says:

  That he is a partner with the law firm of Holland & Knight, LLP, attorneys for plaintiff Platinum-Montaur Life Sciences LLC; that he has read the foregoing Verified Complaint of Platinum-Montaur Life Sciences LLC and knows the contents thereof; that he knows it to be true except as to matters therein stated to be alleged upon information and belief, and as to those matters he believes it to be true.

  That the reason this verification is made by deponent and not by Platinum-Montaur Life Sciences LLC is that the said plaintiff is a foreign corporation that does not reside in the same county where deponent maintains his office.

  The source of deponent's information and the grounds of his belief are documents and records in deponent's possession, information provided by Platinum-Montaur Life Sciences LLC, and documents and records obtained by deponent.

_____
ROBERT J. BURNS

Sworn to before me this
2nd day of November, 2017


_____
Notary Public

WALLIS BETH KARPF
Notary Public, State Of New York
No. 01KA6047092
Qualified In New York County
Commission Expires August 28, 20 18

12

#54200507_v1

# EXHIBIT 1

## PLATINUM MONTAUR LIFE SCIENCES LLC

### Written Consent of the Members
### to Reconstitute and Continue the
### Limited Liability Company as a Successor Company

WHEREAS, Platinum Montaur Life Sciences LLC (the "Company") is a limited liability company formed and existing under the laws of the State of Delaware and governed by and in accordance with the terms of an Operating Agreement dated as of May 10, 2007 (the "Operating Agreement");

WHEREAS, Platinum Partners Value Arbitrage Fund, L.P. ("PPVA"), Michael Goldberg and Mark Mueller (the "Members") are all of the members of the Company, with PPVA holding a 99.9& membership interest in the Company, and with the remainder split between the other Members;

WHEREAS, on November 2, 2016, the Financial Services Division of the Grand Court of the Cayman Islands (the "Grand Court") issued a Winding Up Order (the "Winding Up Order"), under which the Grand Court ordered the winding up of PPVA and the appointment of Matthew James Wright and Christopher Barnett Kennedy (the "Liquidators") as the joint official liquidators thereof;

WHEREAS, the issuance of the Winding Up Order may have caused the termination of the Company pursuant to Section 10.2(ii) of the Operating Agreement, subject to resolution by an action under Section 10.3 of the Operating Agreement, which permits "the owners of a majority in interest of the remaining Members to elect to reconstitute and continue the Company as a Successor Company;"

WHEREAS, the Liquidators, as the successors and representatives of PPVA, desire to reconstitute and continue the Company, as being in the best interest of the Company and all of the Members, notwithstanding the potential termination of the Company under Section 10.2(ii) of the Operating Agreement; and

WHEREAS, the Liquidators desire to elect Matthew James Wright and Christopher Barnett Kennedy, in their capacities as the Liquidators, as the Operating Managers of the Company, as defined in Section 1.1.F of the Operating Agreement (the "Operating Managers"), in accordance with Section 4.1 of the Operating Agreement, as being in the best interest of the Company and all of the Members;

NOW THEREFORE, the Liquidators, as the owners of a majority in interest of the Company, hereby

ELECT to reconstitute and continue the Company, as provided for in Section 10.3 of the Operating Agreement; and to further

ELECT Matthew James Wright and Christopher Barnett Kennedy, in their capacities as the Liquidators, as the Operating Managers of the Company, to serve as and until set forth in the Operating Agreement.

**THE JOINT OFFICIAL LIQUIDATORS OF PLATINUM PARTNERS VALUE ARBITRAGE FUND, L.P., ( IN OFFICIAL LIQUIDATION)**

Date: Feb 3rd 2017

By: _____
Matthew James Wright

By: _____
Christopher Barnett Kennedy

2

#49345647_v1

**WRITTEN CONSENT**

**OF THE MEMBER HOLDING A MAJORITY IN INTEREST OF**

**PLATINUM MONTAUR LIFE SCIENCES LLC**

Platinum Partners Value Arbitrage Fund L.P., a Cayman Islands exempted limited partnership ("PPVA"), being the Member of Platinum Montaur Life Sciences LLC, a Delaware limited liability company (the "Company"), holding a majority in interest of the Company, acting in accordance with the Operating Agreement of the Company and the Act, hereby consents to, takes and adopts the resolutions and actions set forth below by written consent (this "Consent"), effective as of September 29, 2017 (the "Effective Date"). Capitalized terms used but not defined herein shall have the meanings given to such terms in the Operating Agreement.

**WHEREAS**, the Company was formed pursuant to the Act by filing a Certificate of Formation on May 10, 2007 with the Delaware Secretary of State;

**WHEREAS**, pursuant to a Winding Up Order issued by the Financial Services Division of the Grand Court of the Cayman Islands (the "Grand Court") on October 27, 2016, PPVA is in official liquidation as of such date;

**WHEREAS**, pursuant to an order issued by the Grand Court on December 16, 2016, Matthew James Wright and Christopher Barnett Kennedy of RHSW (Cayman) Ltd. were appointed the joint official liquidators ("Liquidators") of PPVA;

**WHEREAS**, pursuant to an order issued by the Grand Court on September 29, 2017, Matthew James Wright was released from his performance as joint official liquidator of PPVA and Martin Nicholas John Trott of RHSW (Cayman) Ltd. was appointed as joint official liquidator of PPVA in his place;

**WHEREAS**, effective February 3, 2017, PPVA appointed Matthew James Wright and Christopher Barnett Kennedy as the Operating Managers of the Company; and

**WHEREAS**, PPVA desires to (i) revoke its prior appointment of Matthew James Wright and Christopher Barnett Kennedy as the Operating Managers of the Company, (ii) appoint PPVA as the Operating Manager of the Company, and (iii) authorize Martin Nicholas John Trott and Christopher Barnett Kennedy, in their capacities as Liquidators of PPVA, to act on behalf of PPVA, including, without limitation, in its capacity as the Operating Manager of the Company.

**NOW THEREFORE, BE IT RESOLVED**, that PPVA's prior appointment of Matthew James Wright and Christopher Barnett Kennedy as the Operating Managers of the Company is hereby revoked and rescinded;

**AND IT IS FURTHER RESOLVED**, that PPVA is hereby appointed as the Operating Manager of the Company;

**AND IT IS FURTHER RESOLVED**, that Martin Nicholas John Trott and Christopher Barnett Kennedy, in their capacities as Liquidators of PPVA, are hereby authorized, either individually or jointly, to act on behalf of PPVA, including, without limitation, in its capacity as the Operating Manager of the Company.

*[Signature page follows]*

#54127319_v2

IN WITNESS WHEREOF, effective as of the Effective Date, PPVA has executed this Consent.

**Platinum Partners Value Arbitrage Fund L.P.
(IN OFFICIAL LIQUIDATION)**

By: _____

Christopher Kennedy as
Joint Official Liquidator

3

# EXHIBIT 22

EX-10.1 2 v319874_ex10-1.htm EXHIBIT 10.1

Exhibit 10.1

Explanatory Note: This Loan Agreement is included as an exhibit to the Navidea Biopharmaceuticals, Inc., Current Report on Form 8-K filed July 31, 2012, to provide information concerning its terms. Except for its status as the agreement between the parties with respect to the transaction described therein, it is not intended to provide factual information about the parties. The representations and warranties contained in the Loan Agreement were made only for purposes of such agreement, and as of specific dates, were solely for the benefit of the contracting parties, and may be subject to limitations agreed by the contracting parties, including being qualified by confidential disclosures between them. These representations and warranties were also made for the purpose of allocating contractual risk between the contracting parties instead of establishing them as facts, and may be subject to standards of materiality applicable to the contracting parties that differ from those applicable to investors. Accordingly, they should not be relied upon by investors as statements of factual information.

LOAN AGREEMENT

dated as of

July 25, 2012

BETWEEN

Navidea Biopharmaceuticals, Inc.,

As Borrower

and

Platinum-Montaur Life Sciences LLC,

As Lender

TABLE OF CONTENTS

ARTICLE 1 - DEFINITIONS 1

 Section 1.1 Certain Defined Terms 1
 Section 1.2 Other Definitional Provisions and Construction 10

ARTICLE 2 - THE TERM LOAN FACILITY AND TERMS OF REPAYMENT 11

 Section 2.1 The Term Loan Facility 11
 Section 2.2 Draws 11
 Section 2.3 Provisions Applicable to Draws 11
 Section 2.4 Events of Default; Pending Defaults 12
 Section 2.5 Draw Requests 12
 Section 2.6 Draw Credit Maximum Amount 12

ARTICLE 3 – PAYMENTS, PREPAYMENTS 13

 Section 3.1 Prepayment and Prepayment Notice 13
 Section 3.2 Mandatory Prepayment 13
 Section 3.3 Method of Payment 13

ARTICLE 4 - CONDITIONS PRECEDENT 13

 Section 4.1 Conditions Precedent to First Draw 13
 Section 4.2 Conditions Precedent to Subsequent Draws 14

ARTICLE 5 – REPRESENTATIONS AND WARRANTIES 15

 Section 5.1 Organization and Authority 15
 Section 5.2 Authorization 16
 Section 5.3 Taxes 16
 Section 5.4 Compliance with Law 16
 Section 5.5 Financial Statements; Full Disclosure 17
 Section 5.6 Litigation; Adverse Effects 17
 Section 5.7 Labor Matters 17
 Section 5.8 Solvency 18
 Section 5.9 Consent 18
 Section 5.10 No Liens 18
 Section 5.11 Indebtedness 18
 Section 5.12 No Defaults 18
 Section 5.13 Intellectual Property 18

| Section 5.14 | Environmental Compliance | 19 |
| Section 5.15 | Disclosure | 19 |

ARTICLE 6 - COVENANTS

| | | 19 |

| Section 6.1 | Payment of Taxes and Claims | 19 |
| Section 6.2 | Insurance | 19 |
| Section 6.3 | Place of Business; Books and Records | 19 |
| Section 6.4 | Maintenance; Certain Covenants | 20 |
| Section 6.5 | Negative Pledge | 20 |
| Section 6.6 | Indebtedness | 20 |
| Section 6.7 | Financial Information and Reporting | 20 |
| Section 6.8 | Deliverables | 21 |
| Section 6.9 | Fundamental Changes; Asset Transfers | 22 |

| | | |
|---|---|---:|
| SECTION 6.10 | TRANSACTIONS WITH AFFILIATES | 22 |
| SECTION 6.11 | COMPLIANCE WITH LAWS | 23 |
| SECTION 6.12 | GUARANTEES | 23 |
| **ARTICLE 7 – EVENTS OF DEFAULT** | | **23** |
| SECTION 7.1 | EVENTS OF DEFAULT | 23 |
| SECTION 7.2 | DEFAULT REMEDIES | 24 |
| **ARTICLE 8 - GENERAL PROVISIONS** | | **24** |
| SECTION 8.1 | NOTICES | 24 |
| SECTION 8.2 | COSTS AND EXPENSES | 25 |
| SECTION 8.3 | SURVIVAL, SUCCESSORS AND ASSIGNS | 25 |
| SECTION 8.4 | AMENDMENT AND WAIVER | 25 |
| SECTION 8.5 | ACCOUNTING TREATMENT AND FISCAL YEAR | 26 |
| SECTION 8.6 | ENFORCEABILITY AND GOVERNING LAW | 26 |
| SECTION 8.7 | CONFIDENTIALITY | 26 |
| SECTION 8.8 | HEADINGS | 27 |
| SECTION 8.9 | INTERPRETATION | 27 |
| SECTION 8.10 | SEVERABILITY OF PROVISIONS | 27 |
| SECTION 8.11 | COUNTERPARTS; ELECTRONIC EXECUTION | 27 |
| SECTION 8.12 | REVIVAL AND REINSTATEMENT OF OBLIGATIONS | 27 |
| SECTION 8.13 | INTEGRATION | 28 |
| SECTION 8.14 | WAIVER OF RIGHT TO TRIAL BY JURY | 28 |
| SECTION 8.15 | INDEMNITY | 28 |

| Exhibits | |
|---|---|
| Exhibit 2.2 | Form of Note |
| Exhibit 2.5 | Form of Draw Request |
| Exhibit 6.12 | Form of Guaranty |
| Schedules | |
| Schedule 5.1(b) | Guarantors |
| Schedule 5.1(c) | Capitalization |
| Schedule 5.6 | Pending or Threatened Claims |
| Schedule 5.7 | Labor Matters |
| Schedule 5.11 | Permitted Indebtedness |
| Schedule 5.13 | Intellectual Property |

LOAN AGREEMENT

This Loan Agreement (as amended, restated, supplemented or otherwise modified, this "Agreement") is entered into between Platinum-Montaur Life Sciences LLC, a Delaware limited liability company with its principal place of business at 152 West 57th Street, 4th Floor, New York, NY 10019 (together with its successors, "Lender"), and Navidea Biopharmaceuticals, Inc., a Delaware corporation with its principal place of business at 425 Metro Place North, Suite 450, Dublin Ohio 43017 (together with its successors, "Borrower"), as of the ___ day of July, 2012 (the "Effective Date").

ARTICLE 1 - DEFINITIONS

Section 1.1    Certain Defined Terms

The following terms used in this Agreement shall have the following meanings, applicable both to the singular and the plural forms of the terms defined. As used in this Agreement:

"Affiliate" means, as applied to any Person, any other Person who, directly or indirectly, controls, is controlled by, or is under common control with, such Person, or is a family member related by birth or marriage. For purposes of this definition only, "control" means the possession, directly or indirectly, of the power to direct the management and policies of a Person, whether through the ownership of equity interests, by contract, or otherwise; provided, however, that, in any event: (i) any Person who owns directly or indirectly fifty percent (50%) or more of the securities having ordinary voting power for the election of directors or other members of the governing body of a Person or fifty percent (50%) or more of the partnership, member or other ownership interests of a Person (other than as a limited partner of such Person) shall be deemed to control such Person; (ii) each director (or manager) of a Person shall be deemed to be an Affiliate of such Person; and (iii) each partnership or joint venture in which a Person is a partner or joint venturer shall be deemed to be an Affiliate of such Person.

"Agreement" means this Agreement.

"Applicable Rate" means the greatest of (i) the United States prime rate as reported in The Wall Street Journal plus 6.75%, (ii) 10.0% and (iii) the highest rate of interest then payable by the Borrower pursuant to the Hercules Loan Documents plus 12.5 basis points (0.125%); provided, that, if and so long as the Applicable Rate is calculated by reference to the prime rate, the Applicable Rate shall be adjusted immediately to correspond with each change in the prime rate.

"Bankruptcy Code" means Title 11 of the United States Code (11 USC, § 101 et seq), as amended from time to time, and any successor statute thereto, including (unless the context requires otherwise) any rules or regulations promulgated thereunder.

"Borrower" is defined in the preamble of this Agreement.

"Business Day" means any day that is not a Saturday, Sunday, or other day on which national banks are authorized or required to close in New York, New York.

"Capital Lease" means a lease that is required to be capitalized for financial reporting purposes in accordance with GAAP.

"Change of Control" means in respect of any Person (i) the replacement of a majority of the directors or managers who constituted the Board of Directors or the managing body on the Effective Date for any reason other than death or disability, and such replacement shall not have been approved by the Board of Directors or managing body as constituted on the Effective Date; or (ii) a Person or Persons acting in concert, as a result of a tender or exchange offer, privately negotiated purchase or purchases, exercise of the stock pledge, death of a shareholder or otherwise, shall have become the "beneficial owner" (within the meaning of Rule 13d-3 and 13d-5 under the Securities Exchange Act of 1934, as amended from time to time) of securities of Borrower representing more than fifty percent (50%) of the combined voting power of the outstanding securities of Borrower ordinarily having the right to vote in the election of directors or managers; provided, however, that (x) any action taken to replace members of the Board of Directors of Borrower by or at the direction of Lender or any Affiliate, or (y) any acquisition or purchase of equity securities of Borrower by Lender or an Affiliate, or the acquisition or purchase of equity securities of Borrower as a result of the sale, transfer or other disposition of such securities by Lender or an Affiliate shall not be deemed to be a Change of Control for purposes of this Agreement.

"Closing Date" means the date of this Agreement.

"Contingent Obligations" mean any agreement, undertaking or arrangement by which any Person assumes, guaranties, endorses, agrees to provide funding, or otherwise becomes or is contingently liable upon the obligation or liability of any other Person.

"Default Rate" means an interest rate per annum equal to five hundred basis points (5%) above the Applicable Rate then in effect.

"Draws" means all draws, advances and disbursements under the Term Loan Facility.

"Draw Credit Maximum Amount" means, initially, $15,000,000, increasing to $35,000,000 automatically and without further action or approval by Lender upon occurrence of the FDA Approval Condition, and subject to further increase thereafter as set forth in Section 2.6 below.

"Draw Credit Obligations" means the aggregate amount of Draws.

"Draw Loan Maturity Date" means, with respect to each Draw, the earlier to occur of (a) the day that is two (2) years following the day such Draw was funded by the Lender and (b) June 30, 2016.

"Draw Request" is defined in Section 2.5 hereof.

"Employee Benefit Plan" means any "employee benefit plan" as defined in Section 3(3) of ERISA that is or was sponsored, maintained or contributed to by, or required to be contributed by, the Borrower, any Guarantor or any of their respective ERISA Affiliates.

"Environmental Action" means any complaint, summons, citation, notice, directive, order, claim, litigation, investigation, judicial or administrative proceeding, judgment, letter, or other communication from any Governmental Authority, or any third party involving violations of Environmental Laws or releases of Hazardous Materials (i) from any assets, properties, or businesses of Borrower or any predecessor in interest, (ii) from any adjoining properties or businesses, or (iii) from or onto any facilities which received Hazardous Materials generated by Borrower or any predecessor in interest.

"Environmental Law" means any applicable federal, state, provincial, foreign or local statute, law, rule, regulation, ordinance, code, binding and enforceable guideline, binding and enforceable written policy or rule of common law now or hereafter in effect and in each case as amended, or any judicial or administrative interpretation thereof, including any judicial or administrative order, consent decree or judgment, to the extent binding on Borrower, relating to the environment, employee health and safety, or Hazardous Materials, including the Comprehensive Environmental Response, Compensation and Liability Act, 42 USC §§ 9601 et seq., as amended from time to time ("CERCLA"); the Resource Conservation and Recovery Act, 42 USC §§ 6901 et seq., as amended from time to time ("RCRA"); the Federal Water Pollution Control Act, 33 USC §§ 1251 et seq.; the Toxic Substances Control Act, 15 USC §§ 2601 et seq.; the Clean Air Act, 42 USC §§ 7401 et seq.; the Safe Drinking Water Act, 42 USC §§ 3803 et seq.; the Oil Pollution Act of 1990, 33 USC §§ 2701 et seq.; the Emergency Planning and the Community Right-to-Know Act of 1986, 42 USC §§ 11001 et seq.; the Hazardous Material Transportation Act, 49 USC §§ 1801 et seq.; and the Occupational Safety and Health Act, 29 USC §§651 et seq. (to the extent it regulates occupational exposure to Hazardous Materials); any state and local or foreign counterparts or equivalents, in each case as amended from time to time.

"Environmental Liabilities and Costs" mean all liabilities, monetary obligations, remedial actions, losses, damages, punitive damages, judgments, consequential damages, treble damages, costs and expenses (including all reasonable fees, disbursements and expenses of counsel, experts, or consultants, and costs of investigation and feasibility studies), fines, penalties, sanctions, and interest incurred as a result of any claim or demand by any Governmental Authority or any third party, and which relate to any Environmental Action.

"Environmental Lien" means any Lien in favor of any Governmental Authority for Environmental Liabilities and Costs.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and any successor statute thereto, including without limitation (unless the context otherwise requires), any rules or regulations promulgated thereunder.

-3-

"ERISA Affiliate" means, with respect to any Person, (a) any corporation that is a member of a controlled group of corporations within the meaning of Section 414(b) of the Internal Revenue Code of which that Person is a member, (b) any trade or business (whether or not incorporated) that is a member of a group of trades or businesses under common control within the meaning of Section 414(c) of the Internal Revenue Code of which that Person is a member and (c) any member of an affiliated service group within the meaning of Section 414(m) or (o) of the Internal Revenue Code of which that Person, any corporation described in clause (a) above or any trade or business described in clause (b) above is a member.

"ERISA Event" means (a) a "reportable event" within the meaning of Section 4043 of ERISA and the regulations issued thereunder with respect to any Pension Plan (excluding those for which the provision for 30-day notice to the Pension Benefit Guaranty Corporation ("PBGC") has been waived by regulation); (b) the failure to meet the minimum funding standard of Section 412 of the Internal Revenue Code with respect to any Pension Plan (whether or not waived in accordance with Section 412(c) of the Internal Revenue Code) or the failure to make by its due date a required installment under Section 430(j) of the Internal Revenue Code with respect to any Pension Plan or the failure to make any required contribution to a Multiemployer Plan; (c) the provision by the administrator of any Pension Plan pursuant to Section 4041(a)(2) of ERISA of a notice of intent to terminate such plan in a distress termination described in Section 4041(c) of ERISA; (d) the withdrawal by the Borrower, any Guarantor or any of their respective ERISA Affiliates from any Pension Plan with two or more contributing sponsors or the termination of any such Pension Plan resulting in liability to the Borrower, any Guarantor or any of their respective ERISA Affiliates pursuant to Section 4063 or 4064 of ERISA; (e) the institution by the PBGC of proceedings to terminate any Pension Plan, or the occurrence of any event or condition which might constitute grounds under ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan; (f) the imposition of liability on the Borrower, any Guarantor or any of their respective ERISA Affiliates pursuant to Section 4062(e) or 4069 of ERISA or by reason of the application of Section 4212(c) of ERISA; (g) the withdrawal of the Borrower, any Guarantor or any of their respective ERISA Affiliates in a complete or partial withdrawal (within the meaning of Sections 4203 and 4205 of ERISA) from any Multiemployer Plan if there is any potential liability therefore, or the receipt by the Borrower, any Guarantor or any of their respective ERISA Affiliates of notice from any Multiemployer Plan that it is in reorganization or insolvency pursuant to Section 4241 or 4245 of ERISA, or that it intends to terminate or has terminated under Section 4041A or 4042 of ERISA; (h) the occurrence of an act or omission which could give rise to the imposition on the Borrower, any Guarantor or any of their respective ERISA Affiliates of fines, penalties, taxes or related charges under Chapter 43 of the Internal Revenue Code or under Section 409, Section 502(c), (i) or (l), or Section 4071 of ERISA in respect of any Employee Benefit Plan; (i) the assertion of a material claim (other than routine claims for benefits) against any Employee Benefit Plan other than a Multiemployer Plan or the assets thereof, or against the Borrower, any Guarantor or any of their respective ERISA Affiliates in connection with any Employee Benefit Plan; (j) receipt from the Internal Revenue Service of notice of the failure of any Pension Plan (or any other Employee Benefit Plan intended to be qualified under Section 401(a) of the Internal Revenue Code) to qualify under Section 401(a) of the Internal Revenue Code, or the failure of any trust forming part of any Pension Plan to qualify for exemption from taxation under Section 501(a) of the Internal Revenue Code; or (k) the imposition of a lien pursuant to Section 430(k) of the Internal Revenue Code or ERISA or a violation of Section 436 of the Internal Revenue Code.

"Event of Default" means an event described in <u>Article 7</u> hereof.

"FDA" means the U.S. Food and Drug Administration.

"FDA Approval Condition" means the approval by the FDA of the Borrower's new drug application with respect to its Lymphoseek® product.

"Financial Officer" means the chief executive officer or chief financial officer of Borrower.

"Foreign Subsidiary" means any Subsidiary that is incorporated or organized outside of the United States of America.

"GAAP" means generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board, the American Institute of Certified Public Accountants and the Financial Accounting Standards Board as in effect from time to time in the United States consistently applied.

"Governmental Authority" means any nation or government, any federal, state, local or other political subdivision thereof and any entity exercising executive, legislative, judicial, regulatory or administrative authority or functions of or pertaining to government, including any authority or other quasi-governmental entity established to perform any of such functions.

"Governmental Rule" means any law, rule, regulation, ordinance or other pronouncement of any Governmental Authority.

"Guaranties" means unlimited guaranties of the Borrower's Obligations to be delivered to Lender from each Guarantor.

"Guarantors" means all Significant Subsidiaries of the Borrower (other than any Foreign Subsidiary), whether now existing or hereafter created or acquired.

"Hazardous Materials" mean (i) substances and wastes of other materials that are defined or listed in, or otherwise classified pursuant to, any applicable laws or regulations as "hazardous substances," "hazardous materials," "hazardous wastes," "toxic substances," or any other formulation intended to define, list, or classify substances by reason of deleterious properties such as ignitability, corrosivity, reactivity, carcinogenicity, toxicity to humans, animals, wildlife or plants, or "EP toxicity," (ii) oil, petroleum, or petroleum derived substances, natural gas, natural gas liquids, synthetic gas, drilling fluids, produced waters, and other wastes associated with the exploration, development, or production of crude oil, natural gas, or geothermal resources, (iii) flammable substances, explosives or radioactive materials, and (iv) asbestos in any form or (v) polychlorinated biphenyls, whether or not contained within electrical equipment, in concentrations in excess of 50 parts per million.

"Hercules Loan Documents" means the Loan and Security Agreement, dated as of December 29, 2011, by and between the Borrower and Hercules Technology II, L.P. and the "Loan Documents" referred to therein, as each may be amended, restated, supplemented or otherwise modified.

"Indebtedness" means, at any time, (i) all indebtedness, obligations or other liabilities (other than accounts payable arising in the ordinary course of business payable on terms customary in the trade) which in accordance with GAAP should be classified as liabilities on the balance sheet of such Person, including without limitation, (A) for borrowed money or evidenced by debt securities, debentures, acceptances, notes or other similar instruments, and any accrued interest, fees and charges relating thereto, (B) under profit payment agreements or in respect of obligations to redeem, repurchase or exchange any securities or to pay dividends in respect of any stock, (C) with respect to letters of credit, bankers acceptances, interest rate swaps or other contracts, currency agreement or other financial products, (D) to pay the deferred purchase price of property or services, or (E) in respect of Capital Leases; (ii) all indebtedness, obligations or other liabilities secured by a lien on any property, whether or not such indebtedness, obligations or liabilities are assumed by the owner of the same; and (iii) all Contingent Obligations.

"Insolvency Proceeding" means any proceeding commenced by or against any Person under any provision of the Bankruptcy Code or under any other state or federal bankruptcy or insolvency law, receivership, assignment for the benefit of creditors, formal or informal moratorium, forbearance, composition, extension generally with creditors, or proceedings seeking reorganization, arrangement, or other similar relief.

"Intellectual Property" means all now owned or hereafter acquired right, title and interest in trade names, trademarks, trade secrets, service marks, data bases, software and software systems, including source and object codes, information systems, discs, tapes, customer lists, telephone numbers, credit memoranda, goodwill, patents, patent applications, patents pending, copyrights, royalties, literary rights, licenses and franchises.

"IRC" or "Internal Revenue Code" means the Internal Revenue Code of 1986, as amended from time to time, and any successor statute thereto, including (unless the context requires otherwise) any rules or regulations promulgated thereunder.

"Legal Requirements" means, collectively, as to any Person, the articles of incorporation, bylaws or other organizational or governing documents of such Person, and any law, treaty, rule or regulation, including any Governmental Rule, any requirement under any permit, and any determination of any Governmental Authority, in each case applicable to or binding upon such Person or any of its properties or to which such Person or any of its property is subject.

"Lender" is defined in the preamble of this Agreement.

"Lien" means any interest in an asset securing an obligation owed to, or a claim by, any Person other than the owner of the asset, whether such interest shall be based on the common law, statute, or contract, whether such interest shall be recorded or perfected, and whether such interest shall be contingent upon the occurrence of some future event or events or the existence of some future circumstance or circumstances, including the lien or security interest arising from any mortgage, deed of trust, encumbrance, pledge, hypothecation, assignment (collateral or otherwise), hypothec, deposit arrangement, security agreement, conditional sale, trust receipt, lease, consignment, or bailment for security purposes, judgment, claim encumbrance or statutory trust and also including reservations, exceptions, encroachments, easements, rights-of-way, covenants, conditions, restrictions, leases, and other title exceptions and encumbrances affecting real property.

"Loan Documents" mean this Agreement, the Notes, the Guaranties, and any other agreements, instruments, and certificates executed in connection herewith or contemplated hereby, as the same may be amended, restated or otherwise modified and in effect from time to time.

"Material Adverse Effect" means, at any time, any event, development or circumstance (other than possible extensions from time to time of any dates related to or prescribed under or in connection with the Prescription Drug User Fee Act) that has or could reasonably be expected to have a material adverse effect in respect of Borrower or any Guarantor upon (i) the business, assets, operations, prospects or condition (financial or otherwise) of the Borrower and the Guarantors taken as a whole and/or (ii) the ability of Borrower and/or any Guarantor to perform any of its obligations under the Loan Documents to which it is a party.

"Multiemployer Plan" means any Employee Benefit Plan that is a "multiemployer plan" as defined in Section 3(37) of ERISA.

"Notes" means all promissory notes evidencing the Term Loan Facility, as such promissory notes may be amended, restated, supplemented or otherwise modified from time to time.

"Obligations" means all obligations of Borrower to pay principal, interest and fees on all Draws, all fees and charges payable hereunder, and all other payment obligations of Borrower arising under or in relation to this Agreement or any Loan Document executed in connection herewith, in each case whether now existing or hereafter arising, due or to become due, direct or indirect, absolute or contingent, and howsoever evidenced, held or acquired.

"Payment Date" means, in the case of each Draw, the first Business Day of each month, and if not previously paid in full, at maturity (whether by acceleration or otherwise) of such Draw.

"Pending Default" is defined in Section 2.4 hereof.

"Pension Plan" means any Employee Benefit Plan, other than a Multiemployer Plan, that is subject to Section 412 of the Internal Revenue Code or Section 302 of ERISA.

"Permitted Acquisition" means any acquisition of all or substantially all of the capital stock of any Person or of all or substantially all of the assets or operations of any Person (or division or operating unit of any Person) by Borrower or any Guarantor, provided that: (i) such acquisition is made at a time when, after giving effect to such acquisition and the related financing thereof, (a) Borrower or such Guarantor would remain Solvent, and (b) no Event of Default or Pending Default exists; (ii) Borrower delivers written notice to Lender of its or a Guarantor's intention to make such acquisition no less than fourteen (14) Business Days prior to the proposed closing date for such acquisition that sets forth, among other things, information regarding liabilities and obligations with respect to environmental matters to be incurred by Borrower or any Guarantor (including, without limitation, the acquired Person in the event of an acquisition of capital stock) as a result of such acquisition, any indemnities afforded under the terms of such acquisition and the scope and results of any environmental review undertaken by Borrower in connection therewith; (iii) the sum for any Permitted Acquisition of (a) the original principal amount thereof, including any deferred purchase price therefor, plus (b) the reasonably estimated transaction costs associated with such acquisition plus (c) the amount of Indebtedness for borrowed money assumed (directly or indirectly) as a result thereof shall not exceed $10,000,000 (excluding any portion of any of the foregoing payable in common equity of Borrower) in the aggregate for all Permitted Acquisitions consummated after the Closing Date; and (iv) after giving effect to the acquisition, such acquired Person shall either (i) become a Significant Subsidiary of the Borrower or of any Guarantor or (ii) be merged with and into Borrower or any Guarantor.

"Permitted Contest" means the right of Borrower to contest or protest any Lien, taxes (other than payroll taxes or taxes that are the subject of a United States federal tax lien), or rental payment, provided that (i) a reserve with respect to such obligation is established on Borrower's books and records in such amount as is required under GAAP, (ii) any such protest is instituted promptly and prosecuted diligently by Borrower in good faith, and (iii) Lender is satisfied in reasonable discretion that, while any such protest is pending, there will be no impairment of the enforceability, validity, or priority of any of Lender's Liens.

"Permitted Indebtedness" means any Indebtedness related to the Permitted Liens.

"Permitted Liens" mean (i) any Liens held by Lender or Affiliates of Lender from time to time, (ii) Liens for unpaid taxes that either are not yet delinquent, or do not constitute an Event of Default hereunder and are the subject of a Permitted Contest, (iii) Liens securing Indebtedness set forth on <u>Schedule 5.11</u> hereto to the extent of the Indebtedness referenced therein, (iv) the interests of lessors under operating leases, (v) Liens securing purchase money Indebtedness or the interests of lessors under Capital Leases to the extent that such Liens or interests secure Permitted Purchase Money Indebtedness, (vi) Liens arising by operation of law in favor of warehousemen, landlords, carriers, mechanics, materialmen, or laborers, incurred in the ordinary course of Borrower's business and not in connection with the borrowing of money, and which Liens either (A) are for sums not yet delinquent, or (B) are the subject of Permitted Contests, (vii) Liens arising from deposits made in connection with obtaining worker's compensation or other unemployment insurance, (viii) Liens or deposits to secure performance of bids, tenders, or leases incurred in the ordinary course of Borrower's business and not in connection with the borrowing of money, (ix) Liens granted as security for surety or appeal bonds in connection with obtaining such bonds in the ordinary course of Borrower's business, (x) Liens resulting from any judgment or award that is not an Event of Default hereunder, and (xi) Liens related to any Permitted Acquisition, to the extent such Liens encumber only the assets acquired in such Permitted Acquisition.

"Permitted Purchase Money Indebtedness" means secured or unsecured purchase money Indebtedness (including obligations under Capital Leases) incurred to finance the acquisition of fixed assets or equipment, if such Indebtedness (i) has a scheduled maturity and is not due on demand, (ii) does not exceed the purchase price of the items being purchased, and (iii) is not secured by any property or assets other than the item or items being purchased.

"Person" means any individual, corporation, firm, enterprise, partnership, trust, incorporated or unincorporated association, joint venture, joint stock company, limited liability company or any other entity of any kind or any government or political subdivision or any agency, department or instrumentality thereof.

"PBGC" means the Pension Benefit Guaranty Corporation.

"Remedial Action" means all actions taken to (i) clean up, remove, remediate, contain, treat, monitor, assess, evaluate, or in any way address Hazardous Materials in the indoor or outdoor environment, (ii) prevent or minimize a release or threatened release of Hazardous Materials so they do not migrate or endanger or threaten to endanger public health or welfare or the indoor or outdoor environment, (iii) perform any pre-remedial studies, investigations, or post-remedial operation and maintenance activities, or (iv) conduct any other actions authorized by 42 USC § 9601 et seq.

"Requirements of Law" means, as to any Person, the charter and by-laws or other organization or governing documents of such Person, and any law, rule or regulation, or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject, including without limitation, the Securities Act of 1933, the Securities Exchange Act of 1934, Regulations T, U and X, ERISA, the Fair Labor Standards Act, the Worker Adjustment and Retraining Notification Act, Americans With Disabilities Act of 1990, and any certificate of occupancy, zoning ordinance, building, environmental or land use requirement or permit or environmental, labor, employment, occupational safety or health law, rule or regulation.

"Significant Subsidiary" shall have the meaning defined in Rule 1-02 of Regulation S-X of the United States Securities and Exchange Commission.

"Solvent" means, with respect to any Person, that at the time of determination: (i) the fair market value of its assets is in excess of the total amount of its liabilities (including, without limitation, Contingent Obligations); (ii) the present fair saleable value of its assets is greater than its probable liability on its existing debts as such debts become absolute and matured; (iii) it is then able and expects to be able to pay its debts (including, without limitation, contingent debts and other commitments) as they mature; and (iv) it has capital sufficient to carry on its business as conducted and as proposed to be conducted.

"Subordinated Indebtedness" means any Indebtedness incurred by Borrower which is subject to a debt subordination agreement or other subordination provisions in favor of Lender, in all respects reasonably satisfactory to Lender.

"Subsidiary" of a Person means any corporation, partnership, limited liability company or other entity, in each case, whether now existing or hereafter created, in which such Person directly or indirectly owns or controls the securities or other ownership interests having ordinary voting power to elect a majority of the board of directors, or appoint managers or other persons performing similar functions.

"Term Loan Facility" is defined in Section 2.1 hereof.

"Triggering Event Date" means the last day of the first fiscal quarter of Borrower in which Borrower recognizes revenues from sales or licensing of Borrower's Lymphoseek® product exceeding $2,000,000.

"UCC" means the New York Uniform Commercial Code, as in effect from time to time.

"Voidable Transfer" is defined in Section 8.12 hereof.

Section 1.2    Other Definitional Provisions and Construction

(a)       Any terms used in this Agreement or in any Loan Document that are defined in the UCC shall have the meanings given such terms therein, unless otherwise defined herein. Any accounting terms used in this Agreement or in any Loan Document and not specifically defined herein shall be construed in accordance with the respective meanings given to such terms under GAAP. When used herein, the term "financial statements" shall include the notes and schedules thereto.

(b)       Unless the context of this Agreement or any other Loan Document clearly requires otherwise, references to the plural include the singular, references to the singular include the plural, and the term "including" is not limiting, the words "hereof," "herein," "hereby," "hereunder," and similar terms in this Agreement or any other Loan Document refer to this Agreement or such other Loan Document, as the case may be, as a whole and not to any particular provision of this Agreement or such other Loan Document, as the case may be. Any reference in this Agreement or in the other Loan Documents to any agreement, instrument, or document shall include all alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements, thereto and thereof, as applicable. Any reference herein to any Person shall be construed to include such Person's successors and assigns.

(c)      All of the schedules and exhibits attached to this Agreement shall be deemed incorporated herein by reference.

ARTICLE 2 - THE TERM LOAN FACILITY AND TERMS OF REPAYMENT

Section 2.1      <u>The Term Loan Facility</u>

(a)      Lender, subject to the terms and conditions hereof, will make a non-revolving draw credit facility (the "<u>Term Loan Facility</u>") available to the Borrower in an aggregate principal amount not to exceed the Draw Credit Maximum Amount. The Term Loan Facility is non-revolving, and Draws repaid may not be re-borrowed.

(b)      Borrower unconditionally promises to pay when due the principal amount of each Draw, all unpaid interest accrued thereon and all other Obligations incurred by it, in accordance with the terms of this Agreement and the other Loan Documents.

Section 2.2      <u>Draws</u>

(a)      The aggregate principal amount of all Draws shall not exceed the Draw Credit Maximum Amount. Each Draw shall be in the minimum amount of $1,000,000, or in whole multiples of $100,000 in excess thereof.

(b)      Interest shall accrue on the unpaid aggregate principal balance of each Draw at an interest rate per annum, subject to the terms and conditions hereof, equal to the Applicable Rate per annum, and shall compound monthly. All interest accruing on each Draw shall be due and payable on each Payment Date.

(c)      Except to the extent prepaid in accordance with <u>Section 3.1</u> below, the principal sum of each Draw shall be due and payable on the applicable Draw Loan Maturity Date.

(d)      The Borrower's obligations hereunder shall also be evidenced by a promissory note, substantially in the form of <u>Exhibit 2.2</u> attached hereto.

(e)      The net proceeds of each Draw shall be used for working capital and general corporate purposes of the Borrower, including, without limitation, to finance in-licensing by Borrower of pharmaceutical product candidates.

Section 2.3      <u>Provisions Applicable to Draws</u>

(a)      Upon the occurrence of any Event of Default, Draws shall, to the extent not prohibited under applicable law, bear interest at the Default Rate.

(b)      Interest, fees and other charges hereunder each shall be calculated on a 360-day year basis and shall be based on the actual number of days which elapse during the interest calculation period, and shall compound monthly.

(c)      In no event whatsoever shall the interest rate and other charges hereunder exceed the highest rate permissible under law which a court of competent jurisdiction, in a final determination, shall deem applicable hereto. In the event such a court determines that Lender has received interest or other charges hereunder in excess of the highest rate applicable thereto, Lender shall promptly refund such excess amount to Borrower, and the provisions hereof shall be deemed amended to provide for such permissible rate.

Section 2.4      Events of Default; Pending Defaults

Lender shall have no obligation to advance any sums pursuant to this Agreement at any time when (i) a set of facts or circumstances exists, which, upon the giving of notice, the lapse of time, or both, would constitute an Event of Default under this Agreement (a "Pending Default"), and/or (ii) an Event of Default exists and is continuing.

Section 2.5      Draw Requests

(a)      Subject to the provisions of this Agreement, with respect to any Draw requested hereunder, Borrower may elect to request a Draw not later than 11:00 a.m., New York City time, five (5) Business Days prior to the date any such Draw is to be effective.

(b)      Draw Requests shall (i) be in form and substance substantially similar to Exhibit 2.5 attached hereto (a "Draw Request"), and (ii) include a certification from the Borrower that, as of the date of such Draw Request, all representations and warranties of the Borrower contained herein remain true and accurate, no Event of Default or Pending Default exists, the Borrower and each Guarantor is Solvent, no event has occurred or failed to occur that could reasonably be expected to result in a Material Adverse Effect, and the other conditions of Section 4.2 hereof are satisfied.

Section 2.6      Draw Credit Maximum Amount

At any time following the satisfaction of the FDA Approval Condition, the Lender may, in the Lender's sole and absolute discretion, increase the Draw Credit Maximum Amount to an amount not to exceed $50,000,000; provided, that, in connection with any such increase, the Lender may, in the Lender' sole and absolute discretion, require the Borrower to (i) execute and deliver a promissory note in such increased Draw Credit Maximum Amount, which promissory note shall be in form and substance satisfactory to the Lender, and (ii) grant collateral to the Lender to secure the Borrower's Obligations hereunder pursuant to a security agreement in form and substance reasonably satisfactory to the Lender. It is understood and agreed that no commitment for such increased availability exists on the date hereof, and such availability shall be dependent upon, among other things, the Lender's assessment of the Borrower's performance, prospects and management.

ARTICLE 3 – PAYMENTS, PREPAYMENTS

Section 3.1        Prepayment and Prepayment Notice

Borrower shall have the option at all times to permanently prepay any Draw, in whole or in part, by providing to Lender two (2) Business Days prior written notice of the effective date and amount of such cancellation or prepayment; provided, however, that any such prepayments shall be applied to Draws in inverse order of maturity. Borrower shall have the right, upon two (2) Business Days prior written notice to the Lender, to irrevocably cancel and terminate the Term Loan Facility upon payment of all amounts due and owing hereunder to Lender; provided, that, it is understood and agreed that the provisions of Article 8 hereof shall survive any such termination.

Section 3.2        Mandatory Prepayment

(a)        If at any time the aggregate principal amount of all Draws exceeds the Draw Credit Maximum Amount then in effect, then Borrower shall immediately pay to Lender such difference, which shall be applied to the Draws, in inverse order of maturity.

(b)        At all times after the fiscal quarter during which the Triggering Event Date occurs, Borrower shall, on a quarterly basis thereafter, pay to Lender an aggregate amount equal to $1/3^{rd}$ of the aggregate amount of revenue derived by Borrower solely from the commercial sales of and license agreements in connection with Lymphoseek during the then immediately prior fiscal quarter, such payments to be applied no later than 30 days following the end of such immediately prior fiscal quarter and to be applied to Draws in inverse order of maturity.

Section 3.3        Method of Payment

All payments of principal, interest, fees and commissions hereunder shall be made, without setoff, deduction or counterclaim, in immediately available funds to Lender at Lender's address specified in writing by Lender to Borrower, by 2:00 p.m. (New York City time) on the date when due.

ARTICLE 4 - CONDITIONS PRECEDENT

Section 4.1        Conditions Precedent to First Draw

This Agreement shall not become effective, and Lender shall not be obligated to fund the first Draw hereunder, until such time as all of the following conditions shall have been satisfied:

(i)        Lender shall have received from Borrower each of following items in form and substance reasonably satisfactory to Lender: this Agreement, a Note, a closing certificate (which shall contain authorizing resolutions, certified copies of the Borrower's certificate of incorporation and by-laws), an opinion of counsel to the Borrower and the domestic Guarantors, and the Guaranties, each duly executed where appropriate and each in form and substance reasonably satisfactory to Lender;

(ii)     No representation or warranty of the Borrower and/or any Guarantor contained herein or in any other Loan Document shall be false or misleading in any material respect; and

(iii)    No event shall have occurred or failed to occur that could reasonably be expected to result in a Material Adverse Effect.

Section 4.2    <u>Conditions Precedent to Subsequent Draws</u>

(a)    Lender shall not be required to fund any Draw hereunder, unless on the applicable date that each such Draw is to be funded:

(i)     The representations and warranties of the Borrower and the Guarantors set forth herein and in the Loan Documents shall be true and correct in all material respects on and as of such date with the same effect as though such warranty or representation had been made on and as of such date, except to the extent that such warranty or representation is stated to expressly relate solely to an earlier date;

(ii)    The Borrower and each Guarantor shall have materially complied and shall then be in compliance with all the terms, covenants and conditions of this Agreement and the Loan Documents which are binding upon them, and no Event of Default or Pending Default shall have occurred and be continuing on such date or after giving effect to the requested Draw;

(iii)   No member of Borrower's management team shall have any knowledge of any facts or circumstances that would reasonably likely be construed or interpreted to require Borrower to perform or conduct additional pre-approval clinical studies of Lymphoseek prior to obtaining the FDA's approval;

(iv)    No event shall have occurred or failed to occur that could reasonably be expected to result in a Material Adverse Effect;

(v)     No Pending Default or Event of Default shall have occurred; and

(vi)    Lender shall have received a Draw Request not less than five (5) Business Days before the requested date of such Draw.

(b)    Each request for a Draw shall constitute a representation and warranty by Borrower that each of the conditions contained in this <u>Section 4.2</u> has been satisfied.

## ARTICLE 5 – REPRESENTATIONS AND WARRANTIES

In order to induce Lender to enter into this Agreement and to make the Term Loan Facility available to the Borrower, the Borrower hereby represents and warrants to the Lender that each of the following statements is true and correct:

Section 5.1       <u>Organization and Authority</u>

(a)       The Borrower (i) is a corporation duly organized, validly existing and in good standing under the laws of the state of Delaware, (ii) has all requisite power and authority and all necessary licenses and permits to own and operate its properties and to carry on its business as now conducted, and (iii) is not doing business or conducting any activity in any jurisdiction in which it is not duly qualified and authorized to do business, except where the failure to do so could not reasonably be expected to have a Material Adverse Effect.

(b)       Schedule 5.1(b) hereto contains a true, correct and complete list of all Subsidiaries of the Borrower, and the percentage of the equity of each such Subsidiary owned by the Borrower. Each Subsidiary of the Borrower (i) is a corporation duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation, (ii) has all requisite power and authority and all necessary licenses and permits to own and operate its properties and to carry on its business as now conducted, and (iii) is not doing business or conducting any activity in any jurisdiction in which it is not duly qualified and authorized to do business, except where the failure to do so could not reasonably be expected to have a Material Adverse Effect.

(c)       Schedule 5.1(c) hereto, and any supplement or replacement schedule signed by Borrower and delivered to Lender, accurately represents to Lender the following: (i) the classes of capital stock of Borrower and par value of each such class, all as authorized by Borrower's Certificate of Incorporation, (ii) the number of shares of each such class of stock issued and outstanding, (iii) the registered owner or holder (legally or beneficially) thereof, (iv) the certificate numbers evidencing the foregoing, and (v) Borrower's employer tax identification number. Borrower does not have outstanding any other stock or other equity security or any other instrument convertible into, exchangeable for or exercisable for any equity security of Borrower, or any commitment, understanding, agreement or arrangement to issue, sell or have outstanding any of the foregoing.

-15-

Section 5.2    Authorization

(a)    All necessary corporate action has been taken in order to duly authorize Borrower's execution and delivery of this Agreement and the other Loan Documents and the performance by the Borrower of its obligations hereunder; (b) this Agreement and the other Loan Documents constitute legal, valid and binding obligations of the Borrower enforceable against the Borrower in accordance with their respective terms; (c) the execution of this Agreement and the other Loan Documents and the performance by the Borrower of its obligations hereunder and thereunder (i) are within the organizational powers of Borrower, and (ii) do not and will not conflict with, result in any breach of any of the provisions of, constitute a default under, or result in the creation of any Lien (other than a Permitted Lien) upon any property of Borrower under the provisions of any, agreement, charter instrument, bylaw, or other instrument to which Borrower is a party or by which it may be bound; and (d) there are no limitations in any indenture, contract, agreement, mortgage, deed of trust or other agreement or instrument to which Borrower is now a party or by which Borrower may be bound with respect to the payment of any Indebtedness, or, to the extent applicable, the ability of Borrower to incur Indebtedness, including any agreements or instruments to be executed in connection with this Agreement.

(b)    All necessary corporate action has been taken in order to duly authorize the execution and delivery of each Loan Document to which a Guarantor is party, and the performance by such Guarantor of its obligations thereunder; (b) each such Loan Document constitutes the legal, valid and binding obligation of such Guarantor, enforceable against such Guarantor in accordance with its respective terms; (c) the execution of such Loan Document by such Guarantor and the performance by such Guarantor of its obligations thereunder (i) are within the organizational powers of such Guarantor, and (ii) do not and will not conflict with, result in any breach of any of the provisions of, constitute a default under, or result in the creation of any Lien (other than a Permitted Lien) upon any property of such Guarantor under the provisions of any, agreement, charter instrument, bylaw, or other instrument to which such Guarantor is a party or by which it may be bound; and (d) there are no limitations in any indenture, contract, agreement, mortgage, deed of trust or other agreement or instrument to which such Guarantor is now a party or by which Borrower may be bound with respect to the payment of any Indebtedness, or, to the extent applicable, the ability of such Guarantor to incur or guaranty Indebtedness, including any agreements or instruments to be executed in connection with this Agreement.

Section 5.3    Taxes

All tax returns and reports required to be filed by the Borrower and each Guarantor in any jurisdiction have been filed, and all taxes, assessments, fees and other governmental charges upon the Borrower, each Guarantor and upon any property, assets, income and franchises thereof, which are shown in such returns or reports to be due and payable, have been paid, except for Permitted Contests. The accruals for taxes on the books of Borrower and each Guarantor for the current fiscal period have been determined in accordance with GAAP, consistently applied, subject to year-end and audit adjustments.

Section 5.4    Compliance with Law

Neither the Borrower nor any Guarantor:

(i)    is in violation of any Requirements of Law which violation is reasonably likely to have a Material Adverse Effect; and/or

(ii)       has failed to obtain any licenses, permits, franchises or other governmental or environmental authorizations necessary to the ownership of the Borrower's or any such Guarantor's properties or to the conduct of its or their business, which violation or failure is reasonably likely to have a Material Adverse Effect.

Section 5.5        <u>Financial Statements; Full Disclosure</u>

The consolidated financial statements of Borrower and its Subsidiaries for the fiscal year ending December 31, 2011 which have been supplied to Lender, have been prepared in accordance with GAAP and fairly represent the financial condition of the Borrower and its Subsidiaries as of such date on a consolidated basis. The interim consolidated financial statements of the Borrower and its Subsidiaries for the period ending March 31, 2012, which have been supplied to Lender, have been prepared in good faith and accurately represent the financial condition of the Borrower and its Subsidiaries as of the dates of such financial information, subject to year-end and audit adjustments. The Borrower does not know of any existing fact or circumstances which has had, shall have or is reasonably likely to have a Material Adverse Effect.

Section 5.6        <u>Litigation; Adverse Effects</u>

<u>Schedule 5.6</u> attached hereto contains a description as of the date hereof of all pending or, to the knowledge of Borrower, threatened claims involving individual claims against Borrower in excess of $1,000,000. There is no action, suit, audit, proceeding, investigation or arbitration (or series of related actions, suits, proceedings, investigations or arbitrations) pending before or by any Governmental Authority or private arbitrator or, to the knowledge of Borrower, threatened against Borrower or any property thereof (i) challenging the validity or the enforceability of any provision of this Agreement, or any other Loan Document or (ii) which has had, shall have or is reasonably likely to have a Material Adverse Effect. Borrower is not subject to or in default with respect to any final judgment, writ, injunction, restraining order or order of any nature, decree, rule or regulation of any court or Governmental Authority, which individually or in the aggregate shall have or is likely to have a Material Adverse Effect.

Section 5.7        <u>Labor Matters</u>

Except as set forth in <u>Schedule 5.7</u> hereto, there is no collective bargaining agreement covering any of the employees of Borrower and/or any Guarantor; no labor disputes (other than grievances arising in the ordinary course of business), strikes or walkouts affecting the operations of Borrower and/or any Guarantor, are pending, or, to the knowledge of Borrower, threatened, planned or contemplated and, except to the extent that the occurrence of any such ERISA Event is not reasonably likely to result in liability to the Borrower and the Guarantors in an aggregate amount that would reasonably be expected to have a Material Adverse Effect, no ERISA Event has occurred, and, to the knowledge of Borrower, no facts or circumstances exist that could reasonably be expected to result in an ERISA Event.

Section 5.8    <u>Solvency</u>

After giving effect to all Indebtedness of the Borrower and each Guarantor on the Closing Date (including without limitation the Draw Credit Maximum Amount and all Contingent Obligations) and such other dates as Draws are requested hereunder, the Borrower and each Guarantor is Solvent.

Section 5.9    <u>Consent</u>

Neither the nature of Borrower, any Guarantor, or any of its or their business or properties, nor any relationship between or among Borrower, any Guarantor, and any other Person, nor any circumstance in connection with the execution of this Agreement, is such as to require a consent, approval or authorization of, or filing, registration or qualification with, any Governmental Authority or any other Person on the part of Borrower as a condition to the execution and delivery of this Agreement and the other Loan Documents, other than those consents, approvals, authorizations or filings that have been obtained or made.

Section 5.10    <u>No Liens</u>

The Borrower each Guarantor (a) has an indefeasible interest in all personal property which it has an interest, free and clear of any Liens, except Permitted Liens, and (b) has not agreed or consented to cause or permit in the future (upon the happening of a contingency or otherwise) any of its property whether now owned or hereafter acquired to be subject to a Lien, except Permitted Liens. Neither Borrower nor any Guarantor owns any real property.

Section 5.11    <u>Indebtedness</u>

As of the Closing Date, set forth on <u>Schedule 5.11</u> is a true and complete schedule of Indebtedness of the Borrower and the Guarantors. Neither Borrower nor any Guarantor has incurred any material Indebtedness other than Indebtedness permitted under this Agreement and set forth on <u>Schedule 5.11</u> hereto.

Section 5.12    <u>No Defaults</u>

No event has occurred and no condition exists which constitutes a Pending Default or an Event of Default pursuant to this Agreement.

Section 5.13    <u>Intellectual Property</u>

The Borrower and each Guarantor owns or has the legal and valid right to use all Intellectual Property necessary for the present and planned operation of its business without any known conflict with the rights of others, free from any Lien or encumbrance, other than Permitted Liens and free of any restrictions material to the operation of its business as presently conducted. Except as set forth in <u>Schedule 5.13</u> attached hereto, neither the Borrower nor any Guarantor (a) has any registered Intellectual Property and (b) as licensor, licenses any registered Intellectual Property.

Section 5.14       Environmental Compliance

To the best of Borrower's knowledge, the Borrower and each Guarantor are in compliance in all material respects with any and all Environmental Laws.

Section 5.15       Disclosure

None of this Agreement, the Loan Documents, any disclosure pursuant to the Securities and Exchange Act of 1934, as amended, and/or any certificate furnished to the Lender by the Borrower and/or any Guarantor in connection with the transactions contemplated herein contains any untrue statement of any material fact or omits to state any material fact necessary to make the statements herein or therein not misleading under the circumstances in which such statements were made. As of the Closing Date, there is no fact known to the Borrower and/or any Guarantor which has not been disclosed to the Lender and which could reasonably be expected to have a Material Adverse Effect.

## ARTICLE 6 - COVENANTS

The Borrower covenants that on and after the date of this Agreement until terminated pursuant to the terms of this Agreement, or so long as any Indebtedness provided for herein remains unpaid:

Section 6.1       Payment of Taxes and Claims

Borrower shall, and shall cause each Guarantor to, pay (a) all taxes, estimated payments, assessments and governmental charges or levies imposed upon the Borrower the Guarantors and its and their property or assets or in respect of any of its franchises, businesses, income or property when due; and (b) all claims of materialmen, mechanics, carriers, warehousemen, landlords, bailees and other like persons, (including without limitation, claims for labor, services, materials and supplies) for sums which have become due and payable and which by law have or may become a Lien upon property or assets of the Borrower and/or the Guarantors, other than for Permitted Contests.

Section 6.2       Insurance

At all times in respect of its personal property, Borrower shall, and shall cause each Guarantor to, have and maintain insurance substantially similar in terms of coverage, amounts and scope as the Borrower's and each Guarantor's existing insurance policies as of the Effective Date.

Section 6.3       Place of Business; Books and Records

(a)       The Borrower shall, and shall cause each Guarantor to, (i) maintain the same principal place of business and chief executive office in existence as of the Effective Date; (ii) deliver to Lender at least thirty (30) days prior to the occurrence of any of the following events, written notice of such impending events: (A) a change in the principal place of business or chief executive office, and (B) a change in name, identity or structure; and (iii) remain organized in the state or jurisdiction of its incorporation or formation as of the Effective Date.

(b)      The Borrower shall, and shall cause each Guarantor to, at all times keep accurate and complete records of its assets and finances in accordance with GAAP, and at all reasonable times and from time to time, shall allow Lender promptly following receipt of written notice (not to be delivered more than one time each calendar year other than during the continuance of an Event of Default), by or through any of its officers, agents, attorneys or accountants, to examine, inspect and make extracts from such books and records.

Section 6.4      <u>Maintenance; Certain Covenants</u>

The Borrower shall, and shall cause each Guarantor to, (i) maintain its property in a condition comparable to that on the date hereof, except for normal wear and tear and routine maintenance and obsolescence in the ordinary course of business; (ii) do or cause to be done all things reasonably necessary to maintain its status as duly organized and existing, and in good standing, under the laws of the state of its organization; (iii) conduct continuously and operate actively its business and take all actions reasonably necessary to enforce and protect the validity of any Intellectual Property material to the business of the Borrower and/or any Guarantor; and (iv) not be in violation of any Requirements of Law, which violation is reasonably likely to have a Material Adverse Effect.

Section 6.5      <u>Negative Pledge</u>

The Borrower shall not, and shall not permit any Guarantor to, cause or permit or permit to exist or agree or consent to cause or permit in the future (upon the happening of a contingency or otherwise), any personal property or Real Property of the Borrower and/or any Guarantor, whether now owned or hereafter acquired, to become subject to a Lien, except for Permitted Liens. The Lender is hereby authorized to file one or more Uniform Commercial Code Financing Statements noting the restrictions of this <u>Section 6.5</u>.

Section 6.6      <u>Indebtedness</u>

The Borrower shall not, and shall not permit any Guarantor to, directly or indirectly create, incur, assume, guarantee, or otherwise become or remain liable with respect to any material Indebtedness, except for (i) Indebtedness to Lender hereunder and any other Permitted Indebtedness, (ii) Indebtedness under the Guaranties, (iii) Permitted Purchase Money Indebtedness (including Capital Lease obligations), and (iv) Subordinated Indebtedness not to exceed the sum of $1,000,000 (aggregating Subordinated Indebtedness of the Borrower and all Guarantors) outstanding at any time.

Section 6.7      <u>Financial Information and Reporting</u>

Borrower shall deliver the following to Lender:

(a)        within 75 days after the end of each fiscal year, audited, unqualified consolidated financial statements of Borrower and its Subsidiaries prepared in accordance with GAAP and certified by an independent public accountant reasonably satisfactory to Lender, containing (i) balance sheets, (ii) statements of income and surplus, and (iii) statements of cash flows and reconciliation of capital accounts; and

(b)        immediately upon becoming aware of the existence of any Pending Default, Event of Default or breach of any term or conditions of this Agreement or any Loan Document, a written notice specifying the nature and period of existence thereof and what action Borrower and the Guarantors are taking or proposes to take with respect thereto.

Notwithstanding the foregoing, documents or statements required to be delivered pursuant to sub-part (a) above may be delivered electronically and if so delivered, shall be deemed to have been delivered and certified on the date on which Borrower posts such documents, or provides a link thereto on the Borrower's website on the Internet.

Section 6.8        Deliverables

The Borrower shall deliver to the Lender:

(i)        Together with each delivery of financial statements of the Borrower hereunder, a completed Compliance Certificate signed by an officer of the Borrower, which shall include (i) a certification as to whether a Pending Default or an Event of Default has occurred and, if a Pending Default or an Event of Default has occurred, specifying the details thereof and any action taken or proposed to be taken with respect thereto, and (ii) a certification that the financial statements delivered with such Compliance Certificate are true, correct and complete in all material respects;

(ii)        Promptly upon the Borrower obtaining knowledge of the occurrence of any ERISA Event that, alone or together with any other ERISA Events that have occurred and not been remedied or otherwise eliminated, would reasonably be expected to result in liability of the Borrower and the Guarantors in an aggregate amount that would reasonably be expected to have a Material Adverse Effect, a written notice specifying the nature thereof, what action the Borrower, any Guarantor or any of its or their respective ERISA Affiliates has taken, is taking or proposes to take with respect thereto and, when known, any action taken or threatened by the Internal Revenue Service, the Department of Labor or the Pension Benefit Guaranty Corporation with respect thereto; and

(iii)     Promptly upon the Borrower obtaining knowledge of the occurrence of any event or circumstance that, alone or together with any other event of circumstance that have occurred and not been remedied or otherwise eliminated, would reasonably be expected to result in liability of the Borrower and the Guarantors in an aggregate amount that would reasonably be expected to have a Material Adverse Effect, a written notice specifying the nature thereof, what action the Borrower, any Guarantor or any of its or their respective Affiliates has taken, is taking or proposes to take with respect thereto and, when known, any action taken or threatened by the Internal Revenue Service, any Person and/or any Governmental Authority with respect thereto.

Section 6.9     Fundamental Changes; Asset Transfers

(a)     The Borrower shall not, and shall not permit any Guarantor to, merge into or consolidate with any other Person, or permit any other Person to merge into or consolidate with it, or liquidate or dissolve, except with respect to a Permitted Acquisition.

(b)     The Borrower shall not, and shall not permit any Guarantor to, sell, transfer, lease, license or otherwise dispose of, in one transaction or a series of transactions: (i) assets representing all or substantially all the assets of the Borrower and the Guarantors taken as a whole (other than to the Borrower or one or more Guarantors); and/or (ii) assets material to the conduct of business of the Borrower and the Guarantors taken as a whole (other than grants of outbound licenses of such Intellectual Property that do not materially detract from the value of the affected asset in the hands of the Borrower and the Guarantors, or interfere with the ordinary conduct of business of the Borrower and the Guarantors taken as a whole, or require the Borrower or any Guarantor to obtain any license of or other right to use such Intellectual Property from the licensee in order to continue to conduct such business).

Section 6.10     Transactions with Affiliates

The Borrower shall not, and shall not permit any Guarantor to, sell, lease, license or otherwise transfer any assets to, or purchase, lease, license or otherwise acquire any assets from, or otherwise engage in any other transactions with, any of its Affiliates, except (a) transactions that are at prices and on terms and conditions not less favorable to the Borrower or such Guarantor than those that would prevail in arm's-length transactions with unrelated third parties, (b) issuances by the Borrower of equity and receipt by the Borrower of capital contributions, (c) compensation and indemnification of, and other employment arrangements with, directors, officers and employees of the Borrower or any Guarantor, (d) any transaction determined by a majority of the disinterested directors of the applicable Person's board of directors to be fair to the applicable Person, and (e) any transaction with respect to which the fair market value of the related property or assets, nor the consideration therefor, exceeds $500,000.

Section 6.11    Compliance with Laws

     The Borrower shall, and shall cause each Guarantor to, comply in all material respects with all applicable Legal Requirements for the operation of its business and all Environmental Laws, except to the extent that (i) the necessity of compliance therewith is contested in good faith by appropriate proceedings or (ii) the failure to so comply could not reasonably be expected to result in any Material Adverse Effect.

Section 6.12    Guarantees

     The Borrower shall cause each Guarantor to guarantee the Borrower's Obligation hereunder pursuant to a Guaranty in form and substance substantially similar to Exhibit 6.12 attached hereto.

ARTICLE 7 – EVENTS OF DEFAULT

Section 7.1    Events of Default

     Each of the following shall constitute an "Event of Default" hereunder:

(i)     Any Event of Default under and as defined in any Loan Document;

(ii)     Borrower fails to make any payment of principal, interest or any other sum due and payable under any Loan Document within five (5) Business Days after the date such payment is due;

(iii)     Borrower fails to perform or observe any covenant, agreement or duty contained in this Agreement, and such failure remains un-remedied for 10 days after an officer of the Borrower first becomes aware, or should have, with reasonable diligence, been aware, of such default;

(iv)     Any warranty, representation or other statement made or deemed to be made in this Agreement or in any Loan Document is false or misleading in any material respect;

(v)     Borrower and/or any Guarantor becomes insolvent or commences any Insolvency Proceeding;

(vi)     Any Insolvency Proceeding is instituted against Borrower and/or any Guarantor and continues for sixty (60) days undismissed or undischarged;

(vii)     One or more final orders, judgments or arbitration awards for (i) the payment of money aggregating in excess of $1,000,000 is or are outstanding against Borrower and/or any Guarantor, or (ii) nonmonetary relief or remedy which is reasonably likely to have a Material Adverse Effect, is entered, and any such order, judgment or award has not been discharged, bonded in full or stayed in all material respects;

(viii)   The occurrence of any event which allows the acceleration of the maturity of any Indebtedness in excess of the amount of $1,000,000 of Borrower and/or any Guarantor on an aggregate basis;

(ix)   A Change of Control of the Borrower shall have occurred;

(x)   A default or event that, with the passage of time or giving of notice or both, shall constitute a default, shall have occurred under the Hercules Loan Documents; and

(xi)   Any ERISA Event shall have occurred that, alone or together with any other ERISA Events that have occurred and not been remedied or eliminated, would reasonably be expected to result in liability of the Borrower and the Guarantors in an aggregate amount that could reasonably be expected to have a Material Adverse Effect.

Section 7.2    Default Remedies

Upon the occurrence and during the continuance of an Event of Default (other than an event described in Section 7.1(v) or Section 7.1(vi) above), Lender may (i) terminate all rights, if any, of Borrower to obtain Draws hereunder, and thereupon, any such right shall terminate immediately, (ii) declare any or all the Draws to be due and payable, and thereupon, the principal of the Draws, together with accrued interest thereon and all fees and other Obligations shall become due and payable immediately, and (iii) immediately exercise any right, power or remedy permitted to Lender by law or any provision of this Agreement, in each case, without any presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by Borrower. Upon the occurrence of an Event of Default described in Section 7.1(v) or Section 7.1(vi) above, Borrower's rights, if any, to obtain Draws hereunder shall automatically terminate and the principal of the Draws, together with accrued interest thereon and all fees and other Obligations shall automatically become due and payable without any presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by Borrower.

ARTICLE 8 - GENERAL PROVISIONS

Section 8.1    Notices

(a)   All communications under this Agreement or under the notes executed pursuant hereto shall be in writing and shall be sent by facsimile or by a nationally recognized overnight delivery service (i) if to Lender, at the address set forth below Lender's signature to this Agreement, or at such other address as may have been furnished in writing to Borrower, by Lender; and (ii) if to Borrower, at the address set forth below Borrower's signature to this Agreement, or at such other address as may have been furnished in writing to Lender by Borrower.

(b)      Any notice so addressed and sent by fax shall be deemed to be given when confirmed, and any notice sent by nationally recognized overnight delivery service shall be deemed to be given the next day after the same is delivered to such carrier.

Section 8.2      Costs and Expenses

Borrower agrees to pay all reasonable and documented costs and expenses incidental to or in connection with this Agreement or Loan Document, the enforcement of Lender's rights in connection with any of the foregoing, any amendment, supplement or modification of this Agreement or any other Loan Document, whether any of the foregoing are incurred prior to or after maturity, the occurrence of an Event of Default, or the rendering of a judgment. Such costs shall include, but not be limited to, reasonable and documented fees of Lender's counsel. The provisions of this Section shall survive the termination of this Agreement and the Loan Documents. Notwithstanding anything herein to the contrary, Borrower's obligation to pay or reimburse Lender hereunder shall not exceed $15,000 with respect to any and all costs, services and expenses incidental to or arising in connection with the preparation, negotiation, arrangement, execution and/or delivery of this Agreement and the other Loan Documents.

Section 8.3      Survival, Successors and Assigns

All warranties, representations, and covenants made by Borrower herein or on any certificate or other instrument delivered by it or on its behalf under this Agreement shall be considered to have been relied upon by Lender and shall survive the funding of Draws regardless of any investigation made by Lender on its behalf. This Agreement shall inure to the benefit of and be binding upon the heirs, successors and assigns of each of the parties. Notwithstanding anything herein to the contrary, Lender may not assign any Loan Document or any rights or obligations arising hereunder or thereunder to any Person that (a) is a natural person or (b) is not organized under the laws of the United States of America or any State therein.

Section 8.4      Amendment and Waiver

All references to this Agreement shall also include all amendments, extensions, renewals, modifications, and substitutions thereto and thereof made in writing and executed by both Borrower and Lender. This Agreement may be amended, and the observance of any term of this Agreement may be waived, with (and only with) the written consent of Borrower and Lender. No delay or failure or other course of conduct by Lender in the exercise of any power or right shall operate as a waiver nor shall any single or partial exercise of the same preclude any other or further exercise thereof, or the exercise of any other power or right.

Section 8.5    <u>Accounting Treatment and Fiscal Year</u>

(a)      Borrower shall, and shall not permit any Guarantor to, change its fiscal year for accounting or tax purposes from a period consisting of the twelve (12) month period ending on December 31st of each calendar year.

(b)      Borrower shall not, and shall not permit any Guarantor to, make any change in accounting treatment and reporting practices or tax reporting treatment except as required by GAAP or law and disclosed in writing to Lender at the address set forth herein.

Section 8.6    <u>Enforceability and Governing Law</u>

Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction, as to such jurisdiction, shall be inapplicable or ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. All of Lender's rights and remedies, whether evidenced hereby or by any other Loan Document, shall be cumulative and may be exercised singularly or concurrently. This Agreement shall be governed by and construed in accordance with the laws of the State of New York (without giving effect to the conflict of laws rules thereof). Borrower agrees that any legal suit, action or proceeding arising out of or relating to this Agreement may be instituted in a state or federal court of appropriate subject matter jurisdiction in the State of New York, waives any objection which it may have now or hereafter to the venue of any suit, action or proceeding, and irrevocably submits to the jurisdiction of any such court in any such suit, action or proceeding.

Section 8.7    <u>Confidentiality</u>

The Borrower covenants and agrees that neither it nor any other person acting on its behalf has provided or will provide the Lender or any agents or counsel of the Lender with any information that the Borrower believes constitutes material non-public information.  The Borrower understands and confirms that the Lender shall be relying on the foregoing representations in effecting transactions in securities of the Borrower. In the event of a breach of the foregoing covenant by the Borrower, or any of the Borrower's Subsidiaries, or any of its or their respective officers, directors, employees and agents, in addition to any other remedy provided herein or in the Loan Documents, the Borrower shall publicly disclose any material, non-public information in a Form 8-K within five (5) Business Days of the date that it discloses such information to the Lender. In the event that the Borrower discloses any material, non-public information to the Lender and fails to publicly file a Form 8-K in accordance with the above, the Lender shall have the right to make a public disclosure, in the form of a press release, public advertisement or otherwise, of such material, nonpublic information without the prior approval by the Borrower, the Borrower's Subsidiaries, or any of its or their respective officers, directors, employees or agents. The Lender shall not have any liability to the Borrower, the Borrower's Subsidiaries, or any of its or their respective officers, directors, employees, stockholders or agents, for any such disclosure.

Section 8.8        Headings

Article and Section headings and numbers have been set forth herein for convenience only. Unless the contrary is compelled by the context, everything contained in each Article and Section applies equally to this entire Agreement.

Section 8.9        Interpretation

Neither this Agreement nor any uncertainty or ambiguity herein shall be construed or resolved against Lender or Borrower, whether under any rule of construction or otherwise. On the contrary, this Agreement has been reviewed by all parties and shall be construed and interpreted according to the ordinary meaning of the words used so as to accomplish fairly the purposes and intentions of all parties hereto.

Section 8.10        Severability of Provisions

Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

Section 8.11        Counterparts; Electronic Execution

This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement. Delivery of an executed counterpart of this Agreement by facsimile shall be equally as effective as delivery of an original executed counterpart of this Agreement. Any party delivering an executed counterpart of this Agreement by facsimile or email also shall deliver an original executed counterpart of this Agreement, but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement. The foregoing shall apply to each other Loan Document mutatis mutandis.

Section 8.12        Revival and Reinstatement of Obligations

If the incurrence or payment of the Obligations by Borrower or the transfer to Lender of any property should for any reason subsequently be declared to be void or voidable under any state or federal law relating to creditors' rights, including provisions of the Bankruptcy Code relating to fraudulent conveyances, preferences, or other voidable or recoverable payments of money or transfers of property (collectively, a "Voidable Transfer"), and if Lender is required to repay or restore, in whole or in part, any such Voidable Transfer, or elects to do so upon the reasonable advice of its counsel, then, as to any such Voidable Transfer, or the amount thereof that Lender is required or elects to repay or restore, and as to all reasonable costs, expenses, and attorneys' fees of Lender related thereto, the liability of Borrower automatically shall be revived, reinstated, and restored and shall exist as though such Voidable Transfer had never been made.

Section 8.13    <u>Integration</u>

This Agreement, together with the other Loan Documents, reflects the entire understanding of the parties with respect to the transactions contemplated hereby and shall not be contradicted or qualified by any other agreement, oral or written, before the date hereof.

Section 8.14    <u>Waiver of Right to Trial by Jury</u>

EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (1) ARISING UNDER THIS AGREEMENT OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR (2) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO THIS AGREEMENT OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR THE TRANSACTIONS RELATED HERETO OR THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

Section 8.15    <u>Indemnity</u>

Borrower shall, and shall cause each Guarantor to, indemnify Lender, Lender's directors, officers, employees, agents, financial advisors, and consultants from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses and disbursements of any kind or nature whatsoever (including without limitation fees and disbursements of counsel) which may be imposed on, incurred by, or asserted against Lender solely in its capacity as a "Lender" hereunder (and not in its capacity as an equity owner of any stock of Borrower) in any litigation, proceeding or investigation instituted or conducted by any governmental agency or instrumentality or any other person or entity with respect to any aspect of, or any transaction contemplated by, or referred to in, or any matter related to, this Agreement or any Loan Document, except to the extent that any of the foregoing arises out of the gross negligence or willful misconduct of Lender or such Person, as determined in a final, non-appealable judgment by a court of competent jurisdiction. The indemnities provided for in this Section shall survive the termination of this Agreement and the indefeasible payment of the Draws in full.

(Signature Pages Follow)

-28-

Each of the parties has signed this Agreement as of the date set forth in the preamble above.

BORROWER:

NAVIDEA BIOPHARMACEUTICALS, INC.

By:/s/Mark J. Pykett

Its: President and CEO

Notice Address:

Navidea Biopharmaceuticals, Inc.
425 Metro Place North, Suite 450
Dublin, OH  43017
Attn:  Mark J. Pykett, V.M.D., Ph.D., President and CEO
Facsimile:  614-822-2386
Telephone:  614-822-2385

with a copy to:

Porter Wright
41 S. High Street, 28th Floor
Columbus, Ohio 43215
Attn: William J. Kelly, Jr.
Fax: (614) 227-2100
Confirmation: (614) 227-2136

[Loan Agreement ]

LENDER:

PLATINUM-MONTAUR LIFE SCIENCES LLC

By:/s/Michael M. Goldberg

Its: Portfolio Manager

Notice Address:

Platinum-Montaur Life Sciences LLC
Attention: Michael M. Goldberg, M.D.
152 West 57th Street, 4th Floor
New York, NY 10019
Fax:  (212) 271-7855

with a copy to:

Burak Anderson & Melloni PLC
Attention: Shane McCormack, Esq.
30 Main Street, Suite 210
Burlington, VT 05401
Email: smccormack@vtlaw1.com
Fax: (802) 862-8176

[Loan Agreement ]

Exhibit 2.2
Form of Note

THIS PROMISSORY NOTE IS SUBJECT TO THE PROVISIONS OF A SUBORDINATION AGREEMENT DATED ON OR ABOUT THE DATE HEREOF BY AND AMONG THE LENDER, HERCULES TECHNOLOGY II, L.P., AND THE BORROWER

PROMISSORY NOTE
(Term Loan Facility)

$35,000,000.00

Dublin, Ohio
July ___, 2012

FOR VALUE RECEIVED, NAVIDEA BIOPHARMACEUTICALS, INC., a Delaware corporation (the "Borrower"), with its principal place of business at 425 Metro Place North, Dublin, Ohio 43107, promises to pay to the order of PLATINUM-MONTAUR LIFE SCIENCES LLC (together with any successors or assigns, the "Lender") at the office of the Lender, 152 West 57th Street, New York, New York 10019, the sum of THIRTY FIVE MILLION DOLLARS and zero cents ($35,000,000.00), or, if less, the amount of all Draws advanced (and not hereafter repaid) by the Lender pursuant to the Loan Agreement, dated on or about the date hereof, between the Borrower and the Lender (as amended, supplemented or modified, the "Loan Agreement"), together with interest on the unpaid balance and all other charges, as provided below. This Note evidences the Term Loan Facility made under and pursuant to the Loan Agreement; capitalized terms used herein and not otherwise defined shall have the respective meanings given in the Loan Agreement.

Interest will accrue on the unpaid balance of each Draw at the Applicable Rate. All interest accruing on each Draw shall be due and payable as set forth in Section 2.2(b) of the Loan Agreement. The principal sum of each Draw shall be due and payable as set forth in Section 2.2(c) of the Loan Agreement.

If any payment hereunder is due on a day that is not a Business Day, such payment shall be due and payable on the next Business Day.

Payments; Prepayments. All payments hereunder shall be made by the Borrower to the Lender in United States currency at the Lender's address specified above (or at such other address as the Lender may specify), in immediately available funds, on the due date thereof. Payments received by the Lender prior to the occurrence of an Event of Default will be applied: first to accrued interest; second to outstanding principal; and third to fees, expenses and other amounts due hereunder (excluding principal and interest); after the occurrence of an Event of Default, payments will be applied to the obligations under this Note as the Lender determines in its sole discretion. Any prepayments of principal made by the Borrower shall be applied to installments of principal in the inverse order of the date on which they become due. Amounts repaid with respect to the Term Loan Facility may not be reborrowed.

Exhibit 2.2 to Loan Agreement

Upon the occurrence of any Event of Default, Draws shall, to the extent not prohibited under applicable law, bear interest at the Default Rate.

Late Payment Charge. If a payment of principal or interest hereunder is not made within ten (10) business days of its due date, the Borrower will pay on demand a late payment charge equal to 5% of the amount of such late payment. Nothing in the preceding sentence shall affect the Lender's right to accelerate the maturity of this Note upon an Event of Default.

Default. The occurrence of any of the following events shall constitute an "Event of Default" hereunder:

(a)    a default in the payment when due of the principal of or interest on this Note; or

(b)    any Event of Default under and as defined in the Loan Agreement.

Remedies. Upon an Event of Default, or at any time thereafter, at the option of the Lender, all Obligations shall become immediately due and payable without notice or demand and the Lender shall then have in any jurisdiction where enforcement hereof is sought all other rights and remedies provided by agreement or at law or in equity. All rights and remedies of the Lender are cumulative and are not exclusive of any rights or remedies provided by laws or any other agreement, and may be exercised separately or concurrently.

Waiver; Amendment. No delay or omission on the part of the Lender in exercising any right hereunder shall operate as a waiver of such right or of any other right under this Note. No waiver of any right contained in, consent to any departure from, or amendment to any provision contained in this Note shall be effective unless in writing and signed by the Lender, nor shall a waiver on one occasion be construed as a waiver of any such right on any future occasion. Without limiting the generality of the foregoing, the acceptance by the Lender of any late payment shall not be deemed to be a waiver of the Event of Default arising as a consequence thereof. Except as otherwise set forth in the Loan Agreement, the Borrower waives presentment, demand, notice, protest and all other demands and notices in connection with the delivery, acceptance, performance, default or enforcement of this Note, and assents to any extensions or postponements of the time of payment or any and all other indulgences under this Note, or to any and all additions or releases of any other parties or persons primarily or secondarily liable under this Note, which from time to time be granted by the Lender in connection herewith regardless of the number or period of any extensions.

Exhibit 2.2 to Loan Agreement

Taxes. The Borrower agrees to indemnify the Lender from and hold it harmless from and against any transfer taxes, documentary taxes, assessments or charges made by any Governmental Authority by reason of the execution, delivery, and performance of this Note; provided, however, the foregoing shall not obligate the Borrower to indemnify or hold harmless the Lender for any taxes imposed on or measured by the overall net income of Lender by any Governmental Authority.

Lender Records. The entries on the records of the Lender (including any appearing on this Note) shall be prima facie evidence of the aggregate principal amount outstanding under this Note and interest accrued thereon.

Severability; Authorization to Complete; Paragraph Headings. If any provision of this Note shall be invalid, illegal or unenforceable, such provision shall be severable from the remainder of this Note and the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby. Paragraph headings are for the convenience of reference only and are not a part of this Note and shall not affect its interpretation.

Certain References. All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine, neuter, singular or plural, as the identity of the person, persons, entity or entities may require. The terms "herein," "hereof" or "hereunder" or similar terms used in this Note refer to this entire Note and not only to the particular provision in which the term is used.

Assignments. Neither this Note nor the proceeds hereof shall be assignable by the Borrower without the Lender's prior written consent, and any attempted assignment without the Lender's prior written consent shall create a default under this Note. Subject to the terms and conditions of Section 8.3 of the Loan Agreement, this Note and any other Loan Document may be assigned, in whole or in part, by the Lender and its successors or assigns.

[Signature Page Follows]

Exhibit 2.2 to Loan Agreement

IN WITNESS WHEREOF, the Borrower has caused this Note to be duly executed and delivered as of the date first above written.

IN THE PRESENCE OF:                                NAVIDEA BIOPHARMACEUTICALS, INC.

                                                   By: _____
Witness _____        Name: _____
                                                   Title: _____

Exhibit 2.2 to Loan Agreement

Exhibit 2.5
Form of Draw Request

Navidea Biopharmaceuticals, Inc.

[Date]

Platinum-Montaur Life Sciences LLC
152 West 57th Street, 4th Floor
New York, NY 10019

Re: Draw Request

Ladies and Gentlemen:

This notice is being submitted pursuant to that certain Loan Agreement, dated as of July 25, 2012 (as such Loan Agreement may be supplemented, amended, extended or renewed, the "Loan Agreement"), by and between Platinum-Montaur Life Sciences LLC, a Delaware limited liability company with its principal place of business at 152 West 57th Street, 4th Floor, New York, NY 10019 (together with its successors, "Lender"), and Navidea Biopharmaceuticals, Inc., a Delaware corporation with its principal place of business at 425 Metro Place North, Suite 450, Dublin Ohio 43017 (together with its successors, "Borrower"). Capitalized terms used herein and not defined herein shall have the meanings assigned to such terms in the Loan Agreement.

1. The Borrower hereby requests a Draw in the amount of _____ dollars and ____ cents ($_____.___);

2. The Borrower hereby certifies that the representations and warranties made by the Borrower as contained in the Loan Agreement are true and correct as of the date hereof;

3. The Borrower hereby certifies that no Event of Default has occurred and no Pending Default exists;

4. Both before and after giving effect to the Draw requested hereunder, the Borrower and each Guarantor is and will be Solvent;

5. No event has occurred or failed to occur that could reasonably be expected to result in a Material Adverse Effect;

6. The Borrower and each Guarantor have materially complied and are in compliance with all the terms, covenants and conditions of the Loan Documents which are binding upon them; and

7. No member of the Borrower's management team has any knowledge of any facts or circumstances that would reasonably likely be construed or interpreted to require the Borrower to perform or conduct additional pre-approval clinical studies of Lymphoseek prior to obtaining the FDA's approval.

[signature page follows]

Exhibit 2.5 to Loan Agreement

This notice was completed by the undersigned as of the date first written above.

NAVIDEA BIOPHARMACEUTICALS, INC.

By: _____

Name: _____

Title: _____

Exhibit 2.5 to Loan Agreement

Exhibit 6.12
Form of Guaranty

GUARANTY

GUARANTY (the "Guaranty"), dated as of [date], by _____, and _____, each a _____ corporation (each a "Guarantor" and jointly and severally the "Guarantors"), each with an address c/o Navidea Biopharmaceuticals, Inc., 425 Metro Place North, Dublin, Ohio 43107, in favor of Platinum-Montaur Life Sciences, LLC, a Delaware limited liability company, with an address of 152 West 57th Street, 4th Floor, New York, New York 10019 (the "Lender").

WHEREAS, the Guarantors are subsidiaries or affiliates of Navidea Biopharmaceuticals, Inc. (the "Borrower"), are directly and materially interested in the financial success of the Borrower, and maintain significant business relationships with the Borrower;

WHEREAS, in accordance with the Loan Agreement, dated on or about the date hereof (as amended, restated, supplemented or otherwise modified, the "Loan Agreement") by and between the Borrower and the Lender, the Promissory Note, dated on or about the date hereof (as amended, restated, supplemented or otherwise modified, the "Note"), executed by the Borrower, and certain related documents and instruments among the Borrower, the Guarantors and the Lender (such documents and instruments, including the "Loan Documents" defined in the Loan Agreement, collectively, as amended, restated, supplemented or otherwise modified from time to time, the "Loan Documents"), the Lender may extend credit to the Borrower (the "Loan");

WHEREAS, the Lender's willingness to extend the Loan is conditioned upon the Guarantors executing and delivering this Guaranty; and

WHEREAS, the Loan will be beneficial to the Guarantors inasmuch as the proceeds of the Loan to the Borrower will benefit the Guarantors.

NOW, THEREFORE, in order to induce the Lender to make the Loan to the Borrower pursuant to the Loan Documents, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by each of the Guarantors, the Guarantors hereby agree as follows:

Exhibit 6.12 to Loan Agreement

1. Guaranty of Payment and Performance. The Guarantors hereby jointly and severally guarantee to the Lender the full and punctual payment when due (whether at maturity, by acceleration or otherwise), and the performance, of all liabilities, agreements and other obligations of the Borrower to the Lender, whether direct or indirect, absolute or contingent, due or to become due, secured or unsecured, now existing or hereafter arising or acquired (whether by way of discount, letter of credit, lease, loan, overdraft or otherwise), under and as defined in the Loan Documents, including without limitation all obligations under the Loan Agreement and the Note and costs and expenses incurred by the Lender in connection with enforcement of this Guaranty (collectively, the "Obligations"). This Guaranty is an absolute, unconditional and continuing guaranty of the full and punctual payment and performance of the Obligations and not of their collectability only and is in no way conditioned upon any requirement that the Lender first attempt to collect any of the Obligations from the Borrower or resort to any security or other means of obtaining their payment. Should the Borrower default in the payment or performance of any of the Obligations, the obligations of each Guarantor hereunder shall become immediately due and payable to the Lender, upon written notice to each Guarantor by the Lender. Payments by each Guarantor hereunder may be required by the Lender on any number of occasions.

2. Unlimited Guaranty; Covenants. The liability of each Guarantor hereunder shall be unlimited to the extent of the Obligations and the other obligations of each Guarantor hereunder (including, without limitation, under Section 1 above). The Guarantors covenant and agree to take no action that would constitute an Event of Default and/or a Pending Default under and as defined in the Loan Agreement.

3. Waivers by Guarantors; Lender's Freedom to Act. Each Guarantor agrees that the Obligations will be paid and performed strictly in accordance with their respective terms regardless of any law, regulation or order now or hereafter in effect in any jurisdiction affecting any of such terms or the rights of the Lender with respect thereto. Each Guarantor waives presentment, demand, protest, notice of acceptance, notice of Obligations incurred and all other notices of any kind, all defenses which may be available to Borrower by virtue of any valuation, stay, moratorium law or other similar law now or hereafter in effect, any right to require the marshalling of assets of the Borrower, and all suretyship defenses generally. Without limiting the generality of the foregoing, each Guarantor agrees to the provisions of any instrument evidencing, securing or otherwise executed in connection with any Obligation and agrees that the obligations of each Guarantor hereunder shall not be released or discharged, in whole or in part, or otherwise affected by (i) the failure of the Lender to assert any claim or demand or to enforce any right or remedy against the Borrower; (ii) any extensions or renewals of any Obligation; (iii) any rescissions, waivers, amendments or modifications of any of the terms or provisions of any agreement evidencing, securing or otherwise executed in connection with any Obligation (provided that the obligations of each Guarantor hereunder shall be appropriately modified to reflect any amendment or modification of the Obligations); (iv) the substitution or release of any entity primarily or secondarily liable for any Obligation; (v) the adequacy of any rights the Lender may have against any collateral or other means of obtaining repayment of the Obligations; (vi) the impairment of any collateral securing the Obligations, including without limitation the failure to perfect or preserve any rights the Lender might have in such collateral or the substitution, exchange, surrender, release, loss or destruction of any such collateral; or (vii) any other act or omission which might in any manner or to any extent vary the risk of any Guarantor or otherwise operate as a release or discharge of any other Guarantor, all of which may be done without notice to any Guarantor.

Exhibit 6.12 to Loan Agreement

4. Unenforceability of Obligations Against Borrower. If for any reason the Borrower has no legal existence or is under no legal obligation to discharge any of the Obligations, or if any of the Obligations have become irrecoverable from the Borrower by operation of law or for any other reason, this Guaranty shall nevertheless be binding on each Guarantor to the same extent as if each Guarantor at all times had been the principal obligor on all such Obligations. In the event that acceleration of the time for payment of the Obligations is stayed upon the insolvency, bankruptcy or reorganization of the Borrower, or for any other reason, all such amounts otherwise subject to acceleration under the terms of any agreement evidencing, securing or otherwise executed in connection with any Obligation shall be immediately due and payable by each Guarantor upon written notice from the Lender.

5. Subrogation; Subordination. Until the payment and performance in full of all Obligations, no Guarantor shall exercise any rights against the Borrower arising as a result of payment by any Guarantor hereunder, by way of subrogation or otherwise, and will not prove any claim in competition with the Lender or its affiliates in respect of any payment hereunder in bankruptcy or insolvency proceedings of any nature; no Guarantor will claim any set-off or counterclaim against the Borrower in respect of any liability of any Guarantor to the Borrower; and each Guarantor waives any benefit of and any right to participate in any collateral which may be held by the Lender or any such affiliate. During the continuance of an Event of Default, all payments of any amounts due with respect to any indebtedness of the Borrower now or hereafter held by any Guarantor shall be subordinated to the prior payment in full of the Obligations. Each Guarantor agrees that during the continuance of an Event of Default, it will not demand, sue for or otherwise attempt to collect any such indebtedness of the Borrower to such Guarantor until the Obligations shall have been paid in full or until the applicable Event of Default has been satisfied or cured in Lender's sole determination. If, notwithstanding the foregoing sentence, any Guarantor shall collect, enforce or receive any amounts in respect of such indebtedness in violation of the foregoing sentence, such amounts shall be collected, enforced and received by such Guarantor as trustee for the Lender and be paid over to the Lender on account of the Obligations without affecting in any manner (other than by reducing the outstanding amount of the Obligations) the liability of any Guarantor under the other provisions of this Guaranty.

6. Further Assurances. Each Guarantor agrees to do all such things and execute all such documents as are reasonably necessary or desirable to give full effect to this Guaranty and to perfect and preserve the rights and powers of the Lender hereunder.

7. Termination; Reinstatement. This Guaranty shall remain in full force and effect until the earlier of: (i) the Obligations are paid in full (other than contingent indemnity obligations) and not subject to any recapture or preference in bankruptcy or similar proceedings, and the Lender has no further commitment to extent credit to the Borrower or (ii) the Lender is given written notice of each Guarantor's intention to discontinue this Guaranty, notwithstanding any intermediate or temporary payment or settlement of the whole or any part of the Obligations. No such notice under (ii) above shall be effective unless received by an officer of the Lender. No notice under (ii) above shall affect any rights of the Lender or of any affiliate hereunder with respect to any Obligations incurred prior to such notice. This Guaranty shall continue to be effective or be reinstated, notwithstanding any notice of termination, if at any time any payment made or value received with respect to an Obligation is rescinded or must otherwise be returned by the Lender upon the insolvency, bankruptcy or reorganization of the Borrower, or otherwise, all as though such payment had not been made or value received.

Exhibit 6.12 to Loan Agreement

8. Successors and Assigns. This Guaranty shall be jointly and severally binding upon each Guarantor and its successors and assigns, and shall inure to the benefit of and be enforceable by the Lender and its successors, transferees and assigns. Without limiting the generality of the foregoing sentence, the Lender may assign or otherwise transfer any agreement or any note held by it evidencing, securing or otherwise executed in connection with the Obligations, or sell participations in any interest therein, to any other person or entity, and such other person or entity shall thereupon become vested, to the extent set forth in the agreement evidencing such assignment, transfer or participation, with all the rights in respect thereof granted to the Lender herein.

9. Amendments and Waivers. No amendment or waiver of any provision of this Guaranty nor consent to any departure by any Guarantor therefrom shall be effective unless the same shall be in writing and signed by the Lender and each Guarantor. No failure on the part of the Lender to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right hereunder preclude any other or further exercise thereof or the exercise of any other right.

10. Notices. All notices and other communications called for hereunder shall be made in writing and, unless otherwise specifically provided herein, shall be deemed to have been duly made or given when delivered by hand or mailed first class mail postage prepaid or, in the case of facsimile or other electronic notice, when transmitted, answer back received, addressed as follows: if to the Guarantors, at the address set forth above, and if to the Lender, at the address set forth above, or at such address as either party may designate in writing.

11. Governing Law; Consent to Jurisdiction. This Guaranty shall be governed by, and construed in accordance with, the laws of the State of New York without reference to its conflicts of laws provisions. Each Guarantor (i) hereby irrevocably submits to the jurisdiction of the United States District Court sitting in the Southern District of New York and the courts of the State of New York located in New York county for the purposes of any suit, action or proceeding arising out of or relating to this Guaranty and (ii) hereby waives, and agrees not to assert in any such suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of such court, that the suit, action or proceeding is brought in an inconvenient forum or that the venue of the suit, action or proceeding is improper. Each Guarantor consents to process being served in any such suit, action or proceeding by mailing a copy thereof to such party at the address first set forth above and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing in this Section 11 shall affect or limit any right to serve process in any other manner permitted by law. Each Guarantor and the Lender, by its acceptance of this Guaranty, hereby agrees that the prevailing party in any suit, action or proceeding arising out of or relating to this Guaranty shall be entitled to reimbursement for reasonable legal fees from the nonprevailing party.

Exhibit 6.12 to Loan Agreement

12. WAIVER OF JURY TRIAL. EACH GUARANTOR AND, BY ITS ACCEPTANCE OF THIS GUARANTY, THE LENDER, HEREBY WAIVES TRIAL BY JURY IN ANY LITIGATION IN ANY COURT WITH RESPECT TO, IN CONNECTION WITH, OR ARISING OUT OF: (A) THIS GUARANTY, ANY LOAN DOCUMENT, OR ANY OTHER INSTRUMENT OR DOCUMENT DELIVERED IN CONNECTION WITH THE OBLIGATIONS; (B) THE VALIDITY, INTERPRETATION, COLLECTION OR ENFORCEMENT THEREOF; OR (C) ANY OTHER CLAIM OR DISPUTE HOWEVER ARISING BETWEEN ANY GUARANTOR AND THE LENDER.

13. Certain References. All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine, neuter, singular or plural, as the identity of the person, persons, entity or entities may require. The terms "herein", "hereof" or "hereunder" or similar terms used in this Guaranty refer to this entire Guaranty and not only to the particular provision in which the term is used.

14. Miscellaneous. This Guaranty, together with the Loan Documents to which the Guarantors are party, constitutes the entire agreement of the Guarantors with respect to the matters set forth herein. The rights and remedies herein provided are cumulative and not exclusive of any remedies provided by law or any other agreement, and this Guaranty shall be in addition to any other guaranty of the Obligations. The invalidity or unenforceability of any one or more sections of this Guaranty shall not affect the validity or enforceability of its remaining provisions. Section headings are for the ease of reference only and shall not affect the meaning of the relevant provisions. The meanings of all defined terms used in this Guaranty shall be equally applicable to the singular and plural, masculine, feminine and generic forms of the terms defined. The obligations of each Guarantor shall be joint and several.

[signature page follows]

Exhibit 6.12 to Loan Agreement

IN WITNESS WHEREOF, each party hereto has caused this Guaranty to be executed as of the date first written above.

[Significant Subsidiary]
By: _____
Name:
Title:


[Significant Subsidiary]
By: _____
Name:
Title:


Exhibit 6.12 to Loan Agreement

# EXHIBIT 3

EX-10.5 5 v410727_ex10-5.htm EXHIBIT 10.5

Exhibit 10.5

THIS INSTRUMENT AND THE INDEBTEDNESS, RIGHTS AND OBLIGATIONS EVIDENCED HEREBY AND ANY LIENS OR OTHER SECURITY INTERESTS SECURING SUCH RIGHTS AND OBLIGATIONS ARE SUBORDINATE IN THE MANNER AND TO THE EXTENT SET FORTH IN THAT CERTAIN SUBORDINATION AGREEMENT (AS AMENDED, RESTATED, SUPPLEMENTED OR MODIFIED FROM TIME TO TIME, THE "SUBORDINATION AGREEMENT") DATED AS OF MAY 8, 2015, BY AND AMONG THE SUBORDINATED CREDITOR IDENTIFIED THEREIN AND CAPITAL ROYALTY PARTNERS II L.P. IN ITS CAPACITY AS AGENT FOR CERTAIN LENDERS (TOGETHER WITH ITS SUCCESSORS AND ASSIGNS, "SENIOR CREDITOR AGENT"), TO CERTAIN INDEBTEDNESS, RIGHTS, AND OBLIGATIONS OF NAVIDEA BIOPHARMACEUTICALS, INC. TO SENIOR CREDITOR AGENT AND SENIOR CREDITOR (AS DEFINED THEREIN) AND LIENS AND SECURITY INTERESTS OF SENIOR CREDITOR AGENT SECURING THE SAME ALL AS DESCRIBED IN THE SUBORDINATION AGREEMENT; AND EACH HOLDER AND TRANSFEREE OF THIS INSTRUMENT, BY ITS ACCEPTANCE HEREOF, IRREVOCABLY AGREES TO BE BOUND BY THE PROVISIONS OF THE SUBORDINATION AGREEMENT.

<u>THIRD AMENDED AND RESTATED PROMISSORY NOTE</u>
(Term Loan Facility)

$35,000,000.00

Dublin, Ohio

Date of Original Issuance: July 25, 2012
Date of First Amendment and Restatement: June 25, 2013
Date of Second Amendment and Restatement: March 4, 2014
Date of Third Amendment and Restatement: May 15, 2015

FOR VALUE RECEIVED, NAVIDEA BIOPHARMACEUTICALS, INC., a Delaware corporation (the "<u>Borrower</u>"), with its principal place of business at 425 Metro Place North, Dublin, Ohio 43107, promises to pay to the order of PLATINUM-MONTAUR LIFE SCIENCES LLC (together with any successors or assigns, the "<u>Lender</u>") at the office of the Lender, 250 West 55th Street, New York, New York 10019, the sum of THIRTY FIVE MILLION DOLLARS and zero cents ($35,000,000.00), or, if less, the amount of all Draws advanced (and not hereafter repaid) by the Lender pursuant to the Loan Agreement, dated June 25, 2012, between the Borrower and the Lender (as amended, supplemented or modified, the "<u>Loan Agreement</u>"), together with interest on the unpaid balance and all other charges, as provided below. This Note evidences the Term Loan Facility made under and pursuant to the Loan Agreement; capitalized terms used herein and not otherwise defined shall have the respective meanings given in the Loan Agreement.

Interest will accrue on the unpaid balance of each Draw at the Applicable Rate. All interest accruing on each Draw shall be due and payable as set forth in Section 2.2(b) of the Loan Agreement. The principal sum of each Draw shall be due and payable as set forth in Section 2.2(c) of the Loan Agreement. Principal, interest and other amounts owing under this Note may be converted into Common Stock as is set forth in the Loan Agreement.

If any payment hereunder is due on a day that is not a Business Day, such payment shall be due and payable on the next Business Day.

Payments; Prepayments. All payments hereunder shall be made by the Borrower to the Lender in United States currency at the Lender's address specified above (or at such other address as the Lender may specify), in immediately available funds, on the due date thereof. Payments received by the Lender prior to the occurrence of an Event of Default will be applied: first to accrued interest; second to outstanding principal; and third to fees, expenses and other amounts due hereunder (excluding principal and interest); after the occurrence of an Event of Default, payments will be applied to the obligations under this Note as the Lender determines in its sole discretion. Any prepayments of principal made by the Borrower shall be applied to installments of principal in the inverse order of the date on which they become due. Amounts repaid with respect to the Term Loan Facility may not be reborrowed.

Upon the occurrence of any Event of Default, Draws shall, to the extent not prohibited under applicable law, bear interest at the Default Rate.

Late Payment Charge. If a payment of principal or interest hereunder is not made within ten (10) business days of its due date, the Borrower will pay on demand a late payment charge equal to 5% of the amount of such late payment. Nothing in the preceding sentence shall affect the Lender's right to accelerate the maturity of this Note upon an Event of Default.

Default. The occurrence of any of the following events shall constitute an "Event of Default" hereunder:

(a)       a default in the payment when due of the principal of or interest on this Note; or

(b)       any Event of Default under and as defined in the Loan Agreement.

Remedies. Upon an Event of Default, or at any time thereafter, at the option of the Lender, all Obligations shall become immediately due and payable without notice or demand and the Lender shall then have in any jurisdiction where enforcement hereof is sought all other rights and remedies provided by agreement or at law or in equity. All rights and remedies of the Lender are cumulative and are not exclusive of any rights or remedies provided by laws or any other agreement, and may be exercised separately or concurrently.

Waiver; Amendment. No delay or omission on the part of the Lender in exercising any right hereunder shall operate as a waiver of such right or of any other right under this Note. No waiver of any right contained in, consent to any departure from, or amendment to any provision contained in this Note shall be effective unless in writing and signed by the Lender, nor shall a waiver on one occasion be construed as a waiver of any such right on any future occasion. Without limiting the generality of the foregoing, the acceptance by the Lender of any late payment shall not be deemed to be a waiver of the Event of Default arising as a consequence thereof. Except as otherwise set forth in the Loan Agreement, the Borrower waives presentment, demand, notice, protest and all other demands and notices in connection with the delivery, acceptance, performance, default or enforcement of this Note, and assents to any extensions or postponements of the time of payment or any and all other indulgences under this Note, or to any and all additions or releases of any other parties or persons primarily or secondarily liable under this Note, which from time to time be granted by the Lender in connection herewith regardless of the number or period of any extensions.

Taxes. The Borrower agrees to indemnify the Lender from and hold it harmless from and against any transfer taxes, documentary taxes, assessments or charges made by any Governmental Authority by reason of the execution, delivery, and performance of this Note; provided, however, the foregoing shall not obligate the Borrower to indemnify or hold harmless the Lender for any taxes imposed on or measured by the overall net income of Lender by any Governmental Authority.

Lender Records. The entries on the records of the Lender (including any appearing on this Note) shall be prima facie evidence of the aggregate principal amount outstanding under this Note and interest accrued thereon.

Severability; Authorization to Complete; Paragraph Headings. If any provision of this Note shall be invalid, illegal or unenforceable, such provision shall be severable from the remainder of this Note and the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby. Paragraph headings are for the convenience of reference only and are not a part of this Note and shall not affect its interpretation.

Certain References. All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine, neuter, singular or plural, as the identity of the person, persons, entity or entities may require. The terms "herein," "hereof" or "hereunder" or similar terms used in this Note refer to this entire Note and not only to the particular provision in which the term is used.

Assignments. Neither this Note nor the proceeds hereof shall be assignable by the Borrower without the Lender's prior written consent, and any attempted assignment without the Lender's prior written consent shall create a default under this Note. Subject to the terms and conditions of Section 8.3 of the Loan Agreement, this Note and any other Loan Document may be assigned, in whole or in part, by the Lender and its successors or assigns.

Amendment and Restatement. This Note amends and restates the Promissory Note (Term Note Facility) dated July 25, 2012 made by Borrower in favor of the Lender in the original principal amount of up to $35,000,000, as amended and restated on each of June 25, 2013 and March 4, 2014 (the "Prior Note"). This Note is issued in exchange for (and not in discharge of the indebtedness evidenced by) the Prior Note.

[Signature Page Follows]

IN WITNESS WHEREOF, the Borrower has caused this Note to be duly executed and delivered as of the date first above written.

IN THE PRESENCE OF:                                        NAVIDEA BIOPHARMACEUTICALS, INC.

/s/ Elizabeth Johnson                                      By:    /s/ Brent L.. Larson
             Witness                                  Name:  Brent L. Larson
                                                           Title:   EVP/CFO

# EXHIBIT 44

10-K 1 navb-10k_20151231.htm 10-K

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# FORM 10-K

(Mark One)

☒ ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended December 31, 2015

or

☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE EXCHANGE ACT

For the transition period from to _____ to _____

Commission file number 001-35076

# NAVIDEA BIOPHARMACEUTICALS, INC.

(Exact name of registrant as specified in its charter)

| Delaware | 31-1080091 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| 5600 Blazer Parkway, Suite 200, Dublin, Ohio | 43017-7550 |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code (614) 793-7500

Securities registered pursuant to Section 12(b) of the Act:

| Common Stock, par value $.001 per share | NYSE MKT |
|---|---|
| (Title of Class) | (Name of Each Exchange on Which Registered) |

Securities registered pursuant to Section 12(g) of the Act: None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes ☐   No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.   Yes ☐   No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   Yes ☒   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§ 229.405 of this chapter) is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.   ☐

Indicate by check mark whether the registrant is a large accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

| Large accelerated filer | ☐ | Accelerated filer | ☒ |
|---|---|---|---|
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12-b-2 of the Act.)   Yes ☐   No ☒

The aggregate market value of shares of common stock held by non-affiliates of the registrant on June 30, 2015 was $239,805,940.

The number of shares of common stock outstanding on March 1, 2016 was 155,566,583.

DOCUMENTS INCORPORATED BY REFERENCE

None.

principal payment of $333,333 was made on the note payable to R-NAV in July 2015. As of December 31, 2015, the outstanding principal balance of the note payable to R-NAV was $333,333. The final payment of $333,333 is due in July 2016.

Platinum Credit Facility

In July 2012, we entered into an agreement with Platinum to provide us with a credit facility of up to $50 million (the Platinum Loan Agreement). Following the approval of Lymphoseek, Platinum was committed under the terms of the agreement to extend up to $35 million in debt financing to the Company. The agreement also provided for Platinum to extend an additional $15 million on terms to be negotiated. Through June 25, 2013, we drew a total of $8.0 million under the original facility.

In June 2013, in connection with entering into the GECC/MidCap Loan Agreement (discussed below), the Company and Platinum entered into an Amendment to the Platinum Loan Agreement (the First Platinum Amendment). Concurrent with the execution of the First Platinum Amendment, the Company delivered an Amended and Restated Promissory Note (the First Amended Platinum Note) to Platinum, which amended and restated the original promissory note issued to Platinum, in the principal amount of up to $35 million. The First Amended Platinum Note also adjusted the interest rate to the greater of (a) the U.S. Prime Rate as reported in the Wall Street Journal plus 6.75%; (b) 10.0%; or (c) the highest rate of interest then payable pursuant to the GECC/MidCap Loan Agreement plus 0.125%. In addition, the First Platinum Amendment granted Platinum the right, at Platinum's option subject to certain conditions, to convert all or any portion of the unpaid principal or unpaid interest accrued on any future draw (the Conversion Amount), beginning on a date two years from the date the draw is advanced, into the number of shares of Navidea's common stock computed by dividing the Conversion Amount by a conversion price equal to the lesser of (i) 90% of the lowest VWAP for the 10 trading days preceding the date of such conversion request, or (ii) the average VWAP for the 10 trading days preceding the date of such conversion request. The First Platinum Amendment also provided a conversion right on the same terms with respect to the amount of any mandatory repayment due following the Company achieving $2 million in cumulative revenues from sales or licensing of Lymphoseek.

Also in connection with the First Platinum Amendment, the Company and Platinum entered into a Warrant Exercise Agreement (Exercise Agreement), pursuant to which Platinum exercised its Series X Warrant and Series AA Warrant. The warrants were exercised on a cashless basis by canceling a portion of the indebtedness outstanding under the Platinum Loan Agreement equal to $4,781,333, the aggregate exercise price of the warrants. Pursuant to the Exercise Agreement, in lieu of common stock, Platinum received on exercise of the warrants 2,364.9 shares of the Company's Series B, convertible into 7,733,223 shares of our common stock in the aggregate (3,270 shares of common stock per preferred share).

In March 2014, in connection with entering into the Oxford Loan Agreement (discussed below), we repaid all amounts outstanding under the GECC/MidCap Loan Agreement and entered into a second amendment to the Platinum Loan Agreement (the Second Platinum Amendment). Concurrent with the execution of the Second Platinum Amendment, the Company delivered an Amended and Restated Promissory Note (the Second Amended Platinum Note) to Platinum, which amended and restated the First Amended Platinum Note. The Second Amended Platinum Note adjusted the interest rate to the greater of (i) the United States prime rate as reported in The Wall Street Journal plus 6.75%, (ii) 10.0%, and (iii) the highest rate of interest then payable by the Company pursuant to the Oxford Loan Agreement plus 0.125%.

In May 2015, in connection with the execution of the CRG Loan Agreement, the Company amended the existing Platinum credit facility to allow this facility to remain in place in a subordinated role to the CRG Loan (the Third Platinum Amendment). Among other things, the Third Platinum Amendment (i) extends the term of the Platinum Loan Agreement until a date six months following the maturity date or earlier repayment of the CRG Term Loan; (ii) changes the interest rate to the greater of (a) the United States prime rate as reported in The Wall Street Journal plus 6.75%, (b) 10.0% and (c) the highest rate of interest then payable pursuant to the CRG Term Loan plus 0.125% (effective interest rate as of December 31, 2015 was 14.125%); (iii) requires such interest to compound monthly; and (iv) changes the provisions of the Platinum Loan Agreement governing Platinum's right to convert advances into common stock of the Company. The Third Platinum Amendment provides for the conversion of all principal and interest outstanding under the Platinum Loan Agreement, but not until such time as the average daily volume weighted average price of the Company's common stock for the ten preceding trading days exceeds $2.53 per share. The amendment became effective upon initial funding of the CRG Loan Agreement.

The Platinum Loan Agreement carries standard non-financial covenants typical for commercial loan agreements, many of which are similar to those contained in the CRG Loan Agreement, that impose significant requirements on us. Our ability to comply with these provisions may be affected by changes in our business condition or results of our operations, or other events beyond our control. The breach of any of these covenants would result in a default under the Platinum Loan Agreement, permitting Platinum to terminate our ability to obtain additional draws under the Platinum Loan Agreement and accelerate the maturity of the debt, subject to the limitations of the Subordination Agreement with CRG. Such actions by Platinum could materially adversely affect our operations, results of operations and financial condition, including causing us to substantially curtail our product development activities. As of the time of filing of this Report, we are in compliance with all covenants under the Platinum Loan Agreement.

The Platinum Loan Agreement, as amended, provides us with a credit facility of up to $50 million.  We drew a total of $4.5 million and $4.0 million under the credit facility in each of the years ended December 31, 2015 and 2013.  We did not make any draws under

the credit facility during the year ended December 31, 2014. In addition, $761,000 of interest was compounded and added to the balance of the Third Amended Platinum Note during the year ended December 31, 2015. As of December 31, 2015, the outstanding principal balance of the Third Amended Platinum Note was approximately $8.5 million, consisting of $7.7 million of draws and $761,000 of compounded interest, with $27.3 million still available under the credit facility. Based on the balance as of December 31, 2015, annual principal and interest payments on the Platinum credit facility are expected to be $0 in 2016 through 2020 and $19.2 million in 2021.

Under the terms of an Agreement dated March 14, 2016, among the Company and Platinum, including certain investment funds managed by it, Platinum has reaffirmed its obligations to make loans to the Company under the Platinum Loan Agreement. See Directors, Executive Officers and Corporate Governance – Directors.

Capital Royalty Partners II, L.P.

In May 2015, Navidea and its subsidiary Macrophage Therapeutics, Inc., as guarantor, executed a Term Loan Agreement (the CRG Loan Agreement) with Capital Royalty Partners II L.P. (CRG) in its capacity as a lender and as control agent for other affiliated lenders party to the CRG Loan Agreement (collectively, the Lenders) in which the Lenders agreed to make a term loan to the Company in the aggregate principal amount of $50 million (the CRG Term Loan), with an additional $10 million in loans to be made available upon the satisfaction of certain conditions stated in the CRG Loan Agreement. Closing and funding of the CRG Term Loan occurred on May 15, 2015 (the Effective Date). The principal balance of the CRG Term Loan will bear interest from the Effective Date at a per annum rate of interest equal to 14.0%. Through March 31, 2019, the Company has the option of paying (i) 10.00% of the per annum interest in cash and (ii) 4.00% of the per annum interest as compounded interest, added to the aggregate principal amount of the CRG Term Loan. During the year ended December 31, 2015, $1.3 million of interest was compounded and added to the balance of the CRG Term Loan. In addition, the Company began paying the cash portion of the interest in arrears on June 30, 2015. Principal is due in eight equal quarterly installments during the final two years of the term. All unpaid principal, and accrued and unpaid interest, is due and payable in full on March 31, 2021. As of December 31, 2015, the outstanding principal balance of the CRG Term Loan was $51.3 million including $1.3 million of compounded interest. Although we did not achieve the 2015 annual revenue target initially established under the CRG Loan Agreement, in December 2015 CRG agreed to a reduction of that target and we were able to meet that reduced target, thereby complying with the covenant, and as of December 31, 2015, we were in compliance with all covenants of the CRG Loan Agreement.

As of the time of filing this report, it appears likely that we will need to draw on the Platinum line of credit in order to maintain compliance with the $5 million liquidity covenant of the CRG Loan Agreement beginning in the second quarter of 2016. Our inability to meet the liquidity covenant would be an event of default under the CRG Loan Agreement. In addition, if we are unable to reach the 2016 annual Lymphoseek sales revenue target of $22.5 million, this would also be an event of default under the CRG Loan Agreement; however, potential shortfalls to this revenue covenant are curable by the Company depositing 2.5 times the amount of the shortfall in a bank account controlled by CRG. The events of default under the CRG Loan Agreement also include a failure of Platinum to perform its funding obligations under the Platinum Loan Agreement at any time as to which the Company had negative EBITDA for the most recent fiscal quarter, as a result either of Platinum's repudiation of its obligations under the Platinum Loan Agreement, or the occurrence of an insolvency event with respect to Platinum. Our ability to comply with these covenants may be affected by changes in our business condition or results of operations, or other events beyond our control. An event of default would entitle CRG to accelerate the maturity of our indebtedness, increase the interest rate to the default rate of 18% per annum, and invoke other remedies available to it under the loan agreement and the related security agreement, including sale of the assets securing the debt, which could raise substantial doubt about the Company's ability to continue as a going concern.

The majority of the proceeds from the CRG Note were used to repay all amounts outstanding under the Oxford Loan Agreement (discussed below). The remaining proceeds are being used to support the growth of the Company's Manocept technology and for general corporate purposes. Based on the balance as of December 31, 2015 and assuming we continue to compound a portion of the interest through March 31, 2019, annual principal and interest payments on the CRG Term Loan are expected to be $5.3 million, $5.5 million, $5.7 million, $28.8 million, $32.9 million and $7.6 million in 2016, 2017, 2018, 2019, 2020 and 2021, respectively. Although we expect these obligations to be repaid primarily through cash flow from operations, it is possibly that we may need to consider other financing options including additional draws on the Platinum line of credit or raising capital from other sources.

Oxford Debt

In March 2014, we executed a Loan and Security Agreement (the Oxford Loan Agreement) with Oxford Finance, LLC (Oxford), providing for a loan to the Company of $30 million. Pursuant to the Oxford Loan Agreement, we issued Oxford: (1) Term Notes in the aggregate principal amount of $30 million, bearing interest at 8.5% (the Oxford Notes), and (2) Series KK warrants to purchase an aggregate of 391,032 shares of our common stock at an exercise price of $1.918 per share, expiring in March 2021 (the Series KK

Case 1:17-cv-09591-VEC   Document 1-1   Filed 12/06/17   Page 80 of 135

# EXHIBIT 5 5

10-K 1 navb_10k.htm NAVIDEA BIOPHARMACEUTICALS FORM 10-K

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

Washington, D.C. 20549

# FORM 10-K

(Mark One)

☒   ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended December 31, 2016

or

☐   TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE EXCHANGE ACT

For the transition period from _____ to _____

Commission file number   001-35076

# NAVIDEA BIOPHARMACEUTICALS, INC.

(Exact name of registrant as specified in its charter)

| | |
|---|---|
| Delaware | 31-1080091 |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| 5600 Blazer Parkway, Suite 200, Dublin, Ohio | 43017-7550 |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code (614) 793-7500

Securities registered pursuant to Section 12(b) of the Act:

| | |
|---|---|
| Common Stock, par value $.001 per share | NYSE MKT |
| (Title of Class) | (Name of Each Exchange on Which Registered) |

Securities registered pursuant to Section 12(g) of the Act: None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes ☐   No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.   Yes ☐   No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   Yes ☒   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§ 229.405 of this chapter) is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.   ☐

Indicate by check mark whether the registrant is a large accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

| Large accelerated filer | ☐ | Accelerated filer | ☒ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12-b-2 of the Act.)   Yes ☐   No ☒

The aggregate market value of shares of common stock held by non-affiliates of the registrant on June 30, 2016 was $84,031,238.

The number of shares of common stock outstanding on March 1, 2017 was 161,898,338.

DOCUMENTS INCORPORA  TED BY REFERENCE

None.

The Platinum Loan Agreement includes a covenant that results in an event of default on the Platinum Loan Agreement upon default on the CRG Loan Agreement. As discussed above, the Company is maintaining its position that CRG's alleged claims do not constitute events of default under the CRG Loan Agreement and believes it has defenses against such claims. The Company has obtained a waiver from Platinum confirming that we are not in default under the Platinum Loan Agreement as a result of the alleged default on the CRG Loan Agreement and as such, we are currently in compliance with all covenants under the Platinum Loan Agreement.

As of December 31, 2016, the outstanding principal balance of the Platinum Note was approximately $9.5 million, with $27.3 million currently available under the credit facility. An additional $15 million was potentially available under the credit facility on terms to be negotiated. However, based on Platinum's recent filing for Chapter 15 bankruptcy protection, Navidea has substantial doubt about Platinum's ability to fund future draw requests under the credit facility.

In connection with the closing of the Asset Sale to Cardinal Health 414, the Company repaid to PPCO an aggregate of approximately $7.7 million in partial satisfaction of the Company's liabilities, obligations and indebtedness under the Platinum Loan Agreement between the Company and Platinum-Montaur, which, to the extent of such payment, were transferred by Platinum-Montaur to PPCO. The Company was informed by PPVA that it was the owner of the balance of the Platinum-Montaur loan. Such balance of approximately $1.9 million was due upon closing of the Asset Sale but withheld by the Company and not paid to anyone as it is subject to competing claims of ownership by both Dr. Michael Goldberg, the Company's President and Chief Executive Officer, and PPVA.

Operating Activities. Cash from operations increased $22.7 million to $3.6 million provided during 2016 compared to $19.1 million used in 2015.

Accounts and other receivables decreased to $1.8 million at December 31, 2016 from $3.7 million at December 31, 2015, primarily due to the receipt of $1.2 million of royalties from Devicor associated with the 2011 sale of the GDS Business coupled with increased receivables due from Cardinal Health 414 resulting from the advances received from Cardinal Health 414 during the fourth quarter of 2016, offset by increased amounts due from our European distribution partner related to the sale of non-commercial product.

Inventory levels increased to $1.5 million at December 31, 2016 from $653,000 at December 31, 2015, primarily due to finished goods, work in process and materials inventory produced offset by materials used in production and finished goods inventory sold. We expect inventory levels to decrease during 2017 following the Asset Sale to Cardinal Health 414.

Prepaid expenses and other current assets decreased slightly to $1.0 million at December 31, 2016 from $1.1 million at December 31, 2015, primarily due to increased legal retainers related to the CRG litigation, prepaid insurance and FDA annual fees, offset by amortization of the prior year's prepaid insurance and FDA annual fees.

Accounts payable increased to $7.1 million at December 31, 2016 from $1.8 million at December 31, 2015, primarily due to net increased payables due to legal and professional services, inventory, NAV4694, investor relations, Tc 99m tilmanocept, and therapeutics vendors. Of the increased accounts payable, at least $894,000 is being disputed by the Company's current management. Accrued liabilities and other current liabilities increased to $8.5 million at December 31, 2016 from $3.0 million at December 31, 2015, primarily due to increased accruals for interest on the CRG debt and therapeutics development costs, offset by decreased accruals for NAV4694 development costs. Our payable and accrual balances are expected to decrease during 2017 following the Asset Sale to Cardinal Health 414 including ending our support of Tc 99m tilmanocept commercialization efforts in the U.S. and payoff of accrued interest associated with the CRG debt, coupled with continuing to decrease our support of NAV4694 development.

Deferred revenue increased to $2.3 million at December 31, 2016 from $1.2 million at December 31, 2015, primarily due to advances from Cardinal Health 414 against the proceeds from the Asset Sale of $2.3 million, offset by recognition of $1.2 million of the $2.0 million non-refundable upfront payment received by the Company related to the Tc 99m tilmanocept license and distribution agreement for Europe. The Company had been recognizing this revenue on a straight-line basis over two years, however the remaining deferred revenue of $417,000 was recognized upon obtaining European approval of a reduced-mass vial in September 2016, five months earlier than originally anticipated. Deferred revenue is expected to decrease during 2017 following the Asset Sale to Cardinal Health 414.

Investing Activities. Investing activities used $39,000 during 2016 compared to using $28,000 in 2015. Capital expenditures of $39,000 during 2015 were primarily for Tc 99m tilmanocept production equipment and computers. Net payments related to the disposal of our investment in R-NAV of $82,000 and capital expenditures of $2,000, primarily for computer equipment, were offset by proceeds from sales of capital equipment of $45,000 during 2016. Proceeds from sales of equipment of $38,000 were offset by patent and trademark costs of $27,000 during 2015. We expect our overall capital expenditures for 2017 will be slightly higher than for 2016 as we maintain our technology infrastructure.

*Oxford Debt*

In March 2014, we executed a Loan and Security Agreement (the "Oxford Loan Agreement") with Oxford Finance, LLC ("Oxford"), providing for a loan to the Company of $30 million. Pursuant to the Oxford Loan Agreement, we issued Oxford: (1) Term Notes in the aggregate principal amount of $30 million, bearing interest at 8.5% (the "Oxford Notes"), and (2) Series KK warrants to purchase an aggregate of 391,032 shares of our common stock at an exercise price of $1.918 per share, expiring in March 2021 (the "Series KK warrants"). We began making monthly payments of interest only on April 1, 2014, and monthly payments of principal and interest beginning April 1, 2015. In May 2015, in connection with the consummation of the CRG Loan Agreement, the Company repaid all amounts outstanding under the Oxford Loan Agreement. The payoff amount of $31.7 million included payments of $289,000 as a pre-payment fee and $2.4 million as an end-of-term final payment fee. The Series KK warrants remained outstanding as of December 31, 2016.

*GECC/MidCap Debt*

In June 2013, we executed a Loan and Security Agreement (the "GECC/MidCap Loan Agreement") with General Electric Capital Corporation ("GECC") and MidCap Financial SBIC, LP ("MidCap"), pursuant to which we issued GECC and MidCap: (1) Term Notes in the aggregate principal amount of $25,000,000 (the "GECC/MidCap Notes"), and (2) Series HH warrants to purchase an aggregate of 301,205 shares of our common stock at an exercise price of $2.49 per share, expiring in June 2023 (the "Series HH warrants"). In March 2014, in connection with the consummation of the Oxford Loan Agreement, we repaid all amounts outstanding under the GECC/MidCap Loan Agreement upon the receipt by GECC/MidCap of a payoff amount of $26.7 million, including $500,000 as a pre-payment fee and $1,000,000 as an end-of-term final payment fee. The Series HH warrants remained outstanding as of December 31, 2016.

*Cardinal Health 414 Asset Sale*

On March 3, 2017, pursuant to a Purchase Agreement dated November 23, 2016, the Company completed its previously announced sale to Cardinal Health 414 of its assets used, held for use, or intended to be used in operating the Business, including the Product, in the Territory (giving effect to the License-Back excluding certain assets specifically retained by the Company). Such assets sold in the Asset Sale consist primarily of, without limitation, (i) intellectual property used in or reasonably necessary for the conduct of the Business, (ii) inventory of, and customer, distribution, and product manufacturing agreements related to, the Business, (iii) all product registrations related to the Product, including the new drug application approved by the FDA for the Product and all regulatory submissions in the United States that have been made with respect to the Product and all Health Canada regulatory submissions and, in each case, all files and records related thereto, (iv) all related clinical trials and clinical trial authorizations and all files and records related thereto, and (v) all right, title and interest in and to the Product, as specified in the Purchase Agreement.

In exchange for the Acquired Assets, Cardinal Health 414 (i) made a cash payment to the Company at closing of approximately $80.6 million after adjustments based on inventory being transferred and an advance of $3 million of guaranteed earnout payments as part of the CRG settlement (described below in Item 3 – Legal Proceedings), (ii) assumed certain liabilities of the Company associated with the Product as specified in the Purchase Agreement, and (iii) agreed to make periodic earnout payments (to consist of contingent payments and milestone payments which, if paid, will be treated as additional purchase price) to the Company based on net sales derived from the purchased Product subject, in each case, to Cardinal Health 414's right to off-set. In no event will the sum of all earnout payments, as further described in the Purchase Agreement, exceed $230 million over a period of ten years, of which $20.1 million are guaranteed payments for the three years immediately after closing of the Asset Sale. At the closing of the Asset Sale, $3 million of such earnout payments were advanced by Cardinal Health 414 to the Company, and paid to CRG as part of the Deposit Amount paid to CRG (described above).

Upon closing of the Asset Sale, the Supply and Distribution Agreement between Cardinal Health 414 and the Company was terminated and, as a result, the provisions thereof are of no further force or effect. At the closing of the Asset Sale, Cardinal Health 414 paid to the Company $1.2 million, as an estimate of the accrued revenue sharing payments owed to the Company as of the closing date, net of prior payments. Post-closing and after paying off our outstanding indebtedness and transaction-related expenses, Navidea had approximately $15.6 million in cash and $3.7 million in payables, a large portion of which is tied to the 4694 program which Navidea is seeking to divest in the near term. Thus, the completion of the Asset Sale significantly improved our financial condition and our ability to continue as a going concern.

# EXHIBIT 66

ASSIGNMENT AGREEMENT

This ASSIGNMENT AGREEMENT (this "**Agreement**"), by and between **Platinum-Montaur Life Sciences, LLC**, as assignor ("**Assignor**") and **Platinum Partners Credit Opportunities Master Fund, LP**, as assignee ("**Assignee**").

WITNESSETH:

WHEREAS, effective March 22, 2016 (the "**Effective Date**"), Assignor wishes to sell, and the Assignee wishes to acquire and purchase, the asset listed on Exhibit A hereto (the "**Asset**"), as such exhibit may be amended, supplemented, or otherwise modified by mutual agreement of the parties from time to time;

NOW, THEREFORE, in consideration of the premises and the mutual agreements hereinafter contained, and for good and valuable consideration (including, but not limited to payment by the Assignee and receipt by the Assignor of the applicable purchase price for the Asset as set forth on Exhibit A hereto), the Assignor and the Assignee each hereby agrees as follows:

1.    **Assignment**. Assignor does hereby sell, transfer, convey and assign, set over and otherwise convey (or "**Assign**") to the Assignee all of its right, title and interest in, to and under the Asset set forth opposite its name on Exhibit A hereto, including, to the extent applicable, (a) all payments paid in respect thereof and all monies due, to become due or paid in respect thereof accruing on and after the Effective Date and all liquidation proceeds and recoveries thereon; (b) such Assignor's pro rata portion of any and all security interests and liens and related property subject thereto from time to time securing payment by obligors under any such Asset (the "**Collateral**"); (c) such Assignor's pro rata portion of all guaranties, indemnities and warranties, and other agreements or arrangements of whatever character from time to time supporting or securing payment of any indebtedness evidenced by any Asset of such Assignor; (d) such Assignor's p r o r at a portion of all cash and investments relating to the Asset of such Assignor on deposit in or otherwise credited to any of such Assignor's accounts; (e) all records of whatever nature with respect to the foregoing (provided that Assignee hereby acknowledges that the Assignor shall retain possession of all such records for the benefit of Assignor and Assignee); and (f) the Assignor's pro rata portion portion of all income, payments, proceeds and other benefits of any and all of the foregoing accruing on and after the Effective Date for the purchase price specified on Exhibit A hereto.

2.    **Representation**. As of the Effective Date, Assignor hereby represents and warrants that it is the owner of the Asset set forth on Exhibit A, free and clear of all liens.

3.    **Further Assurances.** Assignor and the Assignee agree to take all actions reasonably necessary to effectuate the purposes of this Agreement. In addition, the Assignor shall use its commercially reasonable efforts to cause the issuer of each note to

which the Asset relate to issue to Assignee a separate note evidencing Assignee's interest therein, as well as to register the note in the name of Assignee, provided that the failure to cause such separate note to be issued or registered shall not impair or otherwise affect in any manner whatsoever the assignment contemplated hereby nor the effectiveness of this Agreement.

4.    **No Recourse**. Assignor and the Assignee each hereby acknowledge that the Asset assigned hereunder is being assigned without any representation as to the collectability thereof. The Assignee hereby acknowledges and agrees that it shall have no recourse to Assignor for any losses on the Asset due to default or delinquency of the related obligor.

5.    **Governing Law**. This Agreement shall be construed in accordance with the laws of the State of New York, without reference to its conflict of law principles, and the obligations, rights, and remedies of the parties under this Agreement shall be determined in accordance with such laws.

6.    **Effectiveness**. This Agreement shall be effective as of the Effective Date hereof following the execution and delivery of this Agreement by each of the Assignor and the Assignee and the payment of the Purchase Price by Assignor to Assignee.

7.    **Counterparts**. This Agreement may be executed in two or more counterparts (and by different parties in separate counterparts), each of which shall be an original but all of which together shall constitute one and the same instrument. Any signature delivered by facsimile or electronic transmission shall be deemed to be an original signature hereto.

*** Remainder of page intentional left blank; signature page follows***

INDEX NO. 656710/2017

Case 1:17-cv-09591-VEC   Document 1-1   Filed 12/06/17   Page 88 of 135 RECEIVED NYSCEF: 11/02/2017

IN WITNESS WHEREOF, the undersigned has caused this Assignment Agreement to be duly executed on the date written above.

**PLATINUM –MONTAUR LIFE SCIENCES, LLC**

as the Assignor

By:_____

Name: Mark Nordlicht

Title: Chief Investment Officer

**PLATINUM PARTNERS CREDIT OPPORTUNITITES MASTER FUND, LP**

as the Assignee

By:_____

Name: Mark Nordlicht

Title: Chief Investment Officer

EXHIBIT A

| Assignor | Borrower | Description of Instrument (together, the "Asset") | Principal Indebtedness Outstanding under Instrument | Accrued and Unpaid Interest Purchased (if any) | Purchase Price |
|---|---|---|---|---|---|
| PLATINUM-MONTAUR LIFE SCIENCES, LLC | Navidea Biopharmaceuticals, Inc. | Entirety of that Subordinated Promissory Note, dated July 25, 2012 (as amended), issued by Navidea Biopharmaceuticals, Inc. to Platinum-Montaur Life Sceinces, Inc. in the initial principal amount of $6,650,869.35. | $6,560,869.35 | $461,845.86 | $7,022,715.21 |

# EXHIBIT 77

DEFM14A 1 v458707_defm14a.htm DEFM14A

## SCHEDULE 14A INFORMATION

Proxy Statement Pursuant to Section 14(a) of the
Securities Exchange Act of 1934 (Amendment No. 2)

Filed by the Registrant ☒

Filed by a Party other than the Registrant ☐

Check the appropriate box:
- ☐ Preliminary Proxy Statement
- ☐ Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))
- ☒ Definitive Proxy Statement
- ☐ Definitive Additional Materials
- ☐ Soliciting Material under §240.14a-12

### NAVIDEA BIOPHARMACEUTICALS, INC.
(Name of Registrant as Specified In Its Charter)

(Name of Person(s) Filing Proxy Statement, if other than the Registrant)

Payment of Filing Fee (Check the appropriate box):
- ☐ No fee required.
- ☒ Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11

    (1)    Title of each class of securities to which transaction applies:
Not applicable

    (2)    Aggregate number of securities to which transaction applies:
Not applicable

    (3)    Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (Set forth the amount on which the filing fee is calculated and state how it was determined):
Not applicable

    (3)    Proposed maximum aggregate value of transaction:
$100,100,000

    (4)    Total fee paid:
$11,601.59

- ☒ Fee paid previously with preliminary materials.

☐     Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

(1)      Amount Previously Paid:

(2)      Form, Schedule or Registration Statement No.:

(3)      Filing Party:

(4)      Date Filed:

SPECIAL MEETING OF STOCKHOLDERS

February 8, 2017

Dear Stockholder:

You are cordially invited to attend a Special Meeting of Stockholders of Navidea Biopharmaceuticals, Inc., which will be held at 9:00 a.m., Eastern Standard Time, on March 2, 2017, at the Hilton Garden Inn, 70 Challenger Road, Ridgefield Park, NJ 07660, 201-641-2024. The matters on the meeting agenda are described in the Notice of Special Meeting of Stockholders and proxy statement which accompany this letter.

We hope you will be able to attend the meeting, but regardless of your plans, we ask that you please complete, sign, and date the enclosed proxy card and return it in the envelope provided, or follow the instructions on the proxy card to vote online or by telephone, so that your shares will be represented at the meeting.

Very truly yours,

/s/ Michael M. Goldberg, M.D.

Michael M. Goldberg, M.D.
President and Chief Executive Officer

**NAVIDEA BIOPHARMACEUTICALS, INC.**
5600 Blazer Parkway, Suite 200
Dublin, Ohio 43017

NOTICE OF SPECIAL MEETING OF STOCKHOLDERS

To the Stockholders of
NAVIDEA BIOPHARMACEUTICALS, INC.:

A Special Meeting of the Stockholders of Navidea Biopharmaceuticals, Inc., a Delaware corporation (the "Company" or "Navidea"), will be held at the Hilton Garden Inn, 70 Challenger Road, Ridgefield Park, NJ 07660, 201-641-2024, on March 2, 2017, at 9:00 a.m., Eastern Standard Time, for the following purposes:

1. To authorize the sale (the "Asset Sale") by Navidea of its assets used in connection with Navidea's Lymphoseek® business in North America, as defined in and pursuant to the Asset Purchase Agreement, dated as of November 23, 2016, by and between Navidea and Cardinal Health 414, LLC, as more fully described in the enclosed proxy statement;

2. To adjourn the Special Meeting to a later date, if necessary or appropriate, to allow for the solicitation of additional proxies in favor of the proposal to approve the Asset Sale if there are insufficient votes to approve the Asset Sale; and

3. To transact such other business as may properly come before the meeting or any adjournment thereof.

The Board of Directors has fixed the close of business on January 23, 2017, as the record date for the determination of stockholders entitled to notice of and to vote at the Special Meeting and any adjournment thereof. A list of stockholders will be available for examination by any stockholder at the Special Meeting and for a period of 10 days before the Special Meeting at the executive offices of the Company.

Important Notice Regarding the Availability of Proxy Materials for the Special Meeting of Stockholders to be Held on March 2, 2017: The proxy statement is available at www.proxyvote.com.

Whether or not you plan to attend the Special Meeting, please complete, sign, and date the enclosed proxy card and return it in the envelope provided, or follow the instructions on the proxy card to take advantage of the opportunity to vote your proxy online or by telephone.

By Order of the Board of Directors

/s/ Michael M. Goldberg, M.D.

Michael M. Goldberg, M.D.
President and Chief Executive Officer

Dublin, Ohio
February 8, 2017

NAVIDEA BIOPHARMACEUTICALS, INC.
5600 Blazer Parkway, Suite 200
Dublin, Ohio 43017

SPECIAL MEETING OF STOCKHOLDERS

MARCH 2, 2017

PROXY STATEMENT

Dated February 8, 2017

INTRODUCTION

This proxy statement is being furnished to the holders of common stock, $0.001 par value per share ("Common Stock"), of Navidea Biopharmaceuticals, Inc., a Delaware corporation, in connection with the solicitation of proxies for use at a Special Meeting of Stockholders to be held at 9:00 a.m., Eastern Standard Time, on March 2, 2017, at the Hilton Garden Inn, 70 Challenger Road, Ridgefield Park, NJ 07660, 201-641-2024, and at any adjournment of that meeting. This proxy statement is first being mailed to stockholders on or about February 8, 2017.

In this proxy statement the terms "Navidea," "Company," "we," "our," "ours," and "us" refer to Navidea Biopharmaceuticals, Inc. and its subsidiaries. The term "Asset Purchase Agreement" refers to the Asset Purchase Agreement, dated as of November 23, 2016, by and between the Company and Cardinal Health 414, LLC, as it may be amended, restated, modified or superseded from time to time in accordance with its terms. The terms "Lymphoseek" and the "Product" refer to the Company's radioactive diagnostic agent marketed under the Lymphoseek® trademark for current approved indications by the FDA and similar indications approved by the FDA in the future. The Company develops, manufactures and commercializes a product used for (1) lymphatic mapping, (2) lymph node biopsy, and (3) the diagnosis of metastatic spread to lymph nodes for the staging of cancer (the "Business"), including the Product. The term "Asset Sale" refers to the proposed sale of the assets of the Company used, held for use or intended to be used in connection with the operation of the Business in Canada, Mexico and the United States (including their respective territories and possessions) (the "Territory"), as contemplated by the Asset Purchase Agreement. The term "Cardinal Health 414" refers to Cardinal Health 414, LLC, a wholly-owned subsidiary of Cardinal Health, Inc. ("Cardinal Health"), an Ohio corporation with common stock listed on the New York Stock Exchange under the symbol "CAH." Each of Navidea and Cardinal Health 414 are sometimes referred to in this proxy statement as a party, or collectively as the parties.

SUMMARY

This summary highlights selected information contained in this proxy statement and does not contain all of the information that may be important to you. We urge you to read carefully this proxy statement in its entirety, as well as the appendices. For your convenience, we have included cross references to direct you to a more complete description of the topics described in this summary. Additional, important information is also contained in the documents incorporated by reference into this proxy statement; see the section entitled "Where You Can Find More Information; Incorporation by Reference."

The Asset Sale (page 19)

- On November 23, 2016, the members of our Board of Directors adopted and unanimously approved the Asset Sale pursuant to the Asset Purchase Agreement, a copy of which is included as Appendix A to this proxy statement. Please read it carefully. Pursuant to the terms of the Asset Purchase Agreement, among other things:

- we agreed to sell all of our assets used, held for use, or intended to be used in operating the Business in the Territory (giving effect to the license-back described below and excluding certain assets specifically retained by the Company), such assets consisting primarily of, without limitation, (i) intellectual property used in or reasonably necessary for the conduct of the Business, (ii) inventory of, and certain customer, distribution, and product manufacturing agreements related to, the Business, (iii) all product registrations related to the Product, including the new drug application approved by the U.S. Food and Drug Administration ("FDA") for the Product and all regulatory submissions in the United States that have been made with respect to the Product and all Health Canada regulatory submissions and, in each case, all files and records related thereto, (iv) all related clinical trials and clinical trial authorizations and all files and records related thereto; and (v) all right, title and interest in and to the Product (collectively, the "Acquired Assets").

- in exchange for the Acquired Assets, Cardinal Health 414 agreed to: (i) make a cash payment to us at closing of $80,000,000 (reduced by an aggregate of approximately $65.5 million of indebtedness to be repaid to Capital Royalty Partners II, L.P. ("CRG") and Platinum-Montaur Life Sciences LLC and its affiliates ("Platinum") on behalf of the Company (less approximately $1.4 million if the transfer of debt to Dr. Goldberg occurs, as discussed under "Interests of Our Directors and Executive Officers in the Asset Sale" beginning on page 27), the amount by which, if any, transferred Product inventory is less than $6 million, and estimated transaction costs of $600,000); (ii) assume certain liabilities of the Company associated with the Product as specified in the Asset Purchase Agreement; and (iii) make periodic earnout payments (to consist of contingent payments and milestone payments which, if paid, will be treated as additional purchase price) to us based on the "Net Sales" derived from the purchased Product, subject, in each case, to Cardinal Health 414's right to off-set. In no event shall the sum of all earnout payments, as further described below, exceed an aggregate of $230 million. "Net Sales" is defined as gross amounts invoiced to third parties for the Product sold or leased in the Territory for current approved indications by the FDA and similar indications approved by the FDA in the future by Cardinal Health 414, its licensees, sublicensees and affiliates, or in any combination thereof (other than the Company and its sublicensees and affiliates), less the sum of the following actual and customary deductions where applicable and separately listed: cash, trade, or quantity discounts or rebates (as allowed under applicable law); sales tax, use tax, tariff, import/export duties or other excise taxes imposed on particular sales (except for value-added and income taxes imposed on the sales of Product in foreign countries); credits to customers because of rejections or returns, or transfers of Product without charge for charitable, promotional, non-clinical, clinical research or regulatory purposes. For purposes of calculating Net Sales, transfers to Cardinal Health 414's licensees, sublicensees or affiliates (other than the Company and its sublicensees and affiliates) of Product without an invoice for (i) end use (but not resale) by such licensee, sublicensee or affiliate shall be treated as sales by Cardinal Health 414 at Cardinal Health 414's list price for the Product or (ii) resale by such licensee, sublicensee or affiliate shall be treated as sales at the list price of such sublicensee or affiliate.

- during the period commencing on the date of closing of the Asset Sale and ending on the earlier of (i) June 30, 2026 or (ii) such time as $160,000,000 in contingent payments have been earned by the Company (the "Contingent Payment Period"), Cardinal Health 414 will pay to the Company contingent payments in an amount equal to eight percent of the Net Sales for each measuring year, or each fiscal year ending June 30th through and including June 30, 2026; provided that the first measuring year shall be from the closing of the Asset Sale through and including June 30, 2017. In the case of contingent payments to be made with respect to the first three measuring years during the Contingent Payment Period, Cardinal Health 414 will make such payments on a quarterly basis (equal to the greater of (a) eight percent of Net Sales during the applicable fiscal quarter, or (b) $1,675,000) to the Company within 30 days following the end of each fiscal quarter during the applicable measuring year. Notwithstanding the foregoing, with respect to the first measuring year, the minimum contingent payment will be pro rated based on a fraction, the numerator of which equals the number of days elapsed between the closing of the Asset Sale through and including June 30, 2017 and the denominator of which equals 365, and, to the extent such pro ration results in the Company receiving less than the minimum contingent payment for such first measuring period, Cardinal Health 414 will pay the Company a "catch-up contingent payment" in an amount equal to the difference between what the Company received and the minimum contingent payment for such first measuring period within 30 days following the end of the second fiscal quarter of the fourth measuring year. Notwithstanding the foregoing, if the contingent payment in any of the first three measuring years would be less than $6.7 million (as pro rated for the first measuring year) based upon the calculation of Net Sales, then the contingent payment to the Company for the applicable measuring year will be deemed to be $6.7 million (as pro rated for the first measuring year) (each such contingent payment during the first three measuring years and the catch up contingent payment, collectively being the "guaranteed payments"), subject to Cardinal Health 414's right to off-set the difference between $6.7 million and the amount that would have otherwise been

payable in the absence of this minimum threshold against any future earnout payments that are not guaranteed. In no event will the sum of all contingent payments exceed $160,000,000 (of which $20,100,000 are guaranteed payments), subject, in each case, to Cardinal Health 414's right to off-set.

4

- during the Contingent Payment Period, subject to Cardinal Health 414's right to off-set, Cardinal Health 414 will pay to the Company the following additional milestone payments upon the achievement by or on behalf of Cardinal Health 414 of the following milestone events:

  o $10,000,000, payable after the first fiscal year ending June 30th in which annual Net Sales exceed $100,000,000;
  o $15,000,000, payable after the first fiscal year ending June 30th in which annual Net Sales exceed $200,000,000;
  o $20,000,000, payable after the first fiscal year ending June 30th in which annual Net Sales exceed $300,000,000;
  o $25,000,000, payable after the first fiscal year ending June 30th in which annual Net Sales exceed $400,000,000.

  In no event will the aggregate of all such milestone payments exceed $70,000,000, provided, however, that more than one milestone payment can be earned in the same fiscal year.

- As part of the Asset Sale, the parties have agreed that simultaneous with the closing, subject to certain conditions, Cardinal Health 414 will enter into a license-back agreement, a "License Back," with the Company pursuant to which Cardinal Health 414 will grant to the Company a sublicensable (subject to conditions) and royalty-free license to use certain intellectual property rights included in the Acquired Assets and owned by Cardinal Health 414 as of the closing of the Asset Sale to the extent necessary for the Company to (i) on an exclusive basis, subject to certain conditions, develop, manufacture, market, sell and distribute new pharmaceutical and other products that are not Competing Products (as defined below), and (ii) on a non-exclusive basis, develop, manufacture, market, sell and distribute the Product throughout the world other than in the Territory. As used in the License-Back, a "Competing Product" is any pharmaceutical or other product that: (i) accumulates in lymphatic tissue or tumor-draining lymph nodes for the purpose of (a) lymphatic mapping or (b) identifying the existence, location or staging of cancer in a body; (ii) provides for or facilitates any test or procedure that is reasonably substitutable for any test or procedure provided for or facilitated by the Product; or (iii) is marketed for unapproved uses that allow such product to compete with the Product. Subject to the Company's compliance with certain restrictions in the License-Back, the License-Back also restricts Cardinal Health 414 from using the intellectual property rights included in the Acquired Assets to develop, manufacture, market, sell or distribute any product other than the Product or other product that (a) accumulates in lymphatic tissue or tumor-draining lymph nodes for the purpose of (1) lymphatic mapping or (2) identifying the existence, location or staging of cancer in a body, or (b) provides for or facilitates any test or procedure that is reasonably substitutable for any test or procedure provided for or facilitated by the Product. Pursuant to the License-Back and subject to rights under existing agreements, Cardinal Health 414 will be provided with a right of first offer to market, sell and/or market any new products developed from the intellectual property rights licensed by Cardinal Health 414 to the Company by the License-Back.

- Also as part of the Asset Sale, the Company shall grant to Cardinal Health 414 a five (5) year warrant to purchase up to 10 million shares of the Company's Common Stock at an exercise price of $1.50 per share, which warrant is subject to anti-dilution and other customary terms and conditions.

- If all necessary approvals have been obtained or waived, including stockholder approval and any third party consents to the Asset Sale, we expect to complete the Asset Sale shortly after this Special Meeting scheduled for March 2, 2017.

Parties to the Asset Sale (page 19)

- Navidea Biopharmaceuticals, Inc. is a biopharmaceutical company focused on the development and commercialization of precision immunodiagnostic agents and immunotherapeutics. Navidea is developing multiple precision-targeted products based on our Manocept™ platform to help identify the sites and pathways of undetected disease and enable better diagnostic accuracy, clinical decision-making, targeted treatment and, ultimately, patient care. Navidea's Manocept platform is predicated on the ability to specifically target the CD206 mannose receptor expressed on activated macrophages. The Manocept platform serves as the molecular backbone of the Product (technetium Tc 99m tilmanocept), the first product developed and commercialized by Navidea based on the platform. After consummation of the Asset Sale, Navidea intends to distribute the Product in Europe, where the Product received European approval in imaging and intraoperative detection of sentinel lymph nodes in patients with melanoma, breast cancer or localized squamous cell carcinoma of the oral cavity. Navidea also intends to continue developing its remaining candidates using the Manocept platform.

- Cardinal Health, 414, LLC is a wholly-owned subsidiary of Cardinal Health, a global integrated healthcare services and products company providing customized solutions for hospital systems, pharmacies, ambulatory surgery centers, clinical laboratories and physician offices worldwide. Cardinal Health 414 is the exclusive distributor of the Product in the United States.

Reasons for the Asset Sale (page 24)

- In arriving at its determination that the Asset Sale is advisable to, and in the best interests of, the Company and our stockholders, our Board of Directors considered various factors, including without limitation, the need to pay off or refinance the Company's outstanding debt obligations to CRG, as discussed below. For the material factors considered by our Board of Directors in reaching its decision to adopt and approve the Asset Sale and the Asset Purchase Agreement, see "The Asset Sale—Reasons for the Asset Sale," beginning on page 24.

Risk Factors (page 15)

- In evaluating the Asset Sale and Asset Purchase Agreement, you should carefully read this proxy statement and especially consider the factors discussed in the section entitled "Risk Factors" beginning on page 15 of this proxy statement.

Interests of Our Directors and Executive Officers in the Asset Sale (page 27)

- In considering the recommendation of our Board of Directors to vote for the proposal to adopt and approve the Asset Sale, you should be aware that some of our directors and executive officers may have personal interests in the Asset Sale that are, or may be, different from, or in addition to, your interests. See "Interests of Our Directors and Executive Officers in the Asset Sale" beginning on page 27.

- Dr. Michael Goldberg, our President and Chief Executive Officer, previously managed a portfolio of funds for Platinum from May 2007 until December 2013. In 2011, he made an initial investment of $1.5 million in Platinum Partners Value Arbitrage Fund, L.P ("PPVA") as a passive investor. Dr. Goldberg believes his current investment balance is approximately $1.4 million after giving effect to prior redemptions and reinvestments. Dr. Goldberg was not a member of the management of any of the Platinum entities; rather he solely had control over the trading activities of a portfolio of health care investments from funds allocated to him from the Platinum funds. Dr. Goldberg was responsible for all investments made by Platinum in the Company and for the trading in the Company's securities up until he joined the Company's Board of Directors in November 2013, at which time he relinquished all control over the trading of the Company's securities held by all of the Platinum entities. On December 13, 2013, Dr. Goldberg formally separated from Platinum and had no further role in managing their health care portfolio. As part of his separation from Platinum, Dr. Goldberg entered into a settlement agreement, dated March 28, 2014, and amended on June 11, 2015, with PPVA pursuant to which Dr. Goldberg was entitled to receive a beneficial ownership interest in 15% of (1) all securities held by Platinum at the time of his separation from Platinum which included, without limitation, warrants to purchase the

Company's common stock, and (2) the drawn amounts from the Platinum debt facility. Dr. Goldberg and Platinum are presently in the process of effectuating the transfer of ownership in such securities to Dr. Goldberg. In furtherance of the foregoing, on October 17, 2016, Platinum transferred warrants to acquire an aggregate of 5,411,850 shares of our common stock to Dr. Goldberg, which warrants were exercised in full by Dr. Goldberg on January 17, 2017 resulting in gross proceeds to the Company of $54,118.50. The Company has been advised that a portion of its outstanding debt to Platinum, amounting to approximately $1.4 million, which accrues interest at an annual rate of 14.125%, compounded monthly, as evidenced by a third amended and restated promissory note, is currently intended to be transferred to Dr. Goldberg upon consummation of the Asset Sale. That part of the Platinum debt not transferred to Dr. Goldberg will be paid-off by us using proceeds of the Asset Sale as the Asset Purchase Agreement requires that, at closing, all indebtedness of the Company be paid in full out of the initial closing cash payment, which includes debts payable to CRG, Platinum and, if the foregoing debt transfer occurs, Dr. Goldberg. The Company discussed obtaining a waiver of such requirement with respect to any Platinum debt transferred to Dr. Goldberg. Cardinal Health 414 has orally agreed to waive such requirement provided there is no security interest in the assets being transferred to Cardinal Health 414. Dr. Goldberg has agreed to not require repayment by the Company of any debt transferred to him until the original maturity date of September 30, 2021, and has agreed to release any financial covenants and securitization requirements. The Company and Dr. Goldberg intend to finalize the negotiation of the definitive terms of such remaining indebtedness. Currently, the Company and Dr. Goldberg have not entered into a formal written agreement concerning the terms of such repayment. Pursuant to a settlement agreement, dated as of June 16, 2016, among the Company, PPVA, Platinum-Montaur Life Sciences, LLC and others, Platinum agreed to forgive interest owed on its credit facility with the Company in an amount equal to 6%, effective July 1, 2016, making the effective annual interest rate on the Platinum debt 8.125% as of December 31, 2016.

- Jed A. Latkin, our Interim Chief Operating Officer and Chief Financial Officer, was an independent consultant that served as a portfolio manager from 2011 through 2015 for two entities, namely Precious Capital and West Ventures, each of which were during that time owned and controlled, respectively, by PPVA and Platinum Partners Capital Opportunities Fund, L.P. Mr. Latkin was party to a consulting agreement with each of Precious Capital and West Ventures pursuant to which, as of April 2015, an aggregate of approximately $13 million was owed to him, which amount was never paid and Mr. Latkin has no information as to the current value. Mr. Latkin's consulting agreements were terminated upon his ceasing to be an independent consultant in April 2015 with such entities. During his consultancy, Mr. Latkin was granted a .5% ownership interest in each of Precious Capital and West Ventures, however, to his knowledge he no longer owns such interests. In addition, PPVA owes Mr. Latkin $350,000 for unpaid consulting fees earned and expenses accrued in 2015 in respect of multiple consulting roles with them. Except as set forth above, Mr. Latkin has no other past or present affiliations with Platinum.

- Dr. Eric Rowinsky, our director, was recommended for appointment to the Company's Board of Directors by Dr. Goldberg at a time when Dr. Goldberg was affiliated with Platinum and has, since that time, been elected by the Company's stockholders to continue to serve as an independent director. At no time has Dr. Rowinsky been affiliated, or in any way related to, any of the Platinum entities.

Post-Closing Business and Proceeds from the Asset Sale (page 28)

- If the Asset Sale is approved by our stockholders and the other conditions to the closing of the Asset Sale are satisfied or waived, Cardinal Health 414 will acquire the Acquired Assets. We will retain all of our other assets and maintain a license to sell the Product outside of the Territory pursuant to the License-Back as a means to grow our revenues following the Asset Sale. We will also retain all debts and liabilities of the Company not assumed by Cardinal Health 414 pursuant to the Asset Purchase Agreement.

- We intend to use the initial cash proceeds payable at closing of the Asset Sale to pay off our debt to CRG and Platinum in the aggregate amount of approximately $65.5 million (less approximately $1.4 million if the transfer of debt to Dr. Goldberg occurs, as discussed under "Interests of Our Directors and Executive Officers in the Asset Sale" beginning on page 27) and for transaction costs associated with the Asset Sale. Any proceeds remaining, together with guaranteed payments of $20.1 million payable to us during the three years following closing, may be used, at the discretion of our Board of Directors, to fund future business activities and for general working capital purposes.

- If the Asset Sale is not approved by the holders of a majority of our outstanding shares of Common Stock, then Cardinal Health 414 or Navidea may terminate the Asset Purchase Agreement and, among other things, we will not be able to repay our debt to CRG or Platinum. In such instance, our Board of Directors and management will be required to reassess our options in light of our long-term strategic goals. Our Board of Directors and management will also need to focus on our ability to generate sufficient cash flow to sustain our operations and obtain alternative financing to pay off or refinance the CRG debt and the Platinum debt, which financing alternatives have, to date, been unsuccessful or not on terms as favorable to our stockholders as the Asset Sale.

Recommendation of Our Board of Directors (page 28)

- After careful consideration, our Board of Directors unanimously determined the Asset Sale to be advisable and in the best interests of the Company and our stockholders, and unanimously recommends to our stockholders that the Asset Sale be adopted and approved by our stockholders.

Other Agreements and Transactions Related to the Asset Sale (page 28)

- In addition to the Asset Purchase Agreement, we intend to enter into a number of related agreements with Cardinal Health 414, including, without limitation, the License-Back and a transition services agreement pursuant to which we shall provide certain transitional, administrative and support services to Cardinal Health 414 on a short-term basis.

- Under the Asset Purchase Agreement, we are required to amend and restate our license agreement with The Regents of the University of California (San Diego) ("UCSD") pursuant to which UCSD grants a license to us to exploit certain intellectual property rights owned by UCSD and Cardinal Health 414 will separately enter into a license agreement with UCSD pursuant to which UCSD will grant a license to Cardinal Health 414 to exploit certain intellectual property rights owned by UCSD for Cardinal Health 414 to sell the Product in North America.

- The Company shall grant to UCSD a five (5)-year warrant to purchase up to 1 million shares of the Company's Common Stock at an exercise price of $1.50 per share, which warrant is subject to anti-dilution and other customary terms and conditions.

7

Appraisal Rights (page 29)

- You will not experience any change in your rights as a stockholder as a result of the Asset Sale. Delaware law, our certificate of incorporation, and our bylaws do not provide for appraisal or other similar rights for dissenting stockholders in connection with the Asset Sale, and we are not independently providing stockholders with any such right. Accordingly, you will have no right to dissent and obtain payment for your shares in connection with the Asset Sale.

Material U.S. Federal, State and Local Income Tax Consequences (page 29)

- The Asset Sale will not result in any material U.S. federal, state or local income tax consequences to our stockholders. The transaction will be a taxable event to us for U.S. federal, state and local income tax purposes, but we anticipate that a portion of the taxable gain for U.S. federal, state and local income tax purposes resulting from the Asset Sale will be offset by net operating losses and tax credits. For a complete description of the material tax consequences of the Asset Sale to Navidea, you are urged to read the discussion under the section entitled "Material U.S. Federal, State and Local Income Tax Consequences," beginning on page 29 and to consult your tax advisor as to the United States federal income tax consequences of the Asset Sale, as well as the effects of state, local and foreign tax laws.

Regulatory Matters (page 29)

- We do not believe that the Asset Sale is subject to the reporting and waiting requirements of the Hart-Scott-Rodino Antitrust Improvements Act of 1976. Cardinal Health 414 is subject to the terms of the Final Order and Stipulated Permanent Injunction entered by the U.S. District Court for the Southern District of New York on April 23, 2015 in Federal Trade Commission v. Cardinal Health, Inc. (Civ. No. 15-CV-3031(ER)) (the "FTC Order"), and a condition to Cardinal Health 414's obligation to close the Asset Sale is that the waiting period (and any extension thereof) under such order will have expired or will have been terminated or otherwise determined to be inapplicable.

- Except as set forth above, we are not aware of any other material regulatory consents that are required in connection with the Asset Sale.

Covenants and Agreements (page 35)

- The parties have agreed to certain covenants, including, without limitation, covenants requiring that:

  - the Company preserve the present business operations, organization and goodwill of the Business and preserve present relationships with customers, suppliers and employees of the Business until the closing of the Asset Sale;

  - the Company continue to operate its Business generally in the ordinary course until the closing of the Asset Sale;

  - the Company not initiate, solicit, facilitate, or encourage alternative acquisition proposals involving the Acquired Assets or the sale of the Company as a whole, or provide information or engage in discussions with third parties in connection with any such acquisition proposal; and

  - from and after the closing date of the Asset Sale, the Company shall cease to make use of the name "Lymphoseek" and certain of our similar trade names and trademarks.

Covenant Not to Compete or Disclose (page 36)

- Under the Asset Purchase Agreement, we have also agreed, subject to certain exceptions, that for five years following the closing of the Asset Sale, the Company will not,

either directly or indirectly, engage in any business that competes with the Business (including marketing any products for unapproved uses that allow such products to compete with the Product) in the Territory.

- Pursuant to the License-Back, and subject to the Company's compliance with certain restrictions in the License-Back, Cardinal Health 414 will not use the intellectual property rights included in the Acquired Assets to develop, manufacture, market, sell or distribute any product other than the Product or any other product that (a) accumulates in lymphatic tissue or tumor-draining lymph nodes for the purpose of (i) lymphatic mapping or (ii) identifying the existence, location or staging of cancer in a body, or (b) provides for or facilitates any test or procedure that is reasonably substitutable for any test or procedure provided for or facilitated by the Product.

8

- Under the Asset Purchase Agreement, each of Cardinal Health 414 and Navidea covenant to use its good faith, commercially reasonable efforts to ensure that all labeling with respect to the products manufactured by or for the benefit of such party, for a period of five years following the closing of the Asset Sale, shall not suggest that users thereof may use such products in any manner (such as promoting "off-label" use) that would violate the restrictions of such party set forth in the Asset Purchase Agreement (with respect to Navidea) or the License-Back Agreement (with respect to Cardinal Health 414).

Supply and Distribution Agreement (page 36)

- The Supply and Distribution Agreement, dated November 15, 2007 (as amended, the "Supply and Distribution Agreement"), between Cardinal Health 414 and the Company will be terminated as of the closing of the Asset Sale and that the provisions thereof shall be of no further force or effect from and after the closing of the Asset Sale (other than any indemnification, notification or data sharing obligations which shall survive the termination).

Conditions to Completion of the Asset Sale (page 37)

- Before we can complete the Asset Sale, a number of conditions must be satisfied or waived by the appropriate party. These include, among other things:

  - the receipt of our stockholders' approval;

  - all filings with governmental authorities, if any, shall have been made and any necessary authorizations, consents or approvals required from such authorities shall have been obtained;

  - If any notification is required by the Hart-Scott Rodino Act, the waiting period (and any extension thereof) under such act shall have expired or will have been terminated;

  - the absence of any valid order, statute, rule, regulation, executive order, stay, decree, judgment or injunction which prohibits or prevents the consummation of the Asset Sale; and

  - The amended and restated license agreement between UCSD and the Company, and the license agreement between UCSD and Cardinal Health 414, shall each have been executed by the respective parties.

- In addition, the obligations of Cardinal Health 414 to complete the Asset Sale are subject to the satisfaction by us or waiver by Cardinal Health 414 of conditions, including the following:

  - Our fundamental representations and warranties set forth in the Asset Purchase Agreement shall be true and correct in all material respects as of the date of execution of the Asset Purchase Agreement and as of the closing date, and all other representations and warranties set forth therein shall be true and correct (without regard to any qualifications therein as to materiality or material adverse effect) as of the date of execution of the Asset Purchase Agreement and as of the Closing Date as though such representations and warranties were made as of the Closing Date (or as of the specific date referred to for any representation or warranty which specifically refers to an earlier date), except in each case for breaches or inaccuracies of such representations or warranties that, individually or in the aggregate, have not had and would not reasonably be expected to have a material adverse effect;

  - We shall have performed and complied in all material respects with all agreements contained in the Asset Purchase Agreement required to be performed or complied with prior to the closing of the Asset Sale;

- After the date of the Asset Purchase Agreement no Material Adverse Effect (as defined below under "Asset Purchase Agreement – Representations and Warranties") shall have occurred; and

9

- All investigations relating to the Field Alert Report submitted by Cardinal Health 414 to the FDA on March 31, 2016 will have been completed and closed, and any flawed assay method that may be the root cause for the failure that led to the Field Alert Report will have been addressed to the satisfaction of Cardinal Health 414.

- Finally, our obligations to complete the Asset Sale are subject to the satisfaction by Cardinal Health 414 or waiver by us of certain conditions, including the following:

  - Cardinal Health 414's fundamental representations and warranties set forth in the Asset Purchase Agreement shall be true and correct in all material respects as of the date of execution of the Asset Purchase Agreement and as of the closing date, and all other representations and warranties set forth therein shall be true and correct (without regard to any qualifications therein as to materiality or material adverse effect) as of the date of execution of the Asset Purchase Agreement and as of the Closing Date as though such representations and warranties were made as of the Closing Date (or as of the specific date referred to for any representation or warranty which specifically refers to an earlier date), except in each case for breaches or inaccuracies of such representations or warranties that, individually or in the aggregate, have not had and would not reasonably be expected to have a material adverse effect on the ability of Cardinal Health 414 to perform its obligations under the Asset Purchase Agreement or to consummate the transactions contemplated by such agreement; and

  - Cardinal Health 414 shall have performed and complied in all material respects with all agreements contained in the Asset Purchase Agreement required to be performed or complied with at or prior to the closing of the Asset Sale.

Termination (page 38)

- Under certain circumstances, the Asset Purchase Agreement may be terminated and the Asset Sale may be abandoned at any time prior to the closing, whether before or after approval of the Asset Sale by our stockholders. If the Asset Purchase Agreement is terminated, we may be responsible for payment of termination fees and/or reasonable out-of-pocket expenses, and/or be required to extend the term of the Supply and Distribution Agreement with Cardinal Health 414 for an additional three-year period, as described below and in the section entitled "Asset Purchase Agreement – Termination Fees and Expenses."

Termination Fees; Expenses (pages 38-39)

- If the Company terminates the Asset Purchase Agreement at any time prior to obtaining stockholder approval because the Company enters into another acquisition agreement providing for the implementation of transactions contemplated by a superior proposal, as defined in the Asset Purchase Agreement, or Cardinal Health 414 terminates the Asset Purchase Agreement as a result of (i) the Company's board adversely changing its favorable recommendation that the Company's stockholders approve the Asset Sale, (ii) the Company failing to reconfirm its favorable recommendation of the Asset Sale in certain instances upon request by Cardinal Health 414, (iii) the Company or its Board of Directors making certain public disclosure with respect to any acquisition proposal other than the Asset Sale, or (iv) the Company breaching in any material respect any of its exclusivity obligations under the Asset Purchase Agreement, then the Company will be required to pay a termination fee of $3,000,000 to Cardinal Health 414 and reimburse Cardinal Health 414 for its reasonable out-of-pocket expenses, actually documented and incurred or payable by or on behalf of Cardinal Health 414 in connection with or in anticipation of the Asset Sale and the agreements related thereto, including all attorney's fees, financial advisor's fees, accountants' fees and filing fees not to exceed $2,000,000 in the aggregate; provided, however, that if Cardinal Health 414 elects to extend the Supply and Distribution Agreement pursuant to the terms of the Asset Purchase Agreement, the termination fee will not be paid and Cardinal Health 414 will only be eligible to receive a reimbursement of expenses.

- In the event that the Asset Purchase Agreement is terminated pursuant to the termination provisions of the Asset Purchase Agreement and within twelve months after such termination, the Company accepts a written offer for, or otherwise enters into an agreement or consummates one or more transactions that, directly or indirectly, result in a sale, license or other transfer of the Business, the Product or all or substantially all of the Company or its assets to a third party, then the Supply and Distribution Agreement shall, subject to the applicable requirements of the FTC Order, be extended under the existing terms for a period of three years from its then-existing expiration

date; provided, however, that if the parties are unable to extend the Supply and Distribution Agreement under the FTC Order due to the action of any governmental authority or for any other reason, Cardinal Health 414 will be eligible to be paid the termination fee of $3,000,000.

10

- If the Asset Purchase Agreement is terminated by (i) Cardinal Health 414 (so long as Cardinal Health 414 is not then in material breach of the Asset Purchase Agreement) if a breach of the Asset Purchase Agreement by the Company results in or would result in certain conditions of the Asset Purchase Agreement not being satisfied and such breach cannot be cured or, if curable, remains uncured for a period of 30 days after the Company has received written notice from Cardinal Health 414 of the occurrence of such breach (of, if earlier, the date of termination), and such conditions have not been waived by Cardinal Health 414, or (ii) either party if the Asset Sale is not approved by the stockholders, then the Company will reimburse Cardinal Health 414 for its reasonable out-of-pocket expenses, actually documented and incurred or payable by or on behalf of Cardinal Health 414 in connection with or in anticipation of the Asset Sale and the agreements related thereto, including all attorney's fees, financial advisor's fees, accountants' fees and filing fees not to exceed $2,000,000 in the aggregate. In addition, if prior to such termination there exists another proposal for the acquisition, merger, consolidation or other business combination involving the Product or the Company, and within twelve months after such termination the Company or its subsidiaries accepts a written offer for, or otherwise enters into an agreement to consummate or consummates, such other acquisition, merger, consolidation or other business combination involving the Product or the Company, then upon the signing of a definitive agreement related to any such transaction, or, if no such agreement is signed, then upon consummation of any such transaction, the Company will pay to Cardinal Health 414 a $3,000,000 termination fee unless Cardinal Health 414 elects to extend the Supply and Distribution Agreement in accordance with the Asset Purchase Agreement and such term is actually so extended.

QUESTIONS AND ANSWERS ABOUT THE ASSET SALE

The following questions and answers briefly address some commonly asked questions about the Asset Sale and the Asset Purchase Agreement. These questions and answers may not address all questions that may be important to you as a stockholder. You should still carefully read this entire proxy statement, including each of the appendices and the documents referred to or incorporated by reference in this proxy statement because the information in this section does not provide all the information that may be important to you as a stockholder of the Company with respect to the proposals.

<u>The Asset Sale</u>

Q:   What is the proposed transaction?

A:   The Asset Purchase Agreement provides for the sale of our assets used, held for use, or intended to be used in operating the Business in the Territory (giving effect to the license-back described below and excluding certain assets specifically retained by the Company), such assets consisting primarily of, without limitations (i) intellectual property used in or reasonably necessary for the conduct of the Business, (ii) inventory of, and certain customer, distribution, and product manufacturing agreements related to, our Product, (iii) the new drug application approved by the U.S. Food and Drug Administration for the Product and all files and records related thereto; and (iv) all right, title and interest in and to the Product, for: (i) a cash payment of $80,000,000 (reduced by an aggregate of approximately $65.5 million of indebtedness to be repaid to CRG and Platinum on behalf of the Company (less approximately $1.4 million if the transfer of debt to Dr. Goldberg occurs, as discussed under "Interests of Our Directors and Executive Officers in the Asset Sale" beginning on page 27), the amount by which, if any, transferred Product inventory is less than $6 million, and estimated transaction costs of $600,000); (ii) the agreement of Cardinal Health 414 to assume certain liabilities of the Company associated with the Product as specified in the Asset Purchase Agreement; and (iii) periodic earnout payments (to consist of contingent payments and milestone payments) to us based on the annual "Net Sales" derived from the purchased Product, subject to Cardinal Health 414's right to off-set. As part of the Asset Sale, subject to certain conditions, Cardinal Health 414 will enter into a license-back agreement with the Company pursuant to which Cardinal Health 414 will grant to us a sublicensable (subject to conditions) and royalty-free license to use certain intellectual property rights included in the Acquired Assets and owned by Cardinal Health 414 as of the closing of the Asset Sale to the extent necessary for the Company to (i) on an exclusive basis, subject to certain conditions, develop, manufacture, market, sell and distribute new pharmaceutical and other products that are not Competing Products, and (ii) on a non-exclusive basis, develop, manufacture, market, sell and distribute the Product throughout the world other than in the Territory. As used in the License-Back, a Competing Product is any pharmaceutical or other product that: (i) accumulates in lymphatic tissue or tumor-draining lymph nodes for the purpose of (a) lymphatic mapping or (b) identifying the existence, location or staging of cancer in a body; (ii) provides for or facilitates any test or procedure that is reasonably substitutable for any test or procedure provided for or facilitated by the Product; or (iii) is marketed for unapproved uses that allow such product to compete with the Product. Subject to the Company's compliance with certain restrictions in the License-Back, the License-Back also restricts Cardinal Health 414 from using the intellectual property rights included in the Acquired Assets to

develop, manufacture, market, sell or distribute any product other than the Product or other product that (a) accumulates in lymphatic tissue or tumor-draining lymph nodes for the purpose of (1) lymphatic mapping or (2) identifying the existence, location or staging of cancer in a body, or (b) provides for or facilitates any test or procedure that is reasonably substitutable for any test or procedure provided for or facilitated by the Product. Pursuant to the License-Back, Cardinal Health 414 will be provided with a right of first offer to market, sell and/or market any new products developed from the intellectual property rights licensed by Cardinal Health 414 to the Company by the License-Back. Also as part of the Asset Sale, the Company shall grant to Cardinal Health 414 a five (5)-year warrant to purchase up to 10 million shares of the Company's common stock, par value $.001 per share, at an exercise price of $1.50 per share.

11

Q: Why are we asking for a stockholder vote?

A: Stockholder approval of the Asset Sale is a condition to the closing of the Asset Sale under the terms of the Asset Purchase Agreement we negotiated with Cardinal Health 414.

Q: What is the purpose of the proposed transaction?

A: The Company and its subsidiary Macrophage Therapeutics, Inc. ("Macrophage"), as guarantor, are parties to a loan agreement with CRG and other lenders (the "CRG Loan Agreement") pursuant to which there is an aggregate amount of approximately $55.9 million outstanding owed to CRG. During April 2016, the Company received several notices from CRG which claimed that certain events of default had occurred under the CRG Loan Agreement and, as such, interest on the Company's debt to CRG would begin to accrue at a default rate at 18% per annum until paid. On May 31, 2016, CRG declared all of the Company's obligations under the CRG Loan Agreement and all other loan documents to be immediately due and payable. The Company disputes the amount claimed to be due and believes that CRG does not have the right to accelerate the loan. Furthermore, the Company believes that CRG's actions to accelerate the loan constitute a material breach of the CRG Loan Agreement and therefore, the Company is no longer subject to certain provisions of such agreement. This matter is currently being litigated in Harris County Court, Texas.

In addition, the Company's loan agreement with Platinum (the "Platinum Loan Agreement"), pursuant to which there is an aggregate amount of approximately $9.6 million outstanding (inclusive of approximately $1.4 million currently contemplated to be transferred to Dr. Goldberg, as discussed under "Interests of Our Directors and Executive Officers in the Asset Sale" beginning on page 27), carries standard non-financial covenants typical for commercial loan agreements, many of which are similar to those contained in the CRG Loan Agreement, that impose significant requirements on the Company. The Company's ability to comply with these provisions may be affected by changes in our business condition or results of our operations, or other events beyond our control. The breach of any of these covenants would result in a default under the Platinum Loan Agreement, permitting Platinum to terminate our ability to obtain additional draws under the Platinum Loan Agreement and accelerate the maturity of the debt, subject to the limitations of a subordination agreement with CRG. Such actions by Platinum could materially adversely affect our operations, results of operations and financial condition, including causing us to substantially curtail our product development activities.

As a result of the foregoing, the Company believes the best course of action is to pay off its debt to CRG and Platinum and that the Asset Sale will provide the Company with the cash proceeds needed to do so. In addition, the Asset Purchase Agreement requires that, at closing, all indebtedness of the Company be paid in full out of the initial closing cash payment, which includes debts payable to CRG and Platinum. The Platinum Loan Agreement also prohibits us from selling the Business without either obtaining Platinum's consent or repaying the outstanding Platinum debt in full. Furthermore, in connection with the Asset Sale, the $20.1 million of guaranteed payments (subject to Cardinal Health 414's right to off-set from such payments any indemnification obligations of the Company) paid to us during the first three years following the closing of the Asset Sale will provide the Company with needed financial liquidity and flexibility, and provide the Company with the opportunity to continue to operate its Remaining Businesses, as defined below, while pursuing other initiatives intended to increase stockholder value.

Q:  What are the estimated net cash proceeds from the Asset Sale?

A:  We currently estimate the net cash proceeds from the Asset Sale to be approximately $14 million after the payment of $55.9 million principal, accrued interest and fees to CRG, $9.6 million principal to Platinum (less approximately $1.4 million if the transfer of debt to Dr. Goldberg occurs, as discussed under "Interests of Our Directors and Executive Officers in the Asset Sale" beginning on page 27), and estimated transaction costs of $600,000. This estimate assumes that the Asset Sale is completed by February 28, 2017, and does not include the potential additional $230 million in earnout payments (inclusive of contingent and milestone payments) available pursuant to the terms of the Asset Purchase Agreement, of which $20.1 million is guaranteed to be paid. The actual amount of net cash proceeds from the Asset Sale may vary from this estimate. In addition, this estimate does not include, and the actual amount of cash proceeds from the Asset Sale will be reduced by, among other things, continuing benefit costs for departing employees.

Q:  How does Navidea plan to use the net cash proceeds from the Asset Sale?

A:  We currently anticipate that we will use the majority of the initial net cash proceeds from the Asset Sale to pay off our indebtedness owed to Platinum (as necessitated by the Platinum Loan Agreement) and CRG.  We anticipate that the balance from such proceeds, along with $20.1 million of guaranteed payments and any contingent payments under the Asset Purchase Agreement, will be used for working capital and general corporate purposes and to continue to invest in (i) Macrophage, our majority-owned subsidiary that was formed specifically to further explore immune-therapeutic applications for the Manocept platform; (ii) advancing our technology for the early diagnosis and disease monitoring for Cardiovascular diseases or "CVD," rheumatoid arthritis or "RA," along with other macrophage involved diseases; and (iii) the development, manufacture, and commercialization of the Product outside the Territory (hereinafter referred to collectively as the "Remaining Businesses"). We may also use proceeds from the Asset Sale for future acquisitions complementary to our Remaining Businesses; however, at this time no specific acquisition targets have been identified. If we have adequate working capital and establish adequate cash reserves without using all of our cash, and if we are unable to identify suitable acquisition targets that are appropriately valued, we will consider alternate uses of any excess cash in order to enhance stockholder value.

Q:  When will the Asset Sale be consummated?

A:  In the event the stockholders approve the Asset Sale and the Asset Purchase Agreement, we expect that the Asset Sale will close promptly following our Special Meeting. However, the consummation of the Asset Sale is contingent upon a number of closing conditions, including: (i) the absence of a material adverse effect on the Acquired Assets subject to the Asset Sale, the liabilities to be assumed by the Buyer, or the financial condition or results of operations attributed to the Product; (ii) the representations and warranties of the parties being true and correct at closing except as would not reasonably be expected to have a material adverse effect; (iii) there being no material breaches of the terms of the Asset Purchase Agreement; (iv) the absence of any litigation or other legal requirement prohibiting the consummation of the Asset Sale; (v) the receipt of certain third party consents; and (vi) certain other customary closing conditions.

Q:  Will Navidea continue to be publicly traded following the Asset Sale? Will its NYSE MKT ticker symbol change?

A:  The Company will continue to be a publicly traded company whether or not the Asset Sale closes so long as we continue to meet the requirements for continued listing under the rules and regulations of the United States Securities and Exchange Commission (the "SEC") and the NYSE MKT. There can be no assurances in this regard. As long as we continue to trade publicly, we do not intend to change our NYSE MKT ticker symbol, and will remain "NAVB" whether or not the Asset Sale closes.

Q:  What vote of our stockholders is required to adopt and approve the Asset Sale?

A:  For us to complete the Asset Sale, stockholders holding at least a majority of the shares of our outstanding Common Stock at the close of business on the record date (January 23, 2017) must vote "FOR" the proposal adopting and approving the Asset Sale.

Q: What will happen if the Asset Sale is not approved by our stockholders?

A: If the Asset Sale is not approved by our stockholders, we will not complete the Asset Sale and the other transactions contemplated by the Asset Purchase Agreement. In that event, we will be unable to pay our existing debt to CRG and Platinum or to continue to operate the Company as we have been doing. Our Board of Directors will continue to evaluate strategic alternatives, but any such strategic alternatives previously identified have been unsuccessful and, in any event, have not been on terms as favorable to our stockholders as the Asset Sale. In addition, under the Asset Purchase Agreement, we would also be required to reimburse Cardinal Health 414 an amount equal to reasonable out-of-pocket expenses, actually documented and incurred or payable by or on behalf of Cardinal Health 414 in connection with or in anticipation of the Asset Sale and the agreements related thereto, including all attorney's fees, financial advisor's fees, accountants' fees and filing fees up to a maximum amount of $2,000,000 in the aggregate. Moreover, if, prior to such termination, there exists another proposal for the acquisition, merger, consolidation or other business combination involving the Product or the Company, and within twelve months after such termination the Company or its subsidiaries accepts a written offer for, or otherwise enters into an agreement to consummate or consummates, such other acquisition, merger, consolidation or other business combination involving the Product or the Company, then upon signing of a definitive agreement relating to such transaction, or, if no such agreement is signed, then upon consummation of any such transaction, the Company will pay to Cardinal Health 414 a termination fee of $3,000,000 unless Cardinal Health 414 elects to extend the term of the Supply and Distribution Agreement and such term is actually so extended.

Q: Who will solicit and pay the cost of soliciting proxies?

A: All expenses in connection with this solicitation of proxies will be paid by us. Proxies will be solicited principally by mail, but directors, officers and certain other individuals authorized by us may personally solicit proxies.

Q: Who can help answer any other questions I might have?

A: If you have additional questions about the Asset Sale or need assistance in submitting your proxy or voting your shares of our Common Stock, please contact Laurel Hill Advisory Group, 2 Robbins Lane, Suite 201, Jericho, NY 11753, our proxy solicitor. Banks and brokers may call (516) 933-3100; all others may call toll-free at (888) 742-1305. You can also refer to the section of this proxy statement entitled, "Where You Can Find More Information; Incorporation by Reference."

## CAUTIONARY STATEMENT CONCERNING FORWARD-LOOKING INFORMATION

This proxy statement, and the documents to which we refer you to in this proxy statement, contain forward-looking statements, as that term is defined in the Private Securities Litigation Reform Act of 1995, including, among others, under the headings "Summary Term Sheet," "Questions and Answers About the Asset Sale," "Asset Sale," "The Asset Purchase Agreement," "Proposal No 1 – The Asset Sale and the Asset Purchase Agreement," and in statements containing the words "anticipates," "believes," "could," "estimates," "expects," "intends," "may," "should," "plans," "targets" and/or similar words or expressions. Forward-looking statements also include the following: (1) statements containing projections of revenues, operating expenses, income (or loss), earnings (or loss) per share, capital expenditures, dividends, capital structure, and other financial items; (2) statements concerning the plans and objectives of the Company's management for future operations, including plans or objectives relating to its products or services; (3) statements of future economic performance; (4) statements of the assumptions underlying or relating to any statement described in (1), (2), or (3); and (5) statements regarding the timing or completion of the Asset Sale. Actual results could differ materially from those predicted by these forward-looking statements.

You should be aware that forward-looking statements involve known and unknown risks and uncertainties as well as assumptions, among other things, about us and regulatory, clinical, economic and market factors, among others. Although we believe that the expectations reflected in these forward-looking statements are reasonable, we cannot assure you that the actual results or developments we anticipate will be realized, or even if realized, that they will have the expected effects on the business or operations of the Company. These forward-looking statements speak only as of the date on which the statements were made and we undertake no obligation to publicly update or revise any forward-looking statements made in this proxy statement or elsewhere as a result of new information, future developments or otherwise.

# EXHIBIT 88

BART M. SCHWARTZ

Solely in his capacity of Receiver of Certain
Platinum Partners funds as more particularly set out in the
Orders of the Federal Court for the

EASTERN DISTRICT OF NEW YORK
*bearing civil case No. NYC160148*

February 28, 2017

Jed Latkin
Interim Chief Operating Officer and Chief Financial Officer
Navidea Biopharmaceuticals, Inc.
5600 Blazer Parkway
Suite 200
Dublin, Ohio 43017

## RE: PLATINUM NOTE AND PLATINUM LOAN AGREEMENT

Dear Mr. Latkin,

Subject to the December 19, 2016 order of the United Stated District Court for the Eastern District of New York (*Securities and Exchange Commission v. Platinum Management (NY) LLC, et al., Civil Action No. 16-CV-6848 Docket No. 6),* the undersigned was appointed the Receiver of Platinum Partners Credit Opportunities Master Fund, LP ("PPCO").

PPCO makes reference to that certain Loan Agreement entered into by and between Platinum-Montaur Life Sciences, LLC as lender ("Platinum-Montaur") and Navidea Biopharmaceuticals, Inc as borrower (the "Company") on July 25, 2012 and the notes issued pursuant to the Loan Agreement (collectively, as anytime amended, the "Platinum Debt"). Based on the Company's representations in the most recent Definitive Proxy Statement Form 14A filed by the Company with the Securities and Exchange Commission with an effective date of February 8, 2017 (the "Proxy Statement"), the Platinum Debt had an outstanding principal balance of approximately $9,300,000 as of September 30, 2016. PPCO asserts that it is the current holder of a portion of the Platinum Debt consisting of $7,022,715.21 of principal and accrued interest as of March 22, 2016 plus all related accrued and outstanding interest (the "PPCO Portion"). The remaining portion of the Platinum Debt, consisting of $1,742,684.20 of principal and accrued interest as of March 22, 2016 plus all related accrued and outstanding interest, continues to be held by Platinum Montaur, which will provide you with separate instructions as to the payment of its portion of the Platinum Debt.

The Proxy Statement references the pending sale of certain assets of the Company to Cardinal Health 414, LLC pursuant to which the Company would receive $80 million in cash plus future consideration tied to annual sales of the Lymphoseek product and certain sales-based milestones (the "Sale"). The Proxy Statement further references its obligation to repay the Platinum Debt in order to effectuate the Sale.

1325 Avenue of the Americas ● 27th Floor ● Suite 2717 ● New York, NY 10019 ● 212.817.6733

The Company is hereby put on notice that: (a) PPCO is the current holder of the PPCO Portion of the Platinum Debt and the Company may only take direction from the Receiver with regards to the PPCO Portion of the Platinum Debt; (b) Pursuant to the terms and conditions of the Loan Agreement, the Company is prohibited from consummating any transaction in which certain rights, title and interests in Lymphoseek would be sold; and (c) PPCO demands the full prepayment and complete repayment of the PPCO Portion of the Platinum Debt prior to, or simultaneously with, the consummation of the Sale.

Based on our records, as of March 1, 2017 the balance owed to PPCO on account of the PPCO Portion of the Platinum Debt will be approximately $7,714,109.47, and each day during the month of March interest shall accrue at $1,740.64 per day (the "PPCO Payoff Amount"). Please direct the payments of the PPCO Portion of the Platinum Debt to the following accounts:

1. $125,000 to the Cleveland Clinic
   Bank Name:             PNC Bank
   Bank Address:          1900 East 9th Street Cleveland, OH 44114
   SWIFT Code             PNCCUS33
   ABA/Routing Number:    041000124
   Account Name:          Cleveland Clinic Health System Master Account
   Account Number:        4224711715

2. Balance of the PPCO Payoff Amount to Platinum Credit Opportunities Master Fund, LP
   Bank:                  Capital One Bank
   ABA#:                  021407912
   Bank Address:          3090 Ocean Avenue, Brooklyn, NY 11235
   Account Number:        7047565051
   Account Name:          Platinum Partners Credit Opportunities Master Fund LP
   Account Address:       1325 Avenue of the Americas #2717 New York, NY 10019

Should you have any questions regarding this letter, the PPCO Portion of the Platinum Debt balance calculation, or the payment instructions please feel free to contact me at any time. Additionally, please provide us with a draft payoff letter for our review.


Very truly yours,

_Bart M. Schwartz_

_____
Bart M. Schwartz As Receiver
Receiver, Platinum Credit Opportunities Master Fund, LP

1325 Avenue of the Americas ● 27th Floor ● Suite 2717 ● New York, NY 10019 ● 212.817.6733

# EXHIBIT 99

RHSW CARIBBEAN

February 27, 2017

Jed Latkin
Interim Chief Operating Officer and
Chief Financial Officer
Navidea Biopharmaceuticals, Inc.
5600 Blazer Parkway
Suite 200
Dublin, Ohio 43017

Dear Mr. Latkin

**Platinum Partners Value Arbitrage Fund L.P. – In Official Liquidation (the "Master Fund" or "PPVA")**
**Re: Platinum Loan Payoff and Instructions for Payment**

Please be advised that on October 27 2016, by order of the Grand Court of the Cayman Islands (the "**Grand Court**") the Master Fund was placed into official liquidation. Messrs Matthew Wright and Christopher Kennedy of RHSW (Cayman) Limited, PO Box 897, Windward 1, Regatta Office Park, Grand Cayman KY1-1103, Cayman Islands were appointed joint official liquidators ("**JOLs**") of the Company, initially on an interim basis, until their permanent appointment was confirmed by the Grand Court following a hearing on December 12 2016. Please find attached a copy of the Company's winding up order (dated October 27 2016) together with a copy of the final order for appointment of official liquidators (dated December 16 2016) for your information.

PPVA is the holder of 99% of the membership interests in Platinum Montaur Life Sciences, LLC ("Platinum Montaur"). By written consent executed on February 3, 2017, I was appointed as an Operating Manager of Platinum-Montaur.

As you are aware, Navidea Biopharmaceuticals, Inc. (the "**Company**") as borrower and Platinum-Montaur as lender, are parties to that certain Loan Agreement dated July 25, 2012 and the notes issued pursuant thereto (collectively, as anytime amended, the "Platinum Loan"). Based on the Company's representations in the most recent Definitive Proxy Statement Form 14A filed by the Company with the Securities and Exchange Commission with an effective date of February 8, 2017 (the "**Proxy Statement**"), the total principal balance owed by the Company with respect to the Platinum Loan as of September 30, 2016 was approximately $9,300,000 plus accrued and accruing interest thereon (the "**Platinum Debt**"). Platinum-Montaur asserts that it is the current holder of a portion of the Platinum Debt consisting of at least $1,742,684.20 of principal and accrued interest as of March 22, 2016 plus all related accrued and outstanding interest thereon (the "**Platinum-Montaur Portion**"). Platinum-Montaur understands that Platinum Partners Credit Opportunities Fund L.P. ("**PPCO**") asserts that it is the holder of the remaining principal portion of the Platinum Debt, and the PPCO receiver, Bart Schwartz, will provide you with separate instructions as to the payment of that portion of the Platinum Debt.

RHSW (Cayman) Limited

Windward 1
Regatta Office Park
PO Box 897
Grand Cayman KY1-1103
CAYMAN ISLANDS

Tel: 1 (345) 949 7576
Fax: 1 (345) 949 8295

admin@rhswcaribbean.com
www.rhswcaribbean.com

RHSW (Cayman) Limited is a joint venture between Rawlinson & Hunter
Cayman Islands and Smith & Williamson in the United Kingdom

RHSW CARIBBEAN

The Proxy Statement references the pending sale of certain assets of the Company to Cardinal Health 414, LLC pursuant to which the Company would receive $80 million in cash plus future consideration tied to annual sales of the Lymphoseek product and certain sales-based milestones (the "**Sale**"). The Proxy Statement further references its obligation to repay the Platinum Debt in order to effectuate the Sale.

The Company is hereby put on notice that: (a) Platinum-Montaur is the current holder of at least the Platinum-Montaur Portion of the Platinum Debt and the Company may only take direction from the Liquidators with regards to the Platinum-Montaur Portion of the Platinum Debt; (b) Pursuant to the terms and conditions of the Loan Agreement, the Company is prohibited from consummating any transaction in which certain rights, title and interests in Lymphoseek would be sold; and (c) Platinum-Montaur demands the full prepayment and complete repayment of the Platinum-Montaur Portion of the Platinum Debt prior to, or simultaneously with, the consummation of the Sale.

Based on our records, as of March 1, 2017 the balance owed to Platinum-Montaur on account of the Platinum-Montaur Portion of the Platinum Debt will be approximately $1,913,963.48, and each day during the month of March interest shall accrue at $431.87 per day (the "**Platinum-Montaur Payoff Amount**"). Please provide a draft payoff letter documenting these amounts and direct the payments of the Platinum-Montaur Portion of the Platinum Debt to the following accounts:

| | |
|---|---|
| Remit to: | JPMorgan Chase Bank, N. A. |
| | 270 Park Avenue, New York, NY, USA 10017 |
| | SWIFT BIC: CHASUS33 |
| | CHIPS ABA: 0002 |
| | FED WIRE ABA: 021000021 |
| | |
| To Credit: | Scotiabank & Trust (Cayman) Ltd. |
| | Grand Cayman, Cayman Islands |
| | SWIFT BIC: NOSCKYKX |
| | Account # 001058543 |
| | |
| For further credit to: | Platinum Partners Value Arbitrage Fund L.P. (In Official Liquidation) |
| | Account #10028074 |

R<sub>H</sub>S<sub>W</sub> CARIBBEAN

If you have any further questions please do not hesitate to contact me.

Yours faithfully,

Matthew Wright
Joint Official Liquidator

Encl.

- Grand Court of the Cayman Islands Order dated October 27, 2016
- Grand Court of the Cayman Islands Order dated December 16, 2016

# EXHIBIT 100

## BART M. SCHWARTZ

Solely in his capacity of Receiver of Certain
Platinum Partners funds as more particularly set out in the
Orders of the Federal Court for the

EASTERN DISTRICT OF NEW YORK
*bearing civil case No. NYC160148*

March 2, 2017

Navidea Biopharmaceuticals, Inc.
5600 Blazer Parkway, Suite 200
Dublin, Ohio 43017-7550

**Re:    Platinum Payoff**

Ladies and Gentlemen:

Reference is hereby made to all liabilities, obligations and indebtedness (the "**Indebtedness**") owing by Navidea Biopharmaceuticals, Inc., a Delaware corporation (including its affiliates, the "**Borrower**") pursuant to that certain Loan Agreement, dated July 25, 2012 (as amended on June 25, 2013, March 4, 2014, May 8, 2015 and otherwise) by and between Borrower and Platinum-Montaur Life Sciences, LLC ("**Platinum-Montaur**"), the Third Amended and Restated Promissory Note, dated May 15, 2015 made by Borrower in favor of Platinum-Montaur, and all other documents related thereto (collectively, the "**Loan Documents**").  By letter dated February 28, 2017 from Bart M. Schwartz, in his capacity as Receiver of Platinum Partners Credit Opportunities Master Fund, LP (the "**Lender**"), the Borrower was informed that the Lender is the current holder of the Indebtedness to the extent of $7,022,715.21 of principal and accrued interest as of March 22, 2016 plus all related accrued and outstanding interest amount.

If paid on or prior to March 1, 2017 (the "Payoff Date"), the total amount owing to Lender, including interest and any prepayment or termination fees and penalties owing to Lender, is $7,714,109.47 (the "Payoff Amount").  If the Payoff Amount is not satisfied in full as of the Payoff Date, per diem interest of $1,740.64 shall be added to the Payoff Amount.

The Payoff Amount, and any per diem interest payments added thereto, will be fully satisfied by Borrower by wiring such amount pursuant to the following wire instructions:

1.  $125,000 to the Cleveland Clinic
    Bank Name: PNC Bank
    Bank Address: 1900 East 9th Street Cleveland, OH 44114
    SWIFT Code PNCCUS33
    ABA/Routing Number: 041000124
    Account Name: Cleveland Clinic Health System Master Account
    Account Number: 4224711715

2. Balance of the PPCO Payoff Amount to Platinum Partners Credit Opportunities
Master Fund, LP
Bank: Capital One Bank
ABA#: 021407912
Bank Address: 3090 Ocean Avenue, Brooklyn, NY 11235
Account Number: 7047565051
Account Name: Platinum Partners Credit Opportunities Master Fund LP
Account Address: 1325 Avenue of the Americas #2717 New York, NY 10019

Upon payment by or on behalf of Borrower of the Payoff Amount, all Indebtedness owed to Lender shall have been satisfied in full, Borrower shall owe no further obligations whatsoever to Lender on account of the Loan Documents and all Loan Documents shall terminate and have no further force or effect.  The Lender acknowledges and confirms that the Indebtedness is unsecured, no UCC or other filings have been made claiming any security interest with respect to the Indebtedness and, accordingly, no filings or other actions are necessary or advisable to fully and finally release and discharge the Indebtedness or any security interest with respect thereto. Notwithstanding the foregoing, the Lender agrees, upon the request of Borrower, its successors and/or their respective attorneys, to execute and deliver such additional agreements or documents as are necessary or advisable to evidence the satisfaction of Borrower's obligations under the Loan Documents.

Effective as of the date (the "Release Date") of payment in full by or on behalf of Borrower of the Payoff Amount and any per diem interest payments added thereto, Lender hereby fully, finally and irrevocably releases, waives, acquits and forever discharges Borrower, Cardinal Health 414, LLC, and their respective subsidiaries, affiliates, divisions, predecessors, successors and assigns, and the officers, directors, stockholders, employees, agents, attorneys, lenders, investors, insurers and agents thereof (collectively, the "Released Parties") from any and all actions, causes of action, suits, debts, claims, counterclaims, commitments, agreements, contracts, damages, demands, liabilities, obligations, costs, expenses, and sums of money of every kind and nature whatsoever, past, present or future, at law or in equity, whether known or unknown, contingent or otherwise (collectively, the "Liabilities"), which Lender had, has or may have at any time based on facts, events, circumstances, agreements, acts or omissions existing or occurring on or prior to the Release Date, against the Released Parties, or any of them (collectively, "Causes of Action").

To the extent that any Cause of Action is made against any of the Released Parties by any affiliate(s) of Lender, Lender agrees to reimburse, indemnify, and hold harmless the Released Parties against and in respect of any and all Liabilities incurred or suffered by any of them as a result of such Cause of Action.

Lender represents warrants and agrees that (i) it has the corporate power and authority to execute and deliver this Payoff Letter and to carry out its obligations hereunder, and (ii) this Payoff Letter constitutes the valid and binding obligation of Lender and is enforceable against such Lender in accordance with its terms.

Very truly yours,

Platinum Partners Credit Opportunities Master
Fund, LP


By: _____

Name: <u>Bart M. Schwartz as Receiver</u>

Its: <u>Receiver</u>

# EXHIBIT 11

10-Q 1 navb20170630_10q.htm FORM 10-Q

# UNITED ST ATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

## FORM 10-Q

(Mark One)

☒    QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the quarterly period ended June 30, 2017

☐    TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from to _____ to

Commission File Number: 001-35076

# NAVIDEA BIOPHARMACEUTICALS, INC.

(Exact name of registrant as specified in its charter)

| Delaware | 31-1080091 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (IRS Employer Identification No.) |
| 4995 Bradenton Avenue, Suite 240, Dublin, Ohio | 43017-3552 |
| (Address of principal executive offices) | (Zip Code) |

(614) 793-7500
(Registrant's telephone number, including area code)

(Former name, former address and former fiscal year, if changed since last report)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☒ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| Emerging Growth Company | ☐ | | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12-b-2 of the Act.) Yes ☐  No ☒

Indicate the number of shares outstanding of each of the issuer's classes of common stock, as of the latest practicable date: 162,206,646 shares of common stock, par value $.001 per share (as of the close of business on August 1, 2017).

In 2016, MT's Board of Directors authorized modification of the original MT Preferred Stock to a convertible preferred stock with a 10% paid-in-kind ("PIK") coupon retroactive to the time the initial investments were made. The conversion price of the MT Preferred Stock will remain at the $500 million initial market cap but a full ratchet was added to enable the adjustment of conversion price, warrant number and exercise price based on the valuation of the first institutional investment round. In addition, the MT Board of Directors authorized issuance of additional MT Preferred Stock with the same terms to Platinum as compensation for the additional $200,000 of investments made in December 2015 and May 2016. Based on the decision to issue equity for the additional $200,000 of investments made by Platinum, the liability was reclassified to additional paid-in-capital in January 2017. As of the date of filing of this Form 10-Q, final documents related to the above transactions authorized by the MT Board have not been completed.

9.   Accounts Payable, Accrued Liabilities and Other

Accounts payable at June 30, 2017 and December 31, 2016 includes an aggregate of $1,000 and $116,000, respectively, due to related parties related to director fees and MT scientific advisory board fees. At June 30, 2017, approximately $210,000 of accounts payable is being disputed by the Company related to unauthorized expenditures by a former executive and related legal fees incurred during the year ended December 31, 2016.

Accrued liabilities and other at June 30, 2017 includes $64,000 due to related parties for director fees. Accrued liabilities and other at December 31, 2016 includes an aggregate of $106,000 due to related parties for executive bonuses, director fees, deferred salary owed to Dr. Goldberg, and MT scientific advisory board fees.

10.   Notes Payable

Platinum

In July 2012, we entered into an agreement with Platinum-Montaur to provide us with a credit facility of up to $50 million. In connection with the closing of the Asset Sale to Cardinal Health 414, the Company repaid to PPCO an aggregate of approximately $7.7 million in partial satisfaction of the Company's liabilities, obligations and indebtedness under the Platinum Loan Agreement, which, to the extent of such payment, were transferred by Platinum-Montaur to PPCO. The Company was informed by PPVA that it was the owner of the balance of the Platinum Note. Such balance of approximately $1.9 million was due upon closing of the Asset Sale but withheld by the Company and not paid to anyone as it is subject to competing claims of ownership by both Dr. Michael Goldberg, the Company's President and Chief Executive Officer, and PPVA.

During the six-month periods ended June 30, 2017 and 2016, $183,000 and $624,000 of interest was compounded and added to the balance of the Platinum Note, respectively. As of June 30, 2017, the remaining outstanding principal balance of the Platinum Note was approximately $2.0 million.

The Platinum Note is reflected on the consolidated balance sheets at its unpaid principal and interest balance of $1,952,912 and $9,487,822 at June 30, 2017 and December 31, 2016, respectively. Additionally, the estimated fair value of the embedded conversion option of approximately $0 and $153,000 at June 30, 2017 and December 31, 2016, respectively, is included in notes payable on the consolidated balance sheets. Changes in the estimated fair value of the Platinum conversion option were decreases of $13,000 and $1.5 million, respectively, and were recorded as non-cash changes in fair value of the conversion option during the three-month periods ended June 30, 2017 and 2016. Changes in the estimated fair value of the Platinum conversion option were decreases of $153,000 and $2.6 million, respectively, and were recorded as non-cash changes in fair value of the conversion option during the six-month periods ended June 30, 2017 and 2016.

Capital Royalty Partners II, L.P.

In May 2015, Navidea and its subsidiary Macrophage Therapeutics, Inc., as guarantor, executed a Term Loan Agreement (the CRG Loan Agreement) with Capital Royalty Partners II L.P. (CRG) in its capacity as a lender and as control agent for other affiliated lenders party to the CRG Loan Agreement (collectively, the Lenders) in which the Lenders agreed to make a term loan to the Company in the aggregate principal amount of $50 million (the CRG Term Loan), with an additional $10 million in loans to be

# EXHIBIT 12

# Holland & Knight

31 West 52nd Street | New York, NY 10019 | T 212.513.3200 | F 212.385.9010
Holland & Knight LLP | www.hklaw.com

Barbra R. Parlin
(212) 513-3210
barbra.parlin@hklaw.com

**[HOLLAND & KNIGHT 3/9/17 DRAFT
ATTORNEY WORK PRODUCT]**

March 10, 2017

*Via FedEx and E-mail [kwaite@mwcllp.com]*

Kevin W. Waite, Esq.
Moomjian, Waite & Coleman, LLP
100 Jericho Quadrangle, Suite 208
Jericho, New York 11753

            Re:    **Demand for Payment of Amounts Due to Platinum-Montaur**

Dear Mr. Waite:

This firm represents the Joint Official Liquidators (the "**Liquidators**") of Partners Value Arbitrage Fund L.P. ("**PPVA**"), which is the holder of 99% of the membership interests in Platinum-Montaur Life Sciences, LLC ("**Platinum-Montaur**").

By a February 27, 2017 letter to Navidea Biopharmaceuticals, Inc. ("**Navidea**") (copy annexed), the Liquidators, on behalf of Platinum-Montaur, demanded payment of certain monies owed by Navidea to Platinum-Montaur under a Loan Agreement, dated July 25, 2012 (the "**Loan Agreement**"), and the promissory note issued pursuant thereto (the "**Platinum Debt**"). The February 27, 2017 letter advised Navidea, among other things: (a) that Platinum-Montaur is the current holder of at least $1,742,684.29 of principal and accrued interest as of March 22, 2016, plus related accrued and outstanding interest thereon (the "**Platinum-Montaur Portion**") due in connection with the Platinum Debt; (b) that the Platinum-Montaur Portion of the Platinum Debt must be paid pursuant to the direction of the Liquidators of PPVA; and (c) that Platinum-Montaur demands full payment of the Platinum-Montaur Portion of the Platinum Debt prior to, or simultaneously with, the closing of Navidea's announced sale of its assets to Cardinal Health 414, LLC ("**Cardinal Health**"). The February 27, 2017 letter also advised Navidea that the Platinum-Montaur Portion of the Platinum Debt totaled $1,913,963.48 on March 1, 2017, and that interest would accrue at a rate of $431.87 per day thereafter (the "**Platinum-Montaur Payoff Amount**").

According to Navidea's February 8, 2017 Definitive Proxy Statement, a condition of closing the Asset Purchase Agreement between Navidea and Cardinal Health was the repayment of the entire Platinum Debt in cash at closing. Despite this, the sale of Navidea's assets to Cardinal Health pursuant to the Asset Purchase Agreement closed on Friday, March 3, 2017 without

Anchorage | Atlanta | Austin | Boston | Charlotte | Chicago | Dallas | Denver | Fort Lauderdale | Houston | Jacksonville | Lakeland
Los Angeles | Miami | New York | Northern Virginia | Orlando | Portland | San Francisco | Stamford | Tallahassee | Tampa
Washington, D.C. | West Palm Beach
#49914441_v1

Kevin W. Waite, Esq.
March 10, 2017
Page 2

payment of the Platinum-Montaur Portion of the Platinum Debt to Platinum-Montaur or to PPVA as directed by the February 27, 2017 letter.

After repeated attempts to contact you, we finally spoke on Monday, March 6. During the call, I stated that Navidea must immediately pay the Platinum-Montaur Portion of the Platinum Debt as directed by the February 27, 2017 letter. You stated that Navidea is "holding" the Platinum-Montaur Portion because there are "two competing claims" to these monies – one from Platinum-Montaur and one from Michael Goldberg, Navidea's President and Chief Executive Officer. A review of the facts demonstrates that this simply is not the case.

As noted in the Navidea Proxy Statement, the Loan Agreement was between Navidea, as Borrower, and Platinum-Montaur as Lender. The promissory notes issued under the Loan Agreement likewise were from Navidea to Platinum- Montaur. Indeed, the Third Amended and Restated Promissory Note, dated May 15, 2015 ("Third Note"), provides that "for value received, Navidea … (the Borrower) … promises to pay to the order of Platinum-Montaur Life Sciences LLC … (the Lender)… the sum of $35 million, or if less, the amount of all Draws advanced (and not hereafter repaid) by the Lender pursuant to the Loan Agreement, dated June 25, 2012 between the Borrower and the Lender." It is undisputed that neither the Loan Agreement nor any part of the Third Note has ever been transferred or assigned to Michael Goldberg. Since Dr. Goldberg has no interest in, rights to or claim under the Loan Agreement, the Third Note or any proceeds thereof, he has no "competing claim" to the Platinum-Montaur Portion.

Navidea has no right to withhold monies clearly due to Platinum-Montaur based on an alleged "claim" by Dr. Goldberg. Any alleged claim that Dr. Goldberg has against Platinum Management (NY) LLC or some other Platinum entity is wholly irrelevant to Navidea's obligation to repay the Platinum-Montaur Portion of the Platinum Debt and cannot serve as a basis to withhold monies due to Platinum-Montaur. Navidea cannot refuse to pay monies clearly due to Platinum-Montaur under the guise of a "competing claim" by Michael Goldberg. Navidea has no right to place the interests of its President and Chief Executive Officer above the clear and unambiguous terms of the Loan Agreement and Third Note.

In short, Navidea has breached its obligations under the Loan Agreement and the Third Note. Navidea's sale of its assets to Cardinal Health constitutes a breach of Section 6.9(b) of the Loan Agreement. Accordingly, an Event of Default has occurred and is continuing pursuant to Section 7.1(iii).

On behalf of Platinum-Montaur and PPVA, we hereby demand that Navidea immediately pay the Platinum-Montaur Payoff Amount with interest through the date of payment pursuant to the wire transfer instructions in the February 27, 2017 letter. Unless Navidea makes the required payment by March 14, 2017, Platinum-Montaur will pursue all of its rights and remedies under the Loan Agreement and Third Note against Navidea. Platinum-Montaur also will assert all of its rights and remedies against Dr. Goldberg, including but not limited to a claim for tortious interference with contract. We note that pursuant to Section 8.2 of the Loan Agreement, Navidea

Kevin W. Waite, Esq.
March 10, 2017
Page 3

must pay all expenses and costs, including attorneys' fees, incurred by Platinum-Montaur in the enforcement of its rights under the Loan Agreement. Navidea has irrevocably agreed that any action arising out of or relating to the Loan Agreement will be heard in the state or federal courts in New York and has irrevocably submitted to the jurisdiction of such courts pursuant to Section 8.6 of the Loan Agreement.

Platinum-Montaur and PPVA reserve all of their rights and remedies, including, but not limited to, the right to assert additional claims or damages arising out of the Loan Agreement, Third Note and the Guaranty and to assert additional claims or damages, including punitive damages, against Navidea for its baseless and improper refusal to release monies due to Platinum-Montaur and against Dr. Goldberg for his involvement as Navidea's President and Chief Executive Officer in such decision.

Very truly yours,

HOLLAND & KNIGHT LLP

Barbra R. Parlin

Barbra R. Parlin

cc:    Michael Goldberg (By E-Mail)
       Matthew Wright
       Christopher Kennedy
       Warren E. Gluck, Esq.
       Mitchell J. Geller, Esq.

 CT Corporation

**Service of Process
Transmittal**
11/21/2017
CT Log Number 532346249

TO:     Joe Meyer
        Navidea Biopharmaceuticals, Inc.
        4995 Bradenton Ave Ste 240
        Dublin, OH 43017-3552

RE:     **Process Served in Delaware**

FOR:    Navidea Biopharmaceuticals, Inc.   (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Platinum-Montaur Life Sciences LLC, Pltf. vs. Navidea Biopharmaceuticals, Inc., Dft. |
| **DOCUMENT(S) SERVED:** | Summons, Verified Complaint, Verification(s), Exhibit(s) |
| **COURT/AGENCY:** | New York County: Supreme Court, NY<br>Case # 6567102017 |
| **NATURE OF ACTION:** | Plaintiff Platinum-Montaur respectfully requests judgment in its favor against Defendant Navidea for Actual damages - Seeking $1,914,827.22 |
| **ON WHOM PROCESS WAS SERVED:** | The Corporation Trust Company, Wilmington, DE |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 11/21/2017 at 13:45 |
| **JURISDICTION SERVED :** | Delaware |
| **APPEARANCE OR ANSWER DUE:** | Within 30 days after service |
| **ATTORNEY(S) / SENDER(S):** | Robert J. Burns<br>Holland & Knight LLP<br>31 West 52nd Street<br>New York, NY 10019<br>212-513-3200 |
| **ACTION ITEMS:** | SOP Papers with Transmittal, via  UPS Next Day Air , 1Z0399EX0118862411 |
| **SIGNED:**<br>**ADDRESS:**<br><br>**TELEPHONE:** | The Corporation Trust Company<br>1209 N Orange St<br>Wilmington, DE 19801-1120<br>302-658-7581 |

Page 1 of  1 / DJ

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

FILED: NEW YORK COUNTY CLERK 11/02/2017 06:57 PM

NYSCEF DOC. NO. 1

INDEX NO. 656710/2017

RECEIVED NYSCEF: 11/02/2017

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

PLATINUM-MONTAUR LIFE SCIENCES LLC,

Plaintiff,

v.

NAVIDEA BIOPHARMACEUTICALS, INC.,

Defendant.

---

Index No.: _____

**SUMMONS**

**TO THE ABOVE-NAMED DEFENDANT:**

**YOU ARE HEREBY SUMMONED** to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with the summons, to serve a notice of appearance, on the Plaintiff's attorney within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

Plaintiff designates New York County as the place of trial. Venue in New York County is proper pursuant to the written agreement of the parties (Section 8.6 of the Loan Agreement, dated July 25, 2012), and pursuant to CPLR §§ 501 and 503(a).

Dated: November 2, 2017
        New York, New York

HOLLAND & KNIGHT LLP

By: */s/ Robert J. Burns*
    Robert J. Burns
    Warren E. Gluck
    Sean P. Barry
    31 West 52nd Street
    New York, New York 10019
    Telephone: (212) 513-3200
    Fax: (212) 385-9010

    *Attorneys for Plaintiff*
    *Platinum-Montaur Life Sciences LLC*

#54200444_v1